**CASE NO. 25-2132**

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

THE ESTATE OF ANTHONY MOURADIAN, by and through
Special Administrator, Melissa Mouradian,

      Plaintiff-Appellant,

   v.

JACKSON COUNTY, et al.,

      Defendants-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
CASE NO. 23-CV-167
HON. WILLIAM N. CONLEY

**PLAINTIFF-APPELLANT'S BRIEF AND APPENDIX**

**CADE LAW GROUP LLC**

Nathaniel Cade, Jr.*
Annalisa Pusick
Attorneys for Plaintiff-Appellant
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

Attorneys for Appellant
*Lead Counsel of Record*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

1.  The full name of every party that attorney represents in this case:

    Estate of Anthony Mouradian by and through Special Administrator, Melissa Mouradian.

2.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Cade Law Group LLC.

3.  Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

    None.

Dated this 4th day of September, 2025.       **CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
     Nathaniel Cade, Jr., SBN 1028115
     Annalisa Pusick SBN 1116379
     P.O. Box 170887
     Milwaukee, WI  53217
     (414) 255-3802 (phone)
     (414) 255-3804 (fax)
     nate@cade-law.com
     annalisa@cade-law.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Plaintiff-Appellant furnishes the following list in compliance with Circuit Rule 26.1:

1. The full name of every party that attorney represents in this case:

    Estate of Anthony Mouradian by and through Special Administrator, Melissa Mouradian.

2. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Cade Law Group LLC.

3. Any parent corporation and any publicly held company that own 10% or more of stocks of shares:

    None.

Dated this 4th day of September, 2025.      **CADE LAW GROUP LLC**

By: */s/ Nathaniel Cade, Jr.*
    Nathaniel Cade, Jr., SBN 1028115
    Annalisa Pusick SBN 1116379
    P.O. Box 170887
    Milwaukee, WI  53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .................................................... ii

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ................................................... iii

TABLE OF CONTENTS ........................................................................................ iv

TABLE OF AUTHORITIES .................................................................................... vi

JURISDICTIONAL STATEMENT .......................................................................... 8

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................................ 9

STATEMENT OF THE CASE ................................................................................ 10

   I.  Facts Relevant to Issues Submitted for Review .................................................. 10

      A.    Ashley Hakes .............................................................................. 10

      B.    The County Defendants – Scott Bowe, Lucas Johnson, Linda Keller, Duane M. Waldera, Jackson County ............................... 18

   II.  The District Court's Order Granting Summary Judgment. ............................. 25

SUMMARY OF ARGUMENT ................................................................................ 26

ARGUMENT .......................................................................................................... 27

   I.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT TO ASHLEY HAKES. ................................................................... 27

      A.    The professional judgment standard contradicts the Fourteenth Amendment's analysis. ......................................................... 28

          1.    The Fourteenth Amendment standard no longer contains a subjective prong. ......................................................... 29

          2.    The professional judgment standard is a subjective analysis, directly contradicting the *Pittman* standard. .............. 30

      B.    The district court ignored binding precedent: when a psychologist ignores her own opinion, she is not entitled to deference. .................... 35

   II.  THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT TO THE COUNTY DEFENDANTS. .......................................... 42

      A.    The professional judgment standard does not apply to the County Defendants. .......................................................................... 42

B.   The County Defendants did not rely on Hakes' professional judgment in their failure to monitor Mouradian. .................................. 43

C.   Because there is a disputed issue of fact on whether Mouradian's constitutional rights were violated, the district court should not have denied *Monell*. ................................................................. 46

1.   The Jail's Suicide Policy Constitutes a Harmful Practice or Custom ................................................................................ 47

2.   The Jail's Communications System was a Known Defect that the County was aware of. .................................................. 50

CONCLUSION .................................................................................... 51

CERTIFICATE OF SERVICE ............................................................... 53

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c) ..................................................... 54

CIRCUIT RULE 30(d) STATEMENT .................................................. 55

TABLE OF CONTEXT TO CIRCUIT RULE 30(e) REQUIRED APPENDIX .......... 56

# TABLE OF AUTHORITIES

## CASES

*Berry v. Peterman,*
604 F.3d 435 (7th Cir. 2010) ............................................................. 43

*Canton v. Harris,*
489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ......................... 47

*Collignon v. Milwaukee Cnty.,*
163 F.3d 982 (7th Cir. 1998) ......................................................... 30, 33

*Conner v. Rubin-Asch,*
793 F. App'x 427 (7th Cir. 2019) ...................................................... 34

*Crouch v. Brown,*
27 F.4th 1315 (7th Cir. 2022) ............................................................ 27

*Dobbey v. Mitchell-Lawshea,*
806 F.3d 938 (7th Cir. 2015) ............................................................. 42

*Eagan v. Dempsey,*
987 F.3d 667 (7th Cir. 2021) ............................................... 29, 42, 44

*Est. of Hill v. Richards,*
525 F. Supp. 2d 1076 (W.D. Wis. 2007) ........................................... 33

*Estate of Cole v. Fromm,*
94 F.3d 254 (7th Cir. 1996) .......................................................... 31, 32

*Gable v. City of Chi.,*
296 F.3d 531 (7th Cir. 2002) ............................................................. 46

*Gil v. Reed,*
535 F.3d 551 (7th Cir. 2008) ............................................................. 35

*Gonzalez v. Feinerman,*
663 F.3d 311 (7th Cir. 2011) ........................................................ 34, 36

*Goodloe v. Sood,*
947 F.3d 1026 (7th Cir. 2020) ...................................................... 34, 36

*Greeno v. Daley,*
414 F.3d 645 (7th Cir. 2005) ........................................................ 34, 36

*Hernandez v. Dart,*
814 F.3d 836 (7th Cir. 2016) ............................................................. 27

*Jones v. City of Chi.,*
787 F.2d 200 (7th Cir. 1986) ............................................................. 46

*Kingsley v. Hendrickson,*
576 U.S. 389 (2015) .......................................................................... 31

*Monell v. Dept. of Social Servs.,*
436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d. 611 (1978). ..................... 46

*Ortiz v. Webster,*
    655 F.3d 731 (7th Cir. 2011) ................................................................ 35, 36, 37, 39

*Petties v. Carter,*
    836 F.3d 722 (7th Cir. 2016) ................................................................ 34

*Pittman by & through Hamilton v. Madison Cnty., Illinois,*
    108 F.4th 561 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th
    Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025) ........ passim

*Ross v. Town of Austin, Ind.,*
    343 F.3d 915 (7th Cir. 2003) ................................................................ 47

*Sims v. Mulcahy,*
    902 F.2d 524 (7th Cir. 1990) ................................................................ 46

*Smith v. Whitsel,*
    134 F.4th 962 (7th Cir. 2025) ................................................................ 42, 44

*Sullers v. Int'l Union Elevator Constructors, Loc. 2,*
    141 F.4th 890 (7th Cir. 2025) ................................................................ 27

*Thomas v. Town of Davie,*
    847 F.2d 771 (11th Cir. 1988) ................................................................ 50

*Youngberg v. Romero,*
    457 U.S. 307, 102 S. Ct. 2452, 73 L.Ed.2d 28 (1982) ............................................ 31

*Zaya v. Sood,*
    836 F.3d 800 (7th Cir. 2016) ................................................................ 34

## STATUTES

28 U.S.C. § 1291 ............................................................................................. 8
28 U.S.C. § 1331 ............................................................................................. 8
28 U.S.C. § 1343 ............................................................................................. 8

## RULES

Fed. R. Civ. P. 56(a) ....................................................................................... 27

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the United States Constitution, and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983 for a violation of the decedent, Anthony Mouradian's, rights arising under the Fourteenth Amendment to the United States Constitution.

The United States Court for the Seventh Circuit has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment or order of the United States District Court for the Western District of Wisconsin. R. 160.

The order appealed from granted summary judgment in favor of Appellees Jackson County, Duane Waldera, Lucas Johnson, Linda Keller, Scott Bowe, and Ashley Hakes, and was entered by the district court, the Honorable William M. Conley, on June 10, 2025. App. A; R. 161. The Estate filed a timely Notice of Appeal on July 6, 2025. R. 169. Defendants Footprints in Time Midwifery Services LLC and Patricia Jacobson, who are not parties to this appeal, have a pending motion in front of the district court. Defendant-Appellee Ashley Hakes also has a pending motion for attorney's fees under § 1988 and § 1927 in the district court. No issues regarding the merits of the case remain before the district court.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the professional judgment standard applies to Fourteenth Amendment claims?

2.  Whether Ashley Hakes is entitled to deference because she ignored her own opinion?

3.  Whether the district court erroneously granted the County Defendants summary judgment motion?

**STATEMENT OF THE CASE**

## I.  Facts Relevant to Issues Submitted for Review

Anthony Mouradian received mental health treatment for major depression and suicidal intent while he was a detainee at the Jackson County Jail ("Jail") in Black River Falls, Wisconsin. R. 137, ¶ 43; R. 138, ¶¶ 38, 62. Mouradian was a detainee at the Jail from July 30, 2019, to May 28, 2020. R. 135, ¶¶ 1, 187. Although Mouradian pled guilty to multiple charged counts on April 24, 2020, he committed suicide on May 28, 2020, approximately five weeks before he was scheduled to be sentenced to prison on July 2, 2020. R. 137, ¶¶ 219-220.

### A.  Ashley Hakes

Ashley Hakes was the Jail's psychologist. R. 137, ¶¶ 1, 4. Mouradian saw Hakes as a patient from August 2019 to May 2020. R. 137, ¶ 45. Hakes also referred Mouradian to Patricia Jacobson, the Jail's contracted advanced practice nurse practitioner, to prescribe him medication for his major depression disorder and suicidal intent. R. 137, ¶¶ 43; R. 138, ¶¶ 38, 62.

Upon entering the Jail on July 30, 2019, Mouradian stated that he was going to kill himself and threatened to do so by stabbing himself with a sharp object. R. 138, ¶ 15; R. 151, ¶ 15; R. 135, ¶¶ 1-2. As a result of Mouradian's statements, Sergeant Thomas Sharp placed Mouradian on suicide watch. R. 135, ¶ 22. Hakes evaluated Mouradian on August 2 and August 4, 2019. R. 151, ¶¶ 17-18. Mouradian told Hakes he had thoughts of suicide. *Id*. Mouradian was taken off suicide watch on August 9 but remained on precautionary measures. *Id*., ¶ 19-20. He had restrictions

10

on writing utensils and was placed in a side cell used to observe inmates. *Id.*, ¶¶ 20-21.

During that same month, Mouradian attempted to suicide by tying a bedsheet in several knots; this was known to Hakes because Mouradian told her that he wanted to tie so many knots that it would prevent him from aborting the attempt. R. 138, ¶ 16. Mouradian continued to remind Hakes of this plan through his behavior and his comments. R. 138, ¶¶ 85-86, 114. From August 2019 to May 2020, Mouradian had "severe depression," "passive and sometimes active suicidal ideation and plan," and his thoughts "evidenced hopelessness and helplessness." R. 137, ¶ 59; R. 138, ¶¶ 21-22, 24, 26, 27, 31, 33, 39, 41, 43, 45, 50-51, 53, 56, 58, 80, 83, 92, 110, 125-126, 130, 136, 140, 147. Mouradian continuously reported these symptoms to Hakes in August 2019, September 2019, October 2019, November 2019, December 2019, February 2020, March 2020, April 2020, and May 2020. *Id.*

Between August 2019 and December 2019, Mouradian met with Hakes and continuously reported active and passive suicidal ideations with a plan and presented as severely depressed. R. 138, ¶¶ 21-22, 24, 26, 27, 31, 33, 39, 41, 43, 45, 50-51, 53, 56, 58, 80, 83, 92, 110, 125-126, 130, 136, 140, 147. Although in January 2020, Mouradian and Hakes did not meet; Hakes had to reschedule three of their appointments and Mouradian refused one. R. 151, ¶ 61, 63-65.

Mouradian and Hakes did not have another appointment scheduled until February 20, 2020, the day before Mouradian's initial plea hearing on February 21, 2020. R. 151, ¶ 79. Mouradian refused to attend the appointment with Hakes on

February 20. *Id*. Hakes communicated her concerns to the Jail's Captain, Scott Bowe, regarding how the plea hearing (and subsequent sentencing hearing) were going to impact Mouradian's mental health. R. 151, ¶ 80. Hakes warned that any changes in Mouradian's presentation, including signs of improvement in interaction and symptoms, is a red flag. *Id*.; R. 137, ¶ 164. Hakes instructed Bowe to pass this information along to the rest of the correctional staff. *Id*.

On the day of the original initial plea hearing, February 21, Mouradian was reported to have been "looking around his cell for something to hang himself with" the night before. R. 138, ¶ 82. Hakes subsequently met with him, and Mouradian told her that he "intends to kill himself; that he has made up his mind." R. 138, ¶ 87-89. Hakes acknowledged that although Mouradian's suicidal intent "vacillates," Mouradian "does intend to kill himself." *Id*., ¶ 87; R. 137, ¶ 49. Hakes stated that Mouradian is a "very high suicide risk." R. 151, ¶ 83. Bowe placed Mouradian on a "modified suicide watch," which was in the side cell with 30-minute checks and no bedding. R. 138, ¶ 86; R. 137, ¶ 167; R. 151, ¶ 84. The February 21 plea hearing was adjourned.

Mouradian was placed on a modified suicide watch at the Jail from February 21 to February 28 until an emergency detention hearing, pursuant to Chapter 51 of the Wisconsin Statutes, was held on February 28. R. 138, ¶ 82-85; R. 137, ¶¶ 178, 182; R. 135, ¶¶ 107, 111. Hakes recommended a Chapter 51 detention because Mouradian refused three therapy sessions, was refusing his medication, there were reports that Mouradian was looking around his cell for something to hang himself

with, he refused to tell correctional staff prior to acting on suicidal thoughts, and he expressed a plan to harm himself in the suicide watch padded cell. R. 138, ¶ 89; R. 137, ¶ 175. Subsequently, Mouradian was on a Chapter 51 commitment from February 28 to March 18, 2020. R. 137, ¶¶ 177, 182.

Hakes had reiterated to the social workers at Northwest Connections, who were responsible for Mouradian's care during his Chapter 51, that he had no "intention of going to prison" and she "would not be surprised if he ha[d] a plan to [commit] suicide before any transfer to" prison. R. 138, ¶ 92. Specifically, on March 2, Hakes stated that

> While he has not outwardly said it, I do not believe he has any intention of going to prison and I would not be surprised if he has a plan to [commit] suicide before any transfer to Dodge Correctional (our intake facility).

R. 138, ¶ 92. Two days later, on March 4, the social worker responded to Hakes and informed her that the County and Mouradian are going to enter into a 90-day Settlement Agreement that requires Mouradian to take all medication as prescribed and continue for him to meet with Hakes on a weekly basis. *Id.*, ¶ 96. Furthermore, the social worker indicated that during that 90-day period, if Mouradian did not follow the terms of the agreement, Northwest Connections could reevaluate him to determine whether or not he needs to be sent back to the hospital for stabilization. *Id.*

On March 5, Hakes opined to the social worker that Mouradian cannot "sufficiently profit from therapy until it is addressed from a pharmacological perspective," and "the proposed settlement agreement is what we had already been

doing until December (weekly therapy paired with medication) and his mood did not improve" and Mouradian "has a very high chance of suicide attempts or completion." R. 151, ¶ 97. The social worker responded to Hakes and said that the County cannot offer behavioral health services to inmates at the Jail and that if Mouradian does not cooperate with medications pursuant to the Settlement Agreement, Hakes should contact them so they can reassess and determine whether or not he needs to be sent back to an inpatient unit. R. 138, ¶ 98.

During the Chapter 51 commitment, Mouradian was transferred to Winnebago Mental Health Institute, a facility for individuals struggling with a mental illness such that they are a danger to themselves or others, and are in need of treatment, on March 13, 2020, where one additional medication was added to his daily medical regimen. R. 151, ¶¶ 99-100. Mouradian returned to the Jail from the Chapter 51 on March 18, 2020. R. 137, ¶ 182. Although Mouradian's mood seemed to improve the first time Hakes met with him after his commitment ended, on March 21, 2020, any improvement was short lived. R. 138, ¶¶ 103-106. A week later, on March 27, 2020, Mouradian reported that he continued to have suicidal ideation, felt hopeless, and rated his mood a 3 out of 10.[1] R. 138, ¶ 105.

Subsequently after his return from his commitment, Mouradian's plea hearing was rescheduled to April 24. However, by April 10, 2020, Mouradian stopped taking the medication Winnebago added, Fluphenazine, an antipsychotic mediation used

---

[1] Mouradian rating his mood a 3 out of 10 is worse than when he rated his mood pre-Chapter 51 commitment in September (rating it a 3.5 out of 10). *Compare* R. 138, ¶ 31 *with* R. 138, ¶ 105; R. 137, ¶ 105.

primarily to treat schizophrenia, which is the medication Hakes opined that Mouradian "could potentially decompensate again without it." *Id*., ¶ 112. Mouradian also reported to Hakes that he is getting worse and rated his mood a "2 out of 10."[2] *Id*., ¶ 110. A few days later, on April 14, 2020, Hakes became aware that Mouradian was seen "looking around the top of his cell door for somewhere to tie a towel with". R. 138, ¶ 114. After this incident, Hakes spoke with Mouradian, and he told Hakes that he "wanted to die." *Id*., ¶ 125. Hakes also was aware that Mouradian specifically noted that he would "not tell anyone" (including Hakes) if he had "suicidal thoughts, intent, or plans" because "of the consequences." R. 138, ¶ 121, 123. Specifically, Mouradian would not tell anyone because he did not want to get placed into a cell with no bedding or clothing. R. 102, at 68:3-13.

This was the start toward a negative trajectory: before his mental commitment, although Mouradian would not tell correctional staff if he was going to act on his suicide thoughts, he had at least agreed to tell correctional staff that he needed to speak to Hakes (R. 137 ¶¶ 98-99); but now, he specifically noted that he would not tell anyone about his suicidality, *including* Hakes. R. 138, ¶ 122. Because of this, Hakes debated whether she should have Mouradian sent back on the Chapter 51 commitment, but she never followed up on that thought. R. 138, ¶ 124.

Hakes' February warning that Mouradian's plea hearing would negatively impact his mental health became true. R. 138, ¶¶ 80, 136. Mouradian pled guilty in

---

[2] Rating his mood a 2 out of 10 is worse than what his mood was prior to his commitment in February. *Compare* R. 138, ¶¶ 39, 45, 47, 51, 56, *with* R. 138, ¶ 110; R. 137, ¶ 105.

his criminal case on April 24, 2020, and Hakes reported that Mouradian "had a setback" after his plea hearing. R. 138, ¶ 136. Hakes could not recall what the "setback" was—Hakes stated, "it was probably a culmination of – I don't know." R. 138, ¶ 137. When asked under oath about what she meant in anticipating a similar setback with his sentencing hearing, she assumed that she meant "a change in mood." R. 138, ¶ 138. Around the time of Mouradian's plea hearing, Mouradian already said he wanted to die, his thoughts evidenced depressive content, he was having trouble sleeping at night, he would not tell anyone if had suicidal thoughts, plan, or intent, he stopped taking one his medications that Hakes believed he would decompensate without, he was suffering from active suicidal ideation, and Hakes contemplated sending him back on a Chapter 51 commitment. R. 138, ¶¶ 110, 114, 118, 120, 123-124, 125-126, 128-130.

When Mouradian discontinued his medication, Hakes could have reported that fact to the Jackson County social worker, who was requesting updates on Mouradian's compliance with the Settlement Agreement, which was a part of his Chapter 51 commitment. R. 138, ¶¶ 107-109, 112-113, 136, 139. Had Hakes reported the failure to take all medicines to the social worker, Stephanie Kennedy, the social worker could have conducted a subsequent evaluation of Mouradian and recommitted him outside of the Jail as was done in February and March 2020. R. 138, ¶¶ 96, 98, 139. But Hakes never told anyone that Mouradian was not med compliant, and the Settlement Agreement was dismissed on May 7, 2020. R. 138, ¶ 142. Not surprisingly,

the first thing Mouradian did after the Settlement Agreement was dismissed was skip his session with Hakes on May 13, 2020. *Id.*, ¶ 144.

Although Hakes knew that the time period between plea and sentencing hearings increased the risk of suicide, (R. 138, ¶¶ 11-14, 80), that an improvement in behavior was a warning sign of suicide (R. 138, ¶ 80), that Mouradian had a plan to commit suicide prior to prison (R. 138, ¶ 92), and that she hoped to see some improvement if Mouradian completed the treatment materials, Hakes ignored Mouradian's reported feelings of significant guilt and shame, that his "thoughts *still* evidenced depressive content," and that his severe guilt and shame was contributing to his current functioning on May 21, 2020. R. 138, ¶¶ 146-147.

Mouradian exhibited the same signs as before his Chapter 51 commitment: he was seen looking for places to tie a towel to in his cell, he stated he wanted to die, he was suffering active suicidal ideation, he stopped taking his medications, he skipped a therapy session, he reported hopelessness and helplessness, his depression was treatment resistant, and he said he would not tell anyone if he had a suicidal plan or intent. R. 138, ¶¶ 80, 89, 112, 120, 125, 130, 140, 145, 147; R. 137, ¶¶ 178, 182); R. 135, ¶¶ 107, 111. Yet Hakes never followed up on her own opinion that Mouradian might have to be recommitted and never asked Northwest Connections or the Jackson County social worker to reevaluate him. R. 138, ¶ 118, 126, 124. In fact, once the Settlement Agreement was dismissed, Hakes changed nothing about her treatment plan, despite knowing that her pre-Settlement Agreement treatment plan was not working. R. 138, ¶¶ 97, 142-143. Hakes could have recommended that Mouradian

remain in his current cell block (i.e., not move him to a suicide cell) while adding 15-minute or 30-minute observations, or requested additional observations on Mouradian's cell. R. 138, ¶¶ 7-8. Hakes did not take or recommend any measures; she merely carried on with a course of conduct she knew was not working. R. 138, ¶¶ 128-129, 136, 143, 148. The following week, Mouradian committed suicide on May 28, 2020. R. 138, ¶ 152.

### B. The County Defendants – Scott Bowe, Lucas Johnson, Linda Keller, Duane M. Waldera, Jackson County

From the moment Mouradian arrived at the Jail, Mouradian expressed his desire to kill himself to Jail officials. R. 135, ¶ 2; R. 148, ¶ 15. From July 30, 2019, to February 2020, the Jail's policy was that any correctional officer could place an inmate on suicide watch based on articulated facts that the inmate was showing signs of distress. R. 151, ¶ 1; R. 138, ¶ 1. The Jail's policy included risk factors staff should be aware of: easy access to means, previous suicide attempts, getting divorced, Caucasian male, adult age 45-54, mental illness, substance abuse, lack of support from family and friends, feeling like a burden to others, vocational and financial issues, suicidal ideation, suicidal intent, preparatory behaviors, expressing hopelessness, worthlessness, and helplessness, unexplained anger, aggression, and irritability, agitation. R. 138, ¶ 11. Additionally, the Jail's policy included some symptoms that signal a crisis to staff: symptoms of mental illness, medication changes, pending court dates, recent criminal charges, ideation/desire to harm self, ideation/desire to kill self, feeling intolerably alone/disconnected, helplessness, hopelessness. *Id.*, ¶ 13.

From July 30, 2019 to February 14, 2020, non-medical Jail staff were required to remain alert to the following signs and symptoms of emotional distress, which could indicate that an inmate is a possible suicide risk: serious depression, extreme agitation, alternating manic and depressed behavior, between being found guilty and sentencing, inmate talks of suicide, wishing to be dead, or threatens to commit suicide (this is particular important if the inmate discusses a specific method of committing suicide), inmate suddenly behaves in a very calm, resigned manner, inmate has abused drugs or alcohol and has demonstrated unstable behavior. *Id.*, ¶ 12. If those symptoms are observed, and it was not a crisis situation (i.e., the inmate does not need to be placed on suicide watch), Jail staff was required to monitor the inmate every 15 minutes even if the inmate is not on suicide watch. *Id.*

Mouradian was consistent about his statements of harming himself and wanting to die throughout his stay at the Jail. R. 138, ¶ 3. Mouradian had been present at the Jail for months and correctional officers received a volume of information on his mental health status. R. 138, at ¶¶ 4-5. Hakes frequently communicated with Captain Scott Bowe regarding Mouradian's mental health status prior to Mouradian's Chapter 51 commitment. R. 148, ¶¶ 21, 23, 29, 32, 36, 40, 42, 44, 46, 48, 52, 54, 57, 59, 80, 83, 92, 104, 106, 111, 127, 131, 136; R. 135, ¶¶ 50, 58, 60, 66-67, 71-74, 76-86, 108-109, 116-120. Bowe would forward Hakes' email updates to the sergeants, that included Annalisa Hizer, Kaylan Rich, and Thomas Sharp. R. 148, ¶ 81. At times, Hakes would copy all Jail staff on her emails regarding

Mouradian's mental health status, including Appellees Lucas Johnson and Linda Keller. R. 135, ¶ 74.

Immediately before Mouradian went on a Chapter 51 commitment, on February 14, 2020, the Jail changed their suicide and mental health policy. R. 138, ¶ 66. Under the new policy all facility staff were supposed to be trained on "identification of warning signs and risk factors," and "observation and suicide watch procedures," among other things. *Id.*, ¶ 69. There was no way to ensure that Jail staff were aware of the change in policy other than requesting them to click "acknowledge" stating they have reviewed the policy on a virtual platform. *Id.*, ¶ 71. Linda Keller did not acknowledge the new suicide prevention policy. *Id.*, ¶ 72. Most staff did not acknowledge the new policy. *Id.*, ¶ 73. Per the new Policy, the procedure for placing an individual on suicide watch included training to ensure that officers identify behavior suggesting an inmate be placed on suicide watch. In that event, an officer could refer the inmate to a mental health personnel or ask a sergeant to put them on suicide watch. *Id.*, ¶ 74. There was no specific training on the new Policy 723 for Jail staff before Mouradian's death. *Id.*, ¶ 76. Jail staff were not trained finally on suicide prevention until June 2020. *Id.*, ¶ 77.

When Mouradian returned from his Chapter 51 commitment in March 2020, Mouradian was placed in a special two-man cell. R. 135, at ¶ 114-115. Mouradian was in a two-man cell because he was previously on a special mental health watch. R. 135, ¶ 114; R. 99, 83:16-84:21, 116:11-13, 118:3-6; R. 115-3, p. 53. Hakes initially only updated Bowe on Mouradian's status. R. 135, ¶¶ 116-117. Although Hakes

initially reported to Bowe that Mouradian's mood "improved," meaning he still had suicidal ideation, but it was less frequent and intense, Mouradian experienced agitation, stated he was getting worse, and increased feelings of hopelessness and suicidal ideation in April 2020. R. 148, ¶¶ 106, 110.

On April 14, despite Hakes informing Bowe that there were no safety concerns, Officer Sarah Underwood reported to Sergeant Rich that Mouradian was wrapping a towel around the bars of his cell and looking around his cell for a place to tie the towel to. R. 135, ¶¶ 120-122. Sergeant Rich instructed the night shift officers to be extra diligent in rounds and camera observation. *Id.* at ¶¶ 123, 126. Sergeant Rich also informed Bowe of this incident and Bowe forwarded Rich's email to Hakes. *Id.* at ¶ 124. After this incident, all Jail supervisors were included in Hakes' email updates about Mouradian to improve communication. *Id.* at ¶ 128. Hakes directly responded to Bowe's email and wondered if Mouradian needed to go back to Winnebago (where he was for his Chapter 51 commitment). R. 138, ¶¶ 99, 124. Mouradian was suffering from active suicidal ideation at this point. R. 148, ¶ 126. But again, no action was taken.

Shortly after the towel incident, Mouradian had his plea hearing and Hakes reported to Bowe that Mouradian presented as depressed. R. 148, ¶ 131. Bowe was informed that Mouradian had a "setback" – his depression is fairly persistent and that the Settlement Agreement should be extended. *Id.* at ¶ 136. Hakes and Bowe were informed that the Settlement Agreement could not be extended unless there was a justification to go to Court and request a Chapter 51 commitment, *Id.* at ¶ 139.

In the weeks leading up to Mouradian's suicide, Hakes reported to Bowe that his mood was not great, and he declined therapy sessions. R. 135, ¶¶ 133-134. Failure to attend therapy sessions was a basis to be sent back for Chapter 51 commitment, under the settlement agreement. R. 138, ¶ 89.

On the night of Mouradian's suicide, Lucas Johnson was aware that Mouradian previously had been placed on suicide watch and was detained under Chapter 51 for mental health treatment. R. 103, at 12:17-13:2. Johnson was on floor duty from 10:00 p.m. to 2:00 a.m. R. 135, ¶ 157. The floor officer's primary responsibility is to conduct timely wellness checks of all inmates in the assigned area of the jail by walking through each cell block to visually observe each inmate at least once every hour at staggered intervals. *Id.*, ¶ 146. The last cell check that Johnson conducted on Mouradian was at 1:21 AM. R. 138, ¶ 149.

At or before 2:00 a.m., Johnson's assigned shifted, and he was posted to the Jail's control room; Johnson was the only officer in the control room on the night of Mouradian's suicide in a position to directly observe Mouradian's actions. R. 103, at 36:15-37:3. At night, the control officer is to monitor the cameras; other staff would take care of the day-to-day activities, such as opening mail or answering the phone. R. 133, 14:15-22. The control room officer was required to be diligent in monitoring the cameras at night. R. 99, at 55:3-6. Johnson admitted that any other task besides monitoring the cameras should never take away from being observant of the inmates, R. 99, at 46:13-20, and at the time of Mouradian's suicide, his cell monitor was supposed to be enlarged for better viewing. R. 99, at 107:9-20, 107:25-108:2-21.

Mouradian's entire cell was visible by mounted cameras with a feed into the control room.



R. 101, Ex. 25.

Although Johnson did not recall being ordered by Captain Rich to monitor Mouradian's cell with a larger view, there was no reason that night staff should not have been monitoring Mouradian's cell after the April 15 incident as identified by Officer Underwood. R. 138, ¶ 154.

Defendant Linda Keller stopped by the control room at 2:12 a.m. and began her tour through the jail shortly after. R. 99, at 85:1-16. Keller testified that had either herself or Lucas Johnson been "observing [the video monitors] at the time" they would have seen Mouradian's movements. R. 99, at 86:2-11. Keller testified that

Mouradian "was in our jail for quite some time… [a]nd I know we received a lot of information on Mr. Mouradian as far as, like, emails, communication between staff about his well-being, any … mental health concerns." R. 99, 9:22-10:6. Additionally, Keller testified *and specifically recalled* that all Jail staff would receive emails communicating information directly about Mouradian's struggle with mental health issues. R. 99, at 10:7-16. Keller also testified that there existed concerns about Mouradian even when he was off suicide watch because of "his past history" and relied on "information [she] would get from other staff members" about Mouradian's mental health. R. 99, at 79:16-23.

At 1:27:18 a.m., Mouradian is observed on camera getting up and placing a blanket over his head and looks like he is fidgeting with something; at 1:28:18 a.m., Mouradian gets up and places a towel around both sides of the opening to his cell door; at 1:32:18 a.m., Mouradian removes the towel from his cell door; at 1:44:07 a.m., Mouradian gets up and puts the blanket over his head again and stays like this until 1:52 a.m.; at 1:52:14 a.m., Mouradian gets up against and places the towel on either side of his cell door; at 1:59:39 Mouradian takes the towel that is wrapped around his cell door and ties it tightly; Mouradian began to tie something around his cell door at 2:00:33 a.m., (which was later known to be a brown and white towel to seal the door) and roughly 20 seconds later, at 2:00:53, Mouradian had manufactured a noose with a bed sheet and had bent slightly down to tighten the bedsheet around his neck; at 2:00:36 a.m., Mouradian waves goodbye to the camera and hung himself in direct

view of the camera. R. 138, ¶ 152. Mouradian hung in his cell until 2:17 a.m. when Johnson finally noticed him by the cell door, slumped over. *Id.*, ¶ 151.

A full 17 minutes had elapsed from Mouradian hanging himself before Johnson radioed to "ask Officer Keller to go to E block because it looked like someone was kneeling at the bars." R. 138, ¶ 163. And Keller "yelled [Johnson's] name twice and I radioed twice for help." *Id.*, ¶ 164. Keller stated, "….I never heard an acknowledgment from Officer Johnson. So I radioed again, still didn't hear an acknowledgement. Then I ran down the corridor to the direct hallway to control and just yelled….". *Id.*, ¶ 165. It was known that the radio communication to the control room was problematic. *Id.*, ¶¶ 166-167. EMS arrived on scene and transferred Mouradian to the hospital, where he was pronounced dead. R. 135, ¶¶ 182-184.

## II.    The District Court's Order Granting Summary Judgment.

The district court concluded that it was required to defer to Hakes' professional opinion that Mouradian did not need to be on "suicide watch." App. A 034. The district court also concluded that the County Defendnats were entitled to defer to Hakes' opinion that Mouradian did not need to be on suicide watch. *Id.*, p. 34-26. And because there was not a constitutional violation identified, the court dismissed Plaintiff's *Monell* claims. *Id.*, p. 37. Finally, the district court relinquished supplemental jurisdiction over the Estate's state law claims against the County Defendants and Hakes. *Id.*

**SUMMARY OF ARGUMENT**

The district court erred for four reasons when granting Hakes and the County Defendants' summary judgment motions. First, the district court erroneously analyzed the motion under the guise that the Fourteenth Amendment applies the professional judgment standard, which considers a professional's subjective state of mind. Second, even if the professional judgment standard applies to the Fourteenth Amendment, the district court erroneously side-stepped binding precedent that precludes the standard from applying. Third, the district court erroneously applied the deference to a medical professional rule, requiring a subjective analysis. Finally, the district court failed to consider the County Defendants' derelict of duty in observing Mouradian properly which prevents the County Defendants from avoiding liability.

## ARGUMENT

Appellate courts review summary judgment decisions *de novo*. *Sullers v. Int'l Union Elevator Constructors, Loc. 2,* 141 F.4th 890, 897 (7th Cir. 2025), citing *Bishop v. Air Line Pilots Ass'n Int'l,* 5 F.4th 684, 693 (7th Cir. 2021). At the summary judgment phase, appellate courts construe the facts in the light most favorable to the non-moving party and draws all reasonable inferences in his favor—here, that is the Estate. *Id*. Summary judgment is inappropriate when there is a genuine dispute as to any material fact. *Sullers*, 141 F.4th at 897, citing Fed. R. Civ. P. 56(a). Courts shall not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Sullers*, 141 F.4th at 897-98, citing *Bishop*, 5 F.4th at 693.

## I. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT TO ASHLEY HAKES.

In deciding Hakes' summary judgment motion, the district court applied the wrong legal standard, ignored binding precedent, failed to view the facts in favor of the Estate, and discarded genuine disputed issues of fact. Despite the volume of evidence submitted into the record, the district court's lackluster opinion should create significant pause. With regard to Hakes, there exist three reversible errors for this Court to correct: (1) the professional judgment standard does not apply to the Fourteenth Amendment because it utilizes a subjective, rather than objective, analysis, (2) the district court ignored binding precent showing that the professional judgment standard does not apply here, and (3) there is a genuine dispute over whether Hakes ignored or changed her own opinion. Therefore, the district court

erroneously granted Hakes' summary judgment motion, and this Court should reverse and remand for a trial on the merits.

## A. The professional judgment standard contradicts the Fourteenth Amendment's analysis.

Whether the professional judgment standard applies to claims brought under the Fourteenth Amendment is a question of first impression for this Circuit. This Court should conclude that the professional judgment standard does not apply to Fourteenth Amendment claims based on other binding precedent and common sense.

This Court should reverse the district court because the district court erroneously applied the Fourteenth Amendment standard. In deciding that the professional judgment standard applied to the Estate's Fourteenth Amendment claim, the district court relied on the applicable Eighth Amendment standard. App. A, 028. Specifically, the court stated

> …the professional judgment standard requires <u>essentially the same analysis as the Eighth Amendment standard</u>: (1) "plaintiff's medical needs must have been objectively serious"; and (2) the defendant's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" <u>demonstrated by evidence "that the professional knew of the serious medical need" and "disregarded it."</u> *Id.* at 989…Moreover, a psychologist's <u>judgment</u> regarding an inmate's mental health needs is entitled to deference. *Scott v. Moss*, No. 24-1479, 2025 WL 48412, *2 (7th Cir. Jan. 8, 2025).

App. A, 028 (emphasis added). That standard requires courts to analyze the subjective beliefs and judgment of a medical defendant. *See Id.* But, the district court's analysis is flawed: there is no subjective element under the Fourteenth Amendment. *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th

561, 572 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025).

### 1. The Fourteenth Amendment standard no longer contains a subjective prong.

This Court recently held that it was a reversible error to include **any** subjective analysis in a Fourteenth Amendment claim. *See Pittman*, 108 F.4th at 572. For instance, in an Eighth Amendment claim, a plaintiff has to show a subjective element: that a defendant was "deliberately indifferent," i.e., subjectively aware of a strong likelihood of harm. *See, e.g., Eagan v. Dempsey,* 987 F.3d 667, 693-65 (7th Cir. 2021). And this Court, when analyzing a Fourteenth Amendment claim, recently faced the question of whether a plaintiff has to show a subjective element, i.e., that the defendant was aware of the strong likelihood that the plaintiff would seriously harm himself. *Pittman*, 108 F.4th at 572. This Court concluded that a plaintiff **does not** have to show subjective awareness; rather, he must show that the defendants did not take reasonably available measures to abate the risk of serious harm to the plaintiff, even though a reasonable person under the circumstances would have understood the risk involved. *Id*. Therefore, the elements of a Fourteenth Amendment claim after *Pittman* are:

(1) there was a strong likelihood that the plaintiff would serious harm himself;

(2) the defendants failed to take reasonable measures to prevent plaintiff from harming himself, even though a reasonable person under the circumstances would have understood the risk involved, making the consequences of defendants' conduct obvious; and,

(3)     the plaintiff would have suffered less harm if the defendants had
        not disregarded the risk.

*Id.*

The reasoning behind this Court's removal of the subjective element was that
the Fourteenth Amendment is an objective standard. Stated differently, the
Fourteenth Amendment is not designed to impose a burden on plaintiff to prove a
defendant's state of mind. A plaintiff does not have to prove that a defendant acted
"purposefully, knowingly, or recklessly with respect to the obvious consequences of
their actions," because that requires evidence that "a defendant must have personal
knowledge of—and thereby subjectively appreciate—the consequences of their
actions." *Pittman*, 108 F.4th at 568. Therefore, it is error to require proof that a
defendant was subjectively aware of the risk of harm in analyzing a Fourteenth
Amendment claim. *Id.* The district court's analysis hinged on an improper reading of
the Fourteenth Amendment's requirements under this Court's prior rulings, and in
doing so, improper awarded Hakes summary judgment.

## 2.     The professional judgment standard is a subjective analysis, directly contradicting the *Pittman* standard.

The professional judgment standard is a subjective standard, rendering it
inapplicable to the Fourteenth Amendment. Indeed, in its decision, the district court's
cited cases shows that the professional judgment standard is inapplicable. For
instance, the district court cited a case that used the Eighth Amendment's framework
because "the precise scope of the [Fourteenth Amendment's] protections [was] not
well settled" in 1998. *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 987 (7th Cir. 1998).
Now, twenty-seven years later, the Supreme Court of the United States has held that

there is a difference, even if minimal, between the Eighth and Fourteenth Amendment standards, rendering *Collignon* inapplicable. *See Pittman*, 108 F.4th at 568; *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

The history of the professional judgment standard shows that it is a subjective analysis. The professional judgment standard originally morphed from the Supreme Court's decision in *Youngberg v. Romero*, 457 U.S. 307, 322–23, 102 S. Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982). *See, e.g., Estate of Cole v. Fromm*, 94 F.3d 254, 262 (7th Cir. 1996) and *Collignon*, 163 F.3d at 989, both citing *Youngberg*. In *Youngberg*, the Supreme Court decided what constitutional rights an involuntarily committed person possesses. 457 U.S. at 316. The *Youngberg* court concluded that involuntarily committed persons "enjoy[] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests." *Id.*, at 324. It held that there is a constitutional right to be free from restraints except "when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training." *Id.*, at 324.

In *Fromm*, a plaintiff brought a Fourteenth Amendment claim based on the defendant's deliberate indifference to the risk that the decedent would commit suicide. 94 F.3d at 256. The *Fromm* court concluded that a Fourteenth Amendment claim is analyzed under the deliberate indifference standard. *Id.*, at 259 and 259 n. 1 (collecting cases). It also noted that the Supreme Court had not determined the difference between the Fourteenth and Eighth Amendment standards at that time.

*Id.*, at 259 n. 1 (internal citations omitted). Thus, the *Fromm* court's Fourteenth Amendment analysis required the plaintiff to show that "the defendants were aware of the substantial risk of serious injury.…". *Id.*, at 259. And when analyzing whether a medical defendant knew of the substantial risk, the *Fromm* court concluded that a doctor's judgment on what suicide precautions are needed is a subjective conclusion of the risk the inmate posed. *Id.*, at 261. Specifically, the court stated,

> Dr. Butler made a medical judgment that Cole did not need the suicide precautions attendant to "high risk suicide" classification. This diagnosis is, by definition, Butler's subjective conclusion regarding the risk Cole posed to himself… We cannot permit the factfinder to infer subjective knowledge of a substantial risk that Cole would harm himself based on Dr. Davis's testimony that the risk was "obvious" because this would conflict with Dr. Butler's subjective medical judgment, evidenced by her diagnosis, the appropriateness of which plaintiffs do not challenge.

*Id.*

Moreover, the *Fromm* court reasoned that a jury may infer subjective awareness of the risk "only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.*, at 261-62. Therefore, *Fromm* shows us that the professional judgment standard is based entirely on a subjective awareness analysis, and the "substantial departure" language is only used to determine whether the risk was obvious. *Id.*

*Collignon* similarly illustrates that the professional judgment standard is a subjective analysis. The *Collignon* court extended the "substantial departure" language and concluded that under the professional judgment standard, a medical defendant is liable when the professional's decision was "such a substantial departure

from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Collignon*, 163 F.3d at 989.[3] The court reasoned that to show a "substantial departure," evidence that the professional knew of the serious medical need and disregarded it is necessary. *Id.*, at 989 (internal citation omitted). The *Collignon* court further reasoned that the standard focuses on the professional's subjective decisions and thought process:

> A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances.

*Collignon*, 163 F.3d at 989 (internal citation omitted). Therefore, *Collignon* shows that the professional judgment standard relies on the professional's subjective knowledge of the risk and response, *Id.*, yet this is in direct conflict with the Fourteenth Amendment, which does not require the professional to be subjectively aware of the risk to be held liable. *Pittman*, 108 F.4th at 567-568, 572.

Prior precedent **before** *Pittman* confirms the conclusion that the professional judgment standard relies on the subjective knowledge. *See, e.g., Est. of Hill v. Richards*, 525 F. Supp. 2d 1076, 1087 (W.D. Wis. 2007) (discussing professional

---

[3] *Cf. Fromm*, 94 F.3d at 261-62 ("The question then becomes how "obvious" a risk must be, or how "erroneous" a medical professional's treatment decision must be, such that a jury may infer subjective awareness of the risk in a medical treatment case. The answer is that deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment.").

judgment in context of whether the defendant knew of plaintiff's suicidality); *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state…"); *Conner v. Rubin-Asch*, 793 F. App'x 427, 430 (7th Cir. 2019) (applying professional judgment standard to subjective knowledge element of deliberate indifference and concluding that "After months of closely observing Conner in the PSU, Rubin-Asch concluded that his threats and attempts at self-harm were not genuine, and that Conner did not actually pose a danger to himself."); *Petties v. Carter*, 836 F.3d 722, 729-30 (7th Cir. 2016) (stating that the professional judgment standard is based on the subjective opinions of the doctor); *Goodloe v. Sood*, 947 F.3d 1026, 1030-1031 (7th Cir. 2020) (explaining that the professional judgment standard relates to the subjective prong of the deliberate indifference analysis); *Greeno v. Daley,* 414 F.3d 645, 654-55 (7th Cir. 2005) (when medical professional knows his treatment is likely to aggregate the prisoner's condition that is evidence the professional knew of and disregarded the risk, i.e., it shows deliberate indifference); *Gonzalez v. Feinerman*, 663 F.3d 311, 314-15 (7th Cir. 2011) (medical professional's knowledge that current treatment is not working that is evidence the professional knew of and disregarded the risk).

Because this Court explicitly removed the subjective prong from the Fourteenth Amendment standard, and the professional judgment standard is a subjective analysis, the professional judgment standard should not apply to Fourteenth Amendment claims. *See Pittman*, 108 F.4th at 567-568, 572. The

application of the professional judgment standard is effectively diminishing the constitutional rights of individuals who have not been sentenced yet. Those individuals cannot yet be punished. And the professional judgment standard is contradictory to what is constitutionally demanded. Therefore, the district applied the incorrect legal standard and this Court should reverse.

> **B.** **The district court ignored binding precedent: when a psychologist ignores her own opinion, she is not entitled to deference.**

In the alternative, if this Court concludes that the professional judgment standard applies to the Fourteenth Amendment, the district court's opinion should be reversed for ignoring binding precedent and genuine disputes of fact. The district court ignored this Court's binding precedent holding that when a psychologist ignores her own opinion, she is not entitled to any form or measure of deference. The district court also failed to take the facts on the motion for summary judgment in favor of the Estate. The district court incorrectly construed the Estate's claim: it presumed the Estate's claim was based upon Hakes failing to put Mouradian on suicide watch. The Estate's claim is that Hakes acted objectively unreasonable by failing to take *any* preventative measures, despite knowing that the current plan for Mouradian was not working. Therefore, this Court should reverse.

The Seventh Circuit does not defer to a medical professional's judgment if he or she is disregarding instructions from a specialist or has changed his or her own opinion. *See, e.g., Ortiz v. Webster*, 655 F.3d 731, 735-36 (7th Cir. 2011); *Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008). A prison physician's conduct amounts to deliberate indifference when the medical professional knows that her treatment is likely to

aggravate the prisoner's condition, *Greeno,* 414 F.3d at 654-55, or she knows that the treatment is not working. *Gonzalez*, 663 F.3d at 314-15. "Put most bluntly, faced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot "doggedly persis[t] in a course of treatment known to be ineffective" without violating the Eighth Amendment." *Goodloe*, 947 F.3d at 1031, citing *Greeno*, 414 F.3d at 655. And although a "mere difference of opinion" between two medical professionals is generally not enough, *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), this Court has held that it is inappropriate to defer to a medical professional's judgment if she has changed or ignored her own opinion. *See, e.g., Ortiz*, 655 F.3d at 735-36 (reversing district court's grant of summary judgment because it was not a "mere difference in opinion," the defendant "ignored his own opinion").

The first error the district court committed was claiming *Ortiz* and *Gonzalez* were distinguishable. The district court concluded that *Ortiz* was different because the doctor "opined that plaintiff, depending on further evaluation of his vision, would need surgery in the next two years, then never reevaluated the plaintiff nor performed surgery." App. A, 032, citing *Ortiz*, 665 F.3d at 735. However, *Ortiz* is no different: Hakes opined that Mouradian would commit suicide prior to being sent to prison and that he likely needed to go back on a Chapter 51 commitment but never followed up on her Chapter 51 opinion and did not change her treatment plan based on those opinions. The district court also concluded that *Gonzalez* was distinguishable because "even after plaintiff's condition and pain worsened markedly in the last two years, his physicians persisted in the same treatment." App. A, 033,

citing *Gonzalez*, 314-15. *Gonzalez* is no different: Mouradian's mood continued to decline and worsen leading up to his sentencing hearing and Hakes persisted in the same treatment. Had the district court taken the facts in the light most favorable to the Estate, as required, the district court would have concluded that *Ortiz* and *Gonzalez* are on point.

It is undisputed that Hakes opined that Mouradian would not make it to Dodge Correctional[4] - her opinion was that Mouradian would commit suicide before he began serving his prison sentence. R. 151, at ¶¶ 92-93. It also is undisputed that Hakes opined that the treatment plan they were implementing for Mouradian pre-Chapter 51 (medication plus weekly therapy) was not working. R. 151, ¶ 97. When Mouradian returned to the Jail, the treatment plan consisted of the same medications plus therapy. R. 151, ¶ 97. The only difference upon Mouradian's return was that he had now signed a settlement agreement. However, it is undisputed that when back at the Jail after his Chapter 51 commitment, Mouradian showed no improvement because Hakes thought he may need to be recommitted and he had stopped taking one of the prescribed medications. R. 151, ¶ 124. Hakes' failure to take any preventative measures, especially when she had the ability to have Mouradian recommitted for his breach of the settlement agreement, directly contradicts her opinions that Mouradian would commit suicide under the current treatment plan (that did not change) (R. 151, ¶ 92); that Mouradian had a setback and needs to extend the settlement agreement (R. 151, ¶ 136); that Mouradian may need to go back on the

---

[4] Dodge Correctional is the entry prison for all Wisconsin prisoners and which is where they receive their classification and decisions are made about where they generally begin their prison sentences.

Chapter 51 commitment (R. 151, ¶ 124); that Mouradian would commit suicide if more was not done. *See Ortiz*, 655 F.3d at 735 (deference is not owed to a doctor who ignored his own opinion). Hakes could have told Northwest Connections that Mouradian was neither taking his medications (R. 151, ¶ 145) and was not maintaining his safety (R. 151, ¶¶ 125), and he could have been reevaluated for a Chapter 51 commitment at any point, yet she refused to do so. R. 151, ¶ 139.

The district court failed to properly analyze the totality of circumstances surrounding whether Hakes disregarded her own opinions or persisted in a course of treatment that she knew was not working. It is undisputed that Mouradian reported exact symptoms to Hakes ("severe depression," endorsed "passive suicidal ideation and plan, but is void of intent," and his thoughts "evidenced hopelessness and helplessness") in August 2019, September 2019, October 2019, November 2019, December 2019, February 2020, March 2020, April 2020, and May 2020. R. 137, ¶ 59; R. 151, ¶¶ 21-22, 24, 26-27, 31, 33, 39, 41, 43, 45, 50-51, 53, 56, 80, 83, 92, 110, 125, 130, 136, 140, 147. Hakes opined that any changes in Mouradian's presentation following his plea hearing, including the appearance of improvement in interactions and symptoms, is a red flag. R. 151, ¶ 80. Mouradian's February 2020 plea hearing was re-scheduled because Mouradian reportedly was looking around his cell for something to hang himself with. R. 138, ¶ 82. Subsequently, Mouradian told Hakes he would kill himself. R. 138, ¶ 87-89. And then Mouradian was sent out from the Jail on a Chapter 51 commitment. It is undisputed that Hakes opined Mouradian had no "intention of going to prison," she "would not be surprised if he ha[d] a plan to

suicide before any transfer to" prison, he would not get better until his depression is addressed from a medication perspective, and that therapy plus medication does not improve Mouradian's symptoms and mood. R. 151, ¶¶ 92, 97. Hakes ignored her documented opinions. R. 137, ¶ 219, 151, ¶ 114, 151, ¶¶ 125, 124, 136 (documenting setbacks with Mouradian's April and July 2020 sentencing hearings.)

Despite warning Jail officials of the heightened risk between plea and sentencing hearings and that the appearance of improvement is a red flag, Hakes ignored her prior opinion and did not recommend or implement any safety measures for Mouradian after his "setback" following his plea hearing. R. 151, ¶ 80, 118, 124, 128-129, 143, 148; *Ortiz*, 655 F.3d at 735-36. Hakes also ignored her own opinion when she became aware that Mouradian discontinued the medication that she believed Mouradian would decompensate without, as she did not tell anyone. R. 138, ¶¶ 112-113. When Mouradian discontinued his medication prior to Jacobson's approval, Hakes could have reported that fact to Northwest Connections, who was requesting updates on Mouradian's compliance with the Settlement Agreement, which was a part of his emergency commitment. R. 151, ¶¶ 107-108, 136, 139; R. 138, ¶¶ 109, 112-113, 139. Had she reported these facts and her continued concerns to Northwest Connections, Northwest would have done a subsequent evaluation of Mouradian and could have recommitted him, outside of the Jail, as was done in February and March 2020, and permitted under the agreement. R. 138, ¶¶ 96, 98, 139; R. 151, ¶ 139. Northwest Connections even told Hakes that if Mouradian was not taking his medication as prescribed, that would be a justification to go back to

court and request a commitment. R. 138, ¶¶ 96, 98, 139. Yet Hakes continued with a course of conduct that she knew was not working. R. 138, ¶¶ 113, 118, 128-129, 143, 148.

Hakes also knew that her course of treatment at the Jail was not working to adequately protect Mouradian. R. 151, ¶ 97. She repeatedly stated that what she was doing is not working, yet Hakes never tried anything different such as recommending Mouradian being monitored every 15 or 30 minutes. *Id.* Hakes knew in the month leading up to Mouradian's final plea hearing and ultimate suicide that Mouradian was seen looking for a place to hang himself; Mouradian stated that he "wanted to die;" Mouradian discontinued one of medications. Hakes knew Mouradian had a "setback" and expected another one for his sentencing hearing, knew Mouradian's "thoughts still evidence depressive content," he was experiencing severe guilt and shame, and that Mouradian would not tell anyone if he had a plan to commit suicide. R. 138, ¶¶ 80, 89, 112, 120, 125, 130, 140, 145, 147; (R. ¶¶ 178, 182); R. 135, ¶¶ 107, 111. Hakes even contemplated sending Mouradian back to the hospital because he was suffering from active suicidal ideation but instead, she did nothing. R. 138, ¶¶ 118, 126, 124.

Hakes took no precautionary measures. Despite being able to do so, Hakes did not recommend that correctional staff either conduct 15- or 30-minute cell checks on Mouradian or be hypervigilant in monitoring Mouradian's cell via the video-camera footage in the control room. R. 138, ¶¶ 128-129, 143, 148. Hakes also did not recommend or order any special precautions once the Settlement Agreement expired

on May 7. *Id*. Hakes did not tell anyone that Mouradian stopped his medication without Nurse Jacobson's approval. R. 138, ¶¶ 112-113. Had Hakes told someone Mouradian was no longer med-complaint under the Settlement Agreement, Mouradian would have been reevaluated and could have been hospitalized for further stabilization. R. 138, ¶¶ 96-98, 136, 139. In fact, once the Settlement Agreement was dismissed, Hakes changed nothing about her treatment plan, despite knowing that her pre-Settlement Agreement treatment plan was not working. R. 138, ¶¶ 97, 142-143. Despite Hakes knowing Mouradian's plan was that he would hang himself with a bed sheet (R. 138, ¶ 16) and that Mouradian would commit suicide before being sentenced to prison (R. 138, ¶ 92), Hakes provided no instruction or recommendation to Jail staff regarding him having bed sheets or other objects that he could potential hang himself with. R. 138, ¶¶ 128-129, 136-137, 143, 148.

Hakes simply carried on with a course of conduct that she knew was not working. Hakes stated that "[Mouradian] is not able to sufficiently profit from therapy until it is addressed from a pharmacological perspective," and "the proposed settlement agreement is what we had already been doing until December (weekly therapy paired with medication) and his mood did not improve" and Mouradian "has a very high chance of suicide attempts or completion." R. 138, ¶ 97. The only difference between pre-Chapter 51 and post-Chapter 51 was <u>one</u> medication; and Mouradian discontinued the new medication Hakes opined he would decompose without. *Id*., at ¶¶ 112, 125, 145. Nothing changed despite Hake's opinion that Mouradian would commit suicide.

Had the district court taken any of the above referenced facts into consideration and in the light most favorable to the Estate, especially considering that it is undisputed that the treatment plan was not working post-Chapter 51 commitment, the district court would not have granted summary judgment. Therefore, this Court should reverse.

## II. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT TO THE COUNTY DEFENDANTS.

The district court granted summary judgment to the County Defendants based on an erroneous application of the facts and law. Had the district court viewed the facts in the light most favorable to the Estate, it would have found that the County Defendants were solely responsible for observing Mouradian on the night of his suicide. In observing Mouradian, it was a part of the County Defendants' ordinary job duties, a duty independent of the opinion of a mental health provider. Because the law clearly establishes that non-medical jail staff may not ignore a detainee in obvious medical distress, *Smith v. Whitsel*, 134 F.4th 962, 965 (7th Cir. 2025), citing *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015), this Court should reverse and remand.

### A. The professional judgment standard does not apply to the County Defendants.

The rule that correctional officers may avoid liability if the inmate is being treatment by a medical professional does not apply to Fourteenth Amendment claims. At the core of this rule is the correctional officer's subjective knowledge. *See Eagan,* 987 F.3d at 693-65. That is, the standard asks whether the correctional officer relied on the judgment of medical personnel. *Id.*, 693-94. It is used to "demonstrate that the

prison officials knew of and disregarded a serious risk" to the inmate's health or safety. *Id.*, 694. And a plaintiff can only rebut this presumption by showing that the correctional officers <u>knew</u> that their medical staff were failing to treat or inadequately treating the inmate. *Id.* Because this Court removed any subjective analysis from the Fourteenth Amendment standard, the medical deference rule does not apply to Fourteenth Amendment claims. *See Pittman*, 108 F.4th at 567-568, 572. Therefore, the district court granted summary judgment to the County Defendnats based on an erroneous interpretation of the law. This Court should reverse.

**B.      The County Defendants did not rely on Hakes' professional judgment in their failure to monitor Mouradian.**

The district court improperly granted summary judgment on the grounds that the County Defendants were entitled to rely on Hakes' professional judgment, even if the rule applies to Fourteenth Amendment claims. App. A. 034-036. The district court failed to engage in a totality of the circumstances analysis. The County Defendnats were responsible for observing Mouradian on the night of his suicide regardless of Hakes' opinion on Mouradian's observation status. Therefore, this Court should reverse.

The district court erroneously based its conclusion on *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). App. A, 034-036. In *Berry*, this Court held that jail staff are entitled to defer to the judgment of jail health professionals, as long as they did not ignore a detainee's request to see those professionals. 604 F.3d at 441. The district court's reliance on *Berry* is flawed for two reasons. First, *Berry* is factually different. Mouradian never requested to see the Jail's mental health professionals. R. 137, at

¶¶ 10-11. Mouradian only submitted one request to see the Jail's psychologist. R. 120 at Exhibit G, p. 7-8. And Hakes also made the requests for the Jail's nurse, Jacobson, to see him. R. 151 at ¶¶ 30, 38, 50. Therefore, there were no requests for the County Defendants to ignore.

Second, any reliance or deference to Hakes' professional judgment does not extend to the County Defendants ordinary jail staff duties or responsibilities. *See Eagan*, 987 F.3d at 694 (stating the deference applies to "professional judgment of the facility's medical officials <u>on questions of prisoners' medical care</u>." (internal citations omitted) (emphasis added)). For instance, in *Smith v. Whitsel*, this Court concluded that when correctional officers have observation responsibilities, summary judgment is inappropriate. 134 F.4th 962 (7th Cir. 2025). In *Smith*, the correctional officer was supposed to be monitoring a video feed in the control room that showed the inmate exhibiting symptoms from 2:00 p.m. to 6:00 p.m. *Id*., at 964-65. The correctional officer also conducted a floor check. *Id*., at 965. The correctional officer finally noticed the inmate's distress around 6:10 p.m. but did not report the inmate's concerning behavior to medical staff. *Id*. The Seventh Circuit held that the district court appropriately declined summary judgment. *Id*.

Here, the conclusion essentially is that Lucas Johnson did not need to perform his ordinary Jail staff duties (i.e., observing the video monitors during the night shift control room duty) because Mouradian's observation status was not elevated. That conclusion is incorrect both factually and under the summary judgment standard. As an initial matter, the district court ignored contrary evidence. Mouradian's

observation status could be considered as an informally "elevated" classification in a sense. Mouradian was in Block E, which is a two-man cell that has multiple video feeds and a two-way audio feed while the dorm style housing (Huber Block) has one camera and audio. R. 148, ¶¶ 114-115; R. 99, 83:16-84:21, 116:11-13, 118:3-6; R. 115-3, p. 53. Hakes specifically requested that Mouradian be placed in a two-man rather than in the dorm style Huber housing, suggesting that Jail staff would have a closer eye on Mouradian. R. 115-3, at p. 53. Regardless, the district court's conclusion ignores the undisputable fact that Johnson's <u>failure to observe the video feed to Mouradian's cell was not based on Hakes' judgment</u>. Johnson was required to observe the video feeds regardless of whether Hakes recommended more frequent observations. R. 135, ¶¶ 148, 159; R. 138, ¶ 115, 133, 154. The County Defendants' observational duties are not related to Hakes' professional judgment. Therefore, Hakes' "professional judgment" cannot extend to ordinary Jail duties, including a correctional officer's regular observational duties.

The Jail's correctional officers had the primary responsibility of observing inmates at night shift. Linda Keller and Lucas Johnson were able to observe Mouradian throughout the night of his suicide. Johnson and Keller were in the control room at 2:12 a.m. and ignored Mouradian who began hanging himself at approximately 2:00 a.m., and for which it continued for nearly 17 minutes. This lapse of time was not seconds, or even a few minutes; the sheer lack of observation of a man committing suicide right before someone's eyes is a serious injustice. Johnson was responsible for monitoring the video feed and *admitted that he should have observed*

Mouradian tie the bedsheet to his cell door and hang himself. R. 138, ¶¶ 153, 150, 159, 161. Yet for 17 minutes, Mouradian hung in obvious distress. Therefore, the County Defendants' failure to act reasonably in observing Mouradian is not saved by Hakes purported professional judgment to not formally elevate Mouradian's observation status. This Court should reverse and remand for trial.

### C. Because there is a disputed issue of fact on whether Mouradian's constitutional rights were violated, the district court should not have denied *Monell*.

The district court erred when it granted summary judgment on the Estate's municipal liability claim. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d. 611 at 690 (1978). The only reason the *Monell* claim was dismissed was because the district court held there was no underlying constitutional violation. App. A 037. Because there is a genuine dispute as to whether Mouradian's constitutional rights were violated, this Court should reverse and allow the *Monell* claim to proceed to trial.

To demonstrate that the County is liable for a harmful custom or practice, the plaintiff must show that County policymakers were "deliberately indifferent as to [the] known or obvious consequences." *Gable v. City of Chi.,* 296 F.3d 531, 537 (7th Cir. 2002). In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff. *Id.* Therefore, in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable. *See Sims v. Mulcahy,* 902 F.2d 524, 543 (7th Cir. 1990) (quoting *Jones v. City of Chi.,* 787 F.2d 200, 204–05 (7th Cir. 1986)). "The Supreme Court has held that

'the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.'" *Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918 (7th Cir. 2003) (quoting *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

The Estate raised two concerns with regard to Monell which this Court should consider despite the district court's lack of analysis.

### 1. The Jail's Suicide Policy Constitutes a Harmful Practice or Custom.

The Estate argued that the Jail's suicide policy was deficient and that officers were untrained on the proper procedures for placing inmates on suicide watch. This claim is bolstered by the fact that the Jail instituted a "new policy" shortly before Mouradian's suicide and did not require specific training on the differences in the old versus new policy. The procedure's requirements were unclear to most, and certainly were not trained on. There is a significant lack in understanding on how, when, and with what approval an officer is allowed to place an inmate on suicide watch. The mental health professional in question—Dr. Hakes—believed her role was simply to make recommendations to the sergeant regarding who she deemed to be a danger to themselves, but the County Defendants believed that suicide watch had to first be confirmed by that same mental health professional. There was also a modified or elevated watch they could use—including a 15- or 30-minute physical observation and video monitoring. R. 138, ¶ 8. The Jail's botched transition to a new policy was more than costly to Mouradian, and suggested a municipal-wide defect.

Moreover, the new policy includes no directive on what signs and symptoms to look out for. The old policy required correctional staff to look out for signs and symptoms of emotional distress. Policy 366 ("Jail officers and other staff members **shall remain alert to the following signs and symptoms** of emotional distress, which, among others may indicate that an inmate is a possible suicide risk."). Some of the signs and symptoms that the old policy required staff to be on the lookout for were

(i)     Serious depression
(ii)    Extreme agitation
(iii)   Alternating manic and depressed behavior
(iv)    Unduly suspicious thought patterns
(v)     Between the end of a trial [or pleading guilty] and a sentencing date, if found guilty,
(vi)    Inmate talks of suicide, of wishing to be dead, or actually threatens to commit suicide. This is particular significant if the inmate discusses a specific method of committing suicide.
(vii)   Inmate suddenly behaves in a very calm, resigned manner, particularly if the inmate has previous been agitated or depressed,
(viii)  Inmate has abused alcohol and/or drugs and has also demonstrated generally unstable behavior within the jail

R. 134, at Ex. 2 – "Policy 366", at p. 1-2. When an officer or other staff member noticed those behaviors in an inmate, and the situation does not seem to be a crisis situation (i.e., the inmate is not about to commit suicide), jail staff was required to monitor the inmate every 15 minutes, among other things. (Policy 366, at p. 2-3). And, of course, there is no record of correctional staff being trained within the appropriate time frame on this policy either.

In contrast, the new policy, Policy 723, creates a "Suicide Prevention Team." R. 120, Ex. A, "Policy 723", p. 1. This Suicide Prevention Team was required to

coordinate with the Training Officer to ensure that suicide prevention training is provided. *Id*. Under Policy 723, all facility staff were supposed to be <u>trained</u> on "identification of warning signs and risk factors," and "observation and suicide watch procedures," among other things. *Id*., at 2. Policy 723 merely recites the County's obligations under Wisconsin's DOC Administrative Code.

There is nothing in Policy 723 that alerts correctional staff as to what signs and symptoms to look out for. Had correctional staff been trained on the signs and symptoms to look out for, as explained under Policy 366, correctional staff would have observed that between April and May 28, 2020, Anthony was experiencing serious depression, extreme agitation (at times), it was between being found guilty and his sentencing he has talked about suicide and had a plan as early as August 2019 to hang himself with a bed sheet, and he had a substance abuse problem and was generally unstable while he remained in custody at the Jail. Those are all signs under the old policy that would have alerted correctional staff that something was wrong. In comparison, the new policy, Policy 723, has nothing that would alert an officer to a risk of serious harm. Although Policy 723 states that officers will be trained on the warning signs, none of the officers were trained under Policy 723, and Keller did not even acknowledge that Policy 723 existed. Therefore, a lack of training on warning signs and symptoms played a role in Mouradian's suicide.

This lack of guidance and training in the policy is shown by the handling of Mouradian's signs and symptoms. For instance, before Policy 723 was in effect, staff-initiated suicide watches without Dr. Hakes, but once Policy 723 was in effect,

supervising staff waited until Dr. Hakes recommended inmates like Mouradian be on a suicide watch. For instance, the first time Mouradian was reported to be looking around his cell for a place to tie something to, correctional staff immediately initiated a modified suicide watch. The second time Mouradian was reported to be looking around his cell for a place to tie a towel to, correctional staff did not initiate a modified suicide watch.

Additionally, the apparent lack of guidance on the new policy establishes a direct link between what officers believed their role to be in placing inmates on suicide watch, and Mouradian not being placed on at least some form of a modified suicide watch at the time of his death. *See Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir. 1988) (liability may be founded upon proof of a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care).

The County failed to provide training on a newly enacted suicide policy which denied Mouradian of his constitutional right to be free from harm.

2. **The Jail's Communications System was a Known Defect that the County was aware of.**

Second, the Jail's communication system was flawed, and the County knew about it. Not only were the communications between Keller and Johnson at the time of Mouradian's suicide inept, but it was also *known* that the radios had dead spots in critical areas of the Jail. Had the County ensured a fully functioning communication system among officers, Keller would have received Johnson's report that it looked like Mouradian was kneeling and could have responded sooner to Mouradian's cell.

This impediment in communication is directly correlated to the constitutional deprivation Mouradian suffered and was widespread enough to be common knowledge sufficient to hold the County liable under *Monell*. There are clear disputes of fact regarding the two *Monell* claims and whether the County. With this Court's reversal based on a viable constitutional injury, the Estate argues that its *Monell* liability claims hold merit and should be considered by a jury.

## CONCLUSION

Plaintiff-Appellant respectfully requests that this Court REVERSE the district court's grant of summary judgment in favor of the Defendants-Appellees Jackson County, Scott Bowe, Linda Keller, Lucas Johnson, and Ashley Hakes for the reasons stated herein and REMAND for a trial on the merits of the Estate's Fourteenth Amendment claim against the County Defendants and Hakes, *Monell* claim against the County, and state law claims.

Dated this 4th day of September 2025.

Respectfully submitted,

**CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
       Nathaniel Cade, Jr.*
       Wis. Bar No. 1028115
       Annalisa Pusick
       Wis. Bar No. 1116379
       P.O Box 170887
       Milwaukee, WI 53217
       (414) 255-3802 (phone)
       (414) 255-3804 (fax)

nate@cade-law.com
annalisa@cade-law.com

Attorneys for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2025, I electronically filed the foregoing Brief of Plaintiff-Appellant in Support of Appeal with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated this 4th day of September 2025.

**CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
    Nathaniel Cade, Jr.*
    Wis. Bar No. 1028115
    Annalisa Pusick
    Wis. Bar No. 1116379
    P.O Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com

    Attorneys for Plaintiff-Appellant

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)**

The undersigned, counsel of record for the Plaintiff-Appellant, the Estate of Mouradian, furnishes the following in compliance with F.R.A.P Rule 32(a)(7): I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7) for a brief produced with a proportionally spaced font. The length of this brief is 11,589 words.

Dated this 4th day of September 2025.

**CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
      Nathaniel Cade, Jr.*
      Wis. Bar No. 1028115
      Annalisa Pusick
      Wis. Bar No. 1116379
      P.O Box 170887
      Milwaukee, WI 53217
      (414) 255-3802 (phone)
      (414) 255-3804 (fax)
      nate@cade-law.com
      annalisa@cade-law.com

      Attorneys for Plaintiff-Appellant

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the below appendix.

Dated this 4th day of September 2025.

**CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
    Nathaniel Cade, Jr.*
    Wis. Bar No. 1028115
    Annalisa Pusick
    Wis. Bar No. 1116379
    P.O Box 170887
    Milwaukee, WI 53217
    (414) 255-3802 (phone)
    (414) 255-3804 (fax)
    nate@cade-law.com
    annalisa@cade-law.com

    Attorneys for Plaintiff-Appellant

**TABLE OF CONTEXT TO CIRCUIT RULE 30(e) REQUIRED APPENDIX**

District Court Decision Granting Summary Judgment from
Judge William Conley on June 10, 2025…..……………………..……..……App. A. 001-039

Dated this 4th day of September 2025.

**CADE LAW GROUP LLC**

By: */s/ Annalisa Pusick*
       Nathaniel Cade, Jr.*
       Wis. Bar No. 1028115
       Annalisa Pusick
       Wis. Bar No. 1116379
       P.O Box 170887
       Milwaukee, WI 53217
       (414) 255-3802 (phone)
       (414) 255-3804 (fax)
       nate@cade-law.com
       annalisa@cade-law.com

       Attorneys for Plaintiff-Appellant

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF ANTHONY MOURADIAN,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 23-cv-167-wmc |

JACKSON COUNTY,
SCOTT BOWE,
LUCAS JOHNSON,
LINDA KELLER,
DUANE M. WALDERA,
ASHLEY HAKES,
PATRICIA JACOBSON,
FOOTPRINTS IN TIME MIDWIFERY SERVICES LLC,
JOHN DOES 2-10, and
ABC INSURANCE COMPANY,[1]

Defendants.

---

Shortly after pleading guilty to four felony charges and before sentencing, Anthony Mouradian committed suicide while in the custody of the Jackson County Jail. Mouradian's estate (the "Estate") filed this lawsuit against defendants Jackson County, its sheriff, and certain of its jail employees, as well as healthcare providers who treated Mouradian. In its First Amended Complaint, the Estate claims that defendants violated Mouradian's rights under federal and Wisconsin state law. (Dkt. #26.) Pending before the court are: (1) defendants Footprints In Time Midwifery Services, LLC ("Footprints") and its employee Patricia Jacobson's (collectively the "Footprints defendants") first motion

---

[1] In its amended complaint filed on November 10, 2023, plaintiff purported to also proceed against multiple Doe defendants and an unidentified insurance company. However, none have been identified to date, and the time for doing so has long since passed. Accordingly, the court will dismiss these defendants.

for summary judgment based on the Wisconsin statute of limitations for medical claims; (2) the Estate's motion for a hearing on that motion; (3) Footprints defendants' motion to supplement an affidavit in support of that motion; (4) Footprints defendants' second motion for summary judgment on the merits; (5) the Estate's motion to strike Footprints defendants' brief in reply and supplemental proposed findings of fact in support of their second summary judgment motion; (6) defendant Ashley Hakes' motion for summary judgment; and (7) defendants Duane Waldera, Scott Bowe, Lucan Johnson, Linda Keller, and Jackson County's motion for summary judgment on the merits. (Dkt. ##63, 90, 91, 108, 153, 112, & 117.) In reply, defendants Bowe, Johnson, Keller, Waldra, and Jackson County also argue that this court should relinquish jurisdiction of the Estate's remaining state-law claims if summary judgment were to be granted on all of its federal claims. (Dkt. #149.)

The evidence of record establishes that the Estate was untimely in amending its complaint to add the Footprints defendants' and that the remaining defendants were not objectively unreasonable in their treatment and care for Mouradian. Therefore, the court will grant defendants' motions for summary judgment as to the Estate's Fourteenth Amendment claims, relinquish jurisdiction over the Estate's remaining supplemental, state-law claims, and direct the clerk of court to enter final judgment accordingly.

UNDISPUTED FACTS[2]

### A. The Parties

The Estate brought this case on behalf of Anthony Mouradian, a former inmate at Jackson County Jail ("the Jail") in Black River Falls, Wisconsin. Mouradian pleaded guilty to four felony charges on April 24, 2020, for felony burglary, stalking, bail jumping, and possession of methamphetamine. Before his sentencing scheduled for July 2, 2020, Mouradian took his own life in the early hours of May 28, 2020.

Defendant Jackson County is a municipal corporation organized under the laws of the State of Wisconsin. At all relevant times, Jackson County has been responsible for the training, supervision, policy and procedure, as well as implementation, at the Jackson County Sheriff's office and Jail. At all relevant times to this case, defendant Duane Waldera was the elected Sheriff of Jackson County and responsible for the treatment of the Jail's detainees. Defendants Captain Scott Bowe and Correctional Officers Lucas Johnson and Linda Keller worked at the Jail and also had responsibilities supervising and monitoring its detainees.

Defendant Ashley Hakes is a licensed psychologist, holding master's and doctoral degrees from the Wisconsin School of Professional Psychology. During the relevant period, Hakes was under contract with the Jackson County Sheriff's Office to provide

---

[2] The following undisputed, material facts are drawn from defendants' replies in support of their proposed findings of fact (dkts. ##94, 147, & 152) and defendants' responses to plaintiff's proposed findings of fact (dkts. ##93, 148, & 151).

3

psychological services at the Jail one day per week, including face-to-face therapy to detainees like Mouradian.

Defendant Footprints in Time Midwifery Services, LLC, is a Wisconsin limited liability company that also contracted to provide medical services at the Jail. Under this contract, Footprints provided Advanced Practice Nurse Prescriber ("APNP") services to inmates, including medication management. As an APNP for Footprints, defendant Patricia Jacobson in particular provided these medication management services to Mouradian at the Jail.

### B. Medical Treatment at the Jail

#### 1. Intake and early treatment

On July 30, 2019, Mouradian was first booked into Jackson County Jail, exhibiting suicidal ideations and depressive thoughts. Out of concern for his safety, Jail staff placed him on a suicide watch. On August 1, 2019, Mouradian specifically stated that he wanted to use a bedsheet to kill himself, and the next day, August 2, he met with the Jail's contract psychologist, Dr. Hakes, for the first time, telling Hakes that he wanted her to take him out back and shoot him.[3] After Hakes reassessed Mouradian on August 9, she recommended taking him off suicide watch but keeping him in a side cell.[4] However, in an email to Bowe, Jacobson, and nondefendant Travis Brown, Dr. Hakes also indicated

---

[3] During each meeting with Mouradian, Hakes kept detailed Subjective Objective Assessment Plan ("SOAP") Notes detailing his mood symptoms, suicidal thoughts, and safety concerns. Additionally, Hakes would email Jail Captain Bowe, updating him on Mouradian's status.

[4] The Jail's side cell is a holding cell with a concrete slab bunk located near the control area and used by staff to house inmates who may benefit from increased visibility or observation.

App. A 004

that Mouradian had "severe depression" and "endorsed passive suicidal ideation," prompting her recommendation for restrictions being placed on his writing utensils.

From August 9 through December 20, 2019, Hakes and Mouradian met almost every week to attempt a variety of therapeutic strategies.  On several occasions, Hales also asked APNP Jacobson to reevaluate Mouradian's medications.  Hakes also continually reported to Captain Bowe and APNP Jacobson that Mouradian exhibited major depressive symptoms, his symptoms were treatment-resistant, and he continued to have suicidal thoughts and "plans without intent."  Were that to change and Mouradian expressed any *specific* intentions to hurt himself, Mouradian agreed with Hakes that he would tell Jail staff that he needed to speak with her as a means to signal Hakes that he needed to be placed in the side cell on precaution as he would otherwise refuse to tell jail staff that he intended harm himself.  Hakes similarly informed Bowe and Jacobson of this plan.

After their meeting on December 20, 2019, Hakes and Mouradian did not meet again until February 2020.  Following a medication reevaluation on January 3, 2020, however, APNP Jacobson recorded in a SOAP note that Mouradian's depressive symptoms persisted.

On February 14, 2020, the Jail implemented Policy 723, governing its "Suicide Prevention and Intervention."  After it was issued, Jail staff were further instructed to send an alert requiring staff to confirm that they had received the new policy, although multiple Jail staff members, including Officer Keller, did not confirm actually receiving Policy 723. In particular, that policy instructs that "[i]nmates who are not actively suicidal but who

5

have expressed suicidal thoughts or have a recent history of self-injurious behavior should be observed by staff at irregular intervals, not to exceed every 15 minutes."

### 2. Chapter 51 Commitment

On February 20, 2020, after Mouradian indicated that he did not need to meet with Psychologist Hakes, she reported to Jail Captain Bowe and APNP Jacobson her concern that Mouradian's plea hearing, which was scheduled for the next day, February 21, may impact his mental health *and* to be aware of any changes, including what could appear to be an improvement. The next day, Captain Bowe learned that at Mouradian's plea hearing, his attorney told the court that he "couldn't enter the plea because [Mouradian] tried to kill himself in the jail last night." In turn, Captain Bowe reported this to Dr. Hakes, who agreed with his recommendation to place Mouradian in a side cell with 30-minute checks and no bedding.

After this incident, Captain Bowe followed up with Mouradian, his attorney, and his cellmate to learn more. In particular, Mouradian denied attempting to hang himself, and Captain Bowe observed neither marks on his body nor items in his cell that would indicate he attempted to hang himself. Mouradian's attorney clarified that while Mouradian had told him he was looking around for something to hang himself with, he did not *actually* attempt to hang himself. Similarly, Mouradian's cellmate was unaware of any potential suicide attempts.

On February 28, 2020, Mouradian met again with the Jail's contracted psychologist, Hakes. During this meeting, Mouradian stated that: (1) he was extremely frustrated to have been placed on precaution; and (2) he "inten[ds] to kill himself; that he has made up

6

his mind." After this meeting, Hakes recommended a Chapter 51 commitment.[5] A crisis worker from Northwest Connections, a nondefendant, assessed Mouradian that same day and also determined that an emergency detention was appropriate. Mouradian was then immediately transferred to Sacred Heart Hospital in Eau Claire.

On March 2, 2020, Hakes sent an email to Jail Captain Bowe, APNP Jacobson, and another nondefendant, Stephaine Kennedy, a Northwest Connections employee,[6] documenting Mouradian's history of depression and suicidal ideation at the Jail. In this email, Hakes shared her opinion that "although Mouradian [had] not outwardly said it, [she did] not believe [Mouradian] has any intention of going to prison and [she] would not be surprised if he has a plan to [commit] suicide before a transfer to Dodge Correctional," a Wisconsin Department of Corrections ("DOC") facility. On March 5, 2020, Hakes and Kennedy also exchanged emails expressing concern for Mouradian's resistance to treatment and appropriate next steps, including time at a mental hospital for more intensive programming and a possible, 90-day settlement agreement.[7]

On March 13, 2020, Mouradian was transferred to DOC's Winnebago Mental Health Institute in Oshkosh. During his time there, Mouradian was prescribed a new

---

[5] Chapter 51 commitment refers to an involuntary civil commitment for persons who are deemed by a state circuit court to be a danger to themselves and in need of treatment under Wis. Stat. § 51.20.

[6] "Northwest Connections" is a 24/7 emergency crisis line that has contracted with Jackson county to provide additional mental health services and controls Chapter 51 emergency detentions. (Dkt. #150, ¶¶ 15-16.)

[7] Such "settlement agreements" under Chapter 51 are generally negotiated contracts, providing a structured plan for treatment to help individuals receive mental health services.

medication, and he signed a 90-day settlement agreement requiring him to meet with Jail Psychologist Hakes weekly, as well as to comply with his medications.

### 3. Return to Jackson County Jail

Mouradian returned to the Jail on March 18, 2020, although he was not placed on any heightened precaution.  After meeting with Mouradian on March 20, 2020, Hakes reported to Captain Bowe and APNP Jacobson that his mood had improved and his thoughts evidenced less depressive content.  Hakes also emailed Jacobson to ensure that Mouradian's new medication, fluphenazine, was included in his chart, fearing that he may decompensate without it.  After their next meeting on March 27, 2020, however, Hakes noted that Mouradian continued to feel hopeless, though the frequency and intensity of his suicidal ideations had decreased.  Hakes also reported these impressions to Nurse Jacobson and Captain Bowe.

On April 6, 2020, Kennedy inquired into Mouradian's status.  Hakes indicated that "[Mouradian was] more stable than [she had] ever seen him in the past year," although APNP Jacobson did not respond regarding Mouradian's medication compliance.  On April 10, Mouradian reported to Jail Psychologist Hakes that one of his medications, fluphenazine, was making him feel worse with regard to hopelessness and he wanted to stop taking it.  Mouradian also reported this issue to both Captain Bowe and APNP Jacobson.  Although Nurse Jacobson did not agree to stop this medication until she met with Mouradian on April 15, he nevertheless had already stopped taking fluphenazine by that point.  Still, Hakes had also informed Bowe that (1) Mouradian denied having any

8

safety concerns and (2) Mouradian and Hakes had discussed the possibility of Mouradian taking on a job doing laundry.

On April 14, 2020, Mouradian was observed wrapping a towel around the bars of his cell and looking around his cell, as if he might be searching for a place to tie something. That day, nondefendant Captain Rich instructed the night staff to keep an extra diligent eye on Mouradian because of his history. On April 15, APNP Jacobson reported that Mouradian did not have suicidal thoughts, intent, or plans, but would not tell anyone if he had because of the adverse consequences. During his next meeting with Hakes on April 16, 2020, Mouradian initially presented as quite depressed; however, at the end of the meeting, Mouradian stated that Hakes had "instilled some hope." He again denied any security concerns, stating that he would start working in the laundry.

On April 24, 2020, Mouradian pleaded guilty to four Wisconsin felony counts, and his sentencing hearing was scheduled for July 2. At that time, Psychologist Hakes neither recommended nor did the Jail implement any special or protective measures for Mouradian. On April 30, Hakes again recorded that Mouradian's mood was impaired and slightly depressed, and emailed Captain Bowe to inform him of these updates but that there were no safety concerns. On May 4, 2020, in response to an email from Kennedy, Hakes stated that: "Mouradian had a bit of a setback with his plea hearing, but his mood is slightly better than it was prior to his hospitalization"; and "she anticipate[s] a similar setback as he approaches his sentencing in July." Hales also asked about extending the 90-day settlement agreement, to which Kennedy responded that the agreement could not be extended.

9

On May 7, 2020, Hakes reported that Mouradian's mood is not great, but better than it has been, and she noted again that there were no current safety concerns. Later that day, a Jackson County circuit judge dismissed Mouradian's 90-day settlement agreement. In response, Hakes did not recommend any additional precautions or observations. On May 13, 2020, no longer bound by the obligations of the settlement agreement, Mouradian also declined to meet with Hakes.

Psychologist Hakes met with Mouradian for a 25th time on May 21, 2020. In her notes, she indicated that Mouradian reported significant guilt and shame and that his thoughts still evidence depressive content, but he did not mention any current safety concerns. In an email report afterward to Captain Bowe, Hakes stated that: the session was very productive; Mouradian participated more than in the past; she believed they would see improvement should Mouradian work through what she identified; and she would be back on May 28, to meet with Mouradian again. Until then, Hakes did not recommend any increased observations of Mouradian, nor was she contacted by anyone from the Jail between this meeting and May 28.

### 4. Mouradian's Suicide

At the Jackson County Jail, the night "B shift" runs from 6:00 p.m. to 6:00 a.m. and is staffed by two correctional officers. From 6:00 p.m. to 2:00 a.m., these officers are also assisted by at least one other correctional officer and a sergeant. Every four hours, Jail staff also rotate between positions in the control room and the floor. During the 2:00 a.m. to 6:00 a.m. shift, however, there is only one staff member in the control room and one staff member on the floor. The primary responsibility of the floor officer is to conduct timely

10

wellness checks of inmates in their assigned area by walking through each cell block to observe each inmate visually at least once every hour at staggered intervals. The control officer also supplements the individual wellness checks performed by the floor officer through observation of camera feeds originating from inside and outside of the facility. However, there is no written or unwritten policy regarding how often the control officer should be examining these feeds. The feeds also help the control officer know when to lock and unlock doors to facilitate officer and inmate movement around the Jail.

On May 27, 2020, defendants Keller and Johnson were working the night B shift. As of May 27, both defendants were aware that Mouradian had been on suicide watch and received inpatient mental healthcare at times during his incarceration. However, on the night of May 27, Mouradian was not under heightened precautions that would require more frequent checks of his cell. Between 10:00 p.m. to 2:00 a.m., Johnson was floor officer on Mouradian's side of the Jail and conducted a walk-through of the facility at 1:20 a.m., but did not observe any concerning behavior from Mouradian or any other inmate.

At 2:00 a.m., Johnson assumed the control officer post, while Keller assumed the post of floor officer. Having reached the conclusion of their shifts, Sergeant Oates and Correction Officer Frey were preparing to leave the facility. Moreover, for approximately 10-12 minutes, as the remaining two officers on duty, Johnson and Keller discussed various jail related issues with each other and non-defendants Frey and Oates.

At 2:12 a.m., Oates and Frey left the control room, while Johnson monitored their exit on the video feeds. At 2:13 a.m., Keller left the control room area to begin conducting wellness checks. A moment later, Johnson noticed an inmate in E block appeared to be

11

kneeling next to the cell bars.  Based on what he observed, Johnson then radioed Keller, telling her to go to E block.  While this message was apparently not received, Keller entered E block and observed Mouradian hanging from the cell bars at 2:14 a.m.  She radioed Johnson twice requesting assistance.  After receiving her second transmission, Johnson notified dispatch that assistance was needed.

In the meantime, Keller obtained tools to cut Mouradian down and perform CPR. By 2:19 a.m., Keller and Johnson were able to enter Mouradian's cell and cut him down. EMS arrived at approximately 2:28 a.m., and Mouradian was transported to a nearby hospital, arriving at approximately 2:50 a.m.  At 3:12 a.m., a nurse from the hospital called the Jail and informed Officer Johnson that Mouradian had passed away.

Surveillance footage reviewed after the incident showed that:  beginning around 1:27 a.m. (just after Johnson's wellness check), Mouradian spent some time putting his blanket over his head and moving towels on and off his cell door; at 1:59 a.m. (around the same time as the shift change), Mouradian took the towels around his cell door and tied them, effectively "sealing" the door; and immediately after that, he manufactured a noose from his bed sheet, tied it around his neck, and hung himself in view of the camera.

### C. Procedural History

Four months after Mouradian's death, on September 23, 2020, the Estate's present counsel submitted an open records request to the Jackson County and (as the external agency chosen to conduct a review of his death) Eau Claire County Sheriff's Departments for all records relating to his death.  On or about October 1, 2020, a response was mailed to the Estate's counsel.  Included in the response were 56 pages of Mouradian's medical

records and 81 pages of notes from therapy sessions. The notes from the therapy sessions were primarily authored by defendants Hakes and Jacobson, detailing their interactions with and treatment of Mouradian. Across all of the notes and records, Jacobson is referenced 64 times in her capacity as the author, the subject of direct references by Hakes, an addressee of memos, and the manager of Mouradian's prescriptions.

Two and a half years later, on March 15, 2023, the Estate filed its initial complaint naming Jackson County, Duane Waldera, Scott Bowe, Lucas Johnson, Linda Keller, Douglas Oates, Ashley Hakes, John Does 1-10 and ABC Insurance Company as defendants, but not Patricia Jacobson or her employer Footprints. Following a corporate deposition of Jackson County, which mentioned Footprints, and the deposition of Hakes, during which time she disavowed any responsibility for Mouradian's medication, the Estate inquired into Footprints' contract with Jackson County. Finally, on November 10, 2023, 37 months after they were sent Mouradian's medical records and individual therapy notes, the Estate filed an amended complaint naming Jacobson and Footprints as defendants.

## OPINION

In the amended complaint, plaintiff needlessly alleges 14 causes of action, but in response to defendants' summary judgment motions, plaintiff wisely concedes that several claims are best dismissed, including claims under the Americans with Disabilities Act, the Wisconsin Constitution, and state law claims for intentional inflection of emotional distress, safe place, and breach of contract claims. Plaintiff also acknowledged that its claims for legal fees and indemnification are not separate causes of action while not waiving any rights related to them should it prevail on other claims.

13

As a result, plaintiff maintains the following federal and state claims against all defendants:

- Count 1 for deliberate indifference to Mouradian's clear need for basic suicide prevention measures in violation of the Fourteenth Amendment;

- Count II for deliberate indifference to Mouradian's need for closer supervision in violation of the Fourteenth Amendment;

- Count III for deliberate indifference to Mouradian's need for and failure to provide adequate medical and psychiatric care in violation of the Fourteenth Amendment;

- Count VII for wrongful death and survivor benefits under Wisconsin statutes; and

- Count XI for common law negligence.

Finally, plaintiff asserts two, other claims:

- Count IV for Fourteenth Amendment municipal liability under *Monell*[8] against Jackson County and its Sheriff, Duane Waldera; and

- Count VI for state law failure to train and supervise, against Jackson County, Sheriff Waldera, and Captain Bowe.

Summary judgment as to plaintiff's remaining claims is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A "dispute of material fact"

---

[8] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004). Although, as the Seventh Circuit has repeatedly explained, summary judgment is often the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).

## I. Defendant Footprints' First Motion

In their first motion, the Footprints defendants contend they should be granted summary judgment in their favor because there is no dispute of material fact that plaintiff's first amended complaint was untimely as to them when filed in November 2023. In support of this contention, Footprints defendants rely on: (1) an affidavit from Sheriff Dave Riewestahl, stating that the Eau Claire Sheriff's Department sent plaintiff's counsel Mouradian's medical records and mental health records in October 2020 in response to their earlier, faxed request; and a second affidavit from Attorney Jason F. Poje, attesting that these same records contain significant references to Jacobson and her work that should have put plaintiff on notice of her role in Mouradian's treatment at the Jail. In response,

15

plaintiff argues that this evidence is inadmissible, or in the alternative, is insufficient to put them on notice of plaintiff's claims.

As a threshold matter, plaintiff contends that the evidence relied on by the Footprints defendants is inadmissible. At the summary judgment stage, courts "review only those facts whose substance would be admissible at trial under a form permitted by the Federal Rules of Evidence, although the form produced at summary judgment need not be admissible." *Wragg v. Village of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010). Specifically, plaintiff argues that Sheriff Riewestahl may not testify regarding plaintiff's counsel's open records request without producing that request, which is referred to but not attached to his original affidavit. However, defendant filed an unopposed motion to supplement the record that included the request, so the court will consider it. Plaintiff also argues that defense counsel cannot testify as to the knowledge of or the contents of documents sent to plaintiff's counsel following his open records request because he does not have first-hand personal knowledge of what records were sent. Although plaintiff will need to find another way to present similar records to a jury at trial (e.g., request to admit, stipulation or other proof of authenticity), the affidavits of Footprints' counsel and Sheriff Riewestahl establish a chain of custody for the admissibility of the records that were sent to plaintiff's counsel, such that Footprints' counsel may attest to their contents for purposes of summary judgment. *See Cooper v. Eagle River Mem. Hosp. Inc.*, 270 F. 3d 456, 463 (7th Cir. 2001).[9]

---

[9] Having found this evidence admissible, plaintiff voluntarily dismissed their state law claims against Jacobson, although not those against Footprints.

## A. State Law Claims Against Footprints

As for the statute of limitations that governs actions under state law relating to a health care provider's treatment or omissions in treatment, Wis. Stat. § 893.55(1m), states in relevant part that:

> Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:
>
> (a) Three years from the date of the injury, or
>
> (b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

The parties agree that this statute applies to both plaintiff's tort and contract claims, *Estate of Kohls v. Brah*, 57 Wis. 2d 141, 144, 203 N.W.2d 666 (1973),[10] but differ as to *when* the statute began to run in this case.

Defendants maintain that the Estate discovered Footprints' involvement no later than receipt of Mouradian's medical records by plaintiff's counsel in response to the Estate's open records request in October 2020, meaning that the statute of limitations expired three years after Mouradian's death -- on May 28, 2023.[11]  In contrast, plaintiff

---

[10] Federal courts exercising supplemental jurisdiction over state law claims are obligated to follow the applicable substantive state law, including statutes of limitations. *Felder v. Casey*, 487 U.S. 131, 151 (1988); *Guaranty Trust Co. v. York*, 326 U.S. 99, 109-10 (1945).  Statutes of limitations are also considered substantive under Wisconsin law.  *Betthauser v. Med. Prot. Co.*, 172 Wis. 2d 141, 149, 493 N.W.2d 40 (1992).

[11] Under this factual scenario, the statute of limitations would be calculated pursuant to Wis. Stat. § 893.55(1m)(a).

17

argues the statute of limitations was tolled until at the earliest August 2023, when the Estate claims to have first discovered Footprints' involvement in Mouradian's care. This would mean the Estate had until August 2024 to timely name Footprints as a defendant under Wis. Stat. § 893.55(1m)(b).

As with the applicable statute of limitations here, Wisconsin generally follows the "discovery rule" for determining the date on which a cause of action has accrued for instances where "negligence and a resulting injury do not occur simultaneously." *S.J.D. v. Mentor Corp.*, 159 Wis. 2d 261, 265, 463 N.W.2d 873 (1990) (citing *Hansen v. A.H. Robins Co., Inc.*, 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983)). In such cases, as here, "the statute of limitations begins to run when the potential plaintiff discovers the injury, or in the exercise of due diligence should have discovered the injury." *Id.* at 265-66 (citing *Hansen*, 113 Wis. 2d at 560). A cause of action only accrues when (1) the plaintiff "discovers both the nature of his or her injury and its cause"; and (2) "the relationship between the injury and its cause [is] more than a layperson's hunch or belief." *Id.* at 266 (citing *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 406-07, 412, 388 N.W.2d 140 (1986)). Thus, the discovery rule protects plaintiffs where a lapse exists between the injury and the discovery of facts necessary to alert them to their injury, its cause, or the facts underlying the wrong committed against them, *Hansen*, 113 Wis. 2d at 560, although a five-year absolute cap from the date an alleged act or omission applies arising out of medical treatment or operation by a health care provider under Wis. Stat. § 893.55(1m)(b), which is this case would be no later than May 28, 2025.

18

Under the discovery rule, the statute of limitations starts running when the plaintiff has sufficient evidence that an identified person committed a wrong. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 315-16, 533 N.W.2d 780 (1995); *see also Christ v. ExxonMobil Corp.*, 2015 WI 58, ¶ 5, 362 Wis. 2d 668, 866 N.W.2d 602 (discovery rule permits accrual of wrongful death claims to occur after decedent's death). Consequently, a tort-based claim begins to accrue "when the identity of the defendant is discovered." *Spitler v. Dean*, 148 Wis. 2d 630, 637-38, 436 N.W.2d 308 (1989). However, whether a claim has accrued based on what a plaintiff knew or should have known is a question that needs to be addressed with respect to *each* specific defendant. *See John Doe 1 v. Archdiocese of Milwaukee,* 2007 WI 95, ¶ 2, 303 Wis. 2d 34; 734 N.W.2d 827 (finding different statutes of limitations applied to different defendants being sued over claims arising from common set of facts); *Baldwin v. Badger Mining Corp.*, 2003 WI App 95, ¶¶ 11-20, 264 Wis. 2d 301, 663 N.W.2d 382 (same).

Even for the same claims in the same case, therefore, when the statutes of limitations begins to run as to a specific defendant depends on what a plaintiff could have discovered through the exercise of reasonable diligence as to that defendant. *Jacobs v. Nor-Lake, Inc.*, 217 Wis. 2d 625, 636, 579 N.W.2d 254 (Ct. App. 1998). "Reasonable diligence" means that a plaintiff must be as diligent "as the great majority of persons would [be] in the same or similar circumstances." *Spitler*, 148 Wis. 2d at 638 (citing *Hilker v. Western Automobile Ins. Co.*, 204 Wis. 1, 15, 231 N.W. 257, 235 N.W. 413 (1931) (opinion on reconsideration)). "Plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which

19

may be inferred to be within their reach." *Id.* (citing *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980)).

Accordingly, the question before the court is when the Estate had or should have had an objective basis for determining that the Footprints defendants played a role in Mouradian's care *and* his alleged, wrongful injury.  Based on undisputed material facts of record at summary judgment, the court concludes that plaintiff would have discovered its claim against Footprints through the exercise of reasonable diligence well before November 10, 2022 -- the last possible date for plaintiff's amended complaint to be timely under Wis. Stat. § 893.55(1m)(b).

In *Groom v. Pros. Ins. Co.*, 179 Wis. 2d 241, 507 N.W.2d 121 (Ct. App. 1993), the Wisconsin Court of Appeals was confronted with a plaintiff who was sent her deceased husband's hospital records in February 1987, three months after he passed.  *Id.* at 246. Those records named three physicians connected with her husband's care.  *Id.* at 250.  In her original complaint, filed in November 1989, however, the plaintiff only named one of those physicians as a defendant, while her amended complaint filed in January 1991 -- more than three years from the production of the hospital records -- plaintiff added a second physician and the medical group in which both were members.  *Id.* at 251.  On these facts, the Wisconsin Court of Appeals concluded as a matter of law that "minimal inquiries would have disclosed" the claims against these newly named defendants well before February 1990, the cut off to have the amended complaint in compliance with Wis. Stat. § 893.55(1m)(b) and, therefore, plaintiff's amended complaint against the second physician and the medical group was untimely filed.  *Id.* at 251-52.

20

Here, just four months after Mouradian's death in October 2020, plaintiff's counsel received Mouradian's medical records which contained multiple medical providers. Nevertheless, similar to *Groom,* in the original complaint, only one medical provider (Psychologist Hakes) was named as a defendant.  More than three years after plaintiff received the deceased's medical records through its counsel, an amended complaint was filed that purported to add another medical provider named in the medical records (Jacobson) and her employer (Footprints) as defendants.  Moreover, as in *Groom*, there were significant references in the medical records to Jacobson's treatment notes, what information was passed to her, and the medications she prescribed.  Therefore, this court follows *Groom* in finding that had plaintiff exercised reasonable diligence, including minimal inquiry into the medical professionals identified in the records received, plaintiff would have discovered the possible connection between Mouradian's suicide and Footprints' involvement in his medications well before November 2022.  As a result, the state law claims asserted against Footprints are untimely under Wis. Stat. § 893.55(1m)(b).[12]

In response, plaintiff argues that nothing in the medical records originally produced implicated Footprints' liability for Mouradian's medical care, but this argument overlooks what information plaintiff possessed *and* what, with reasonable diligence, it could have and should have known.  Specifically, on or around October 1, 2020, Plaintiff was sent medical records reflecting care received from multiple providers who were under contract to provide

---

[12] The court expresses no opinion as to the timeliness of any cross-claims against the Footprints defendants.

physical and mental health treatment, not just to Jail detainees, but to Jacobson in particular.  Instead of performing inquiries into those providers, plaintiff was content to bring its original suit against Hakes and assume -- while holding records that directly contradicted that assumption -- she was personally managing Mouradian's medications. Indeed, given Hakes' qualifications, plaintiff (or at least its counsel) should have known that Hakes, as a psychologist, could only have prescribed pharmaceuticals in consultation with someone licensed to do so.  (Dkt. #147, ¶ 36.)  Because plaintiff failed to pursue Jacobson or Footprints with reasonable diligence and add them as defendants in a timely manner, the state law claims against them will be dismissed as barred by the applicable statute of limitations.

### B.  Federal Claims Against Footprints Defendants

The parties disagree on how the discovery rule applies to plaintiff's federal claims. The Footprints defendants contend that it is the same statute of limitations as the state-law claims discussed above; however, plaintiff contends that the federal claims are subject to Wis. Stat. § 893.53 which states that  "[a]n action to recover damages for an injury to the character or rights of another, not arising on contract, shall be commenced within 3 years after the cause of action accrues, except where a different period is expressly prescribed, or be barred." Regardless of which statute applies, plaintiff's federal claims against the Footprints defendants are untimely.[13]

---

[13] The analysis of plaintiff's federal clams under Footprints defendants' theory would be the same as their state law claims *supra*.

For the same reasons discussed above, plaintiff had three years from when it could have discovered the Footprints defendants through the exercise of reasonable diligence. *Jacobs*, 217 Wis. 2d at 636.  Once again, plaintiff argues that it could not have known, or through reasonable diligence discovered, that the Footprints defendants were involved with Mouradian's care at the time of his death.  However, this argument is incompatible with the undisputed facts.  As for Jacobson, the Estate was sent Mouradian's medical and mental health records on October 1, 2020.  This limits reasonable inferences on when the records were received to early October.  Because "plaintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach," the only reasonable inferences are that the Estate was aware of Jacobson and her role in Mouradian's treatment at that time as well.  *Spitler*, 148 Wis. 2d at 638 (citing *Kanack v. Kremski*, 96 Wis. 2d 426, 432, 291 N.W.2d 864 (1980)).  Therefore, plaintiff's three year statute of limitations began to run in early October 2020 and ended in early October 2023, prior to filing its amended complaint naming Jacobson.  Additionally, like *Groom*, discussed above, minimal inquiries into Jacobson would have revealed that her services for the Jail were provided pursuant to the Jail's contract with Footprints.  Therefore, plaintiff's federal claims in the amended complaint naming Jacobson and Footprints as defendants will be dismissed as well.

## C. Equitable Tolling

In an attempt to save its claims against the Footprints defendants, plaintiff asks the court to apply the doctrine of equitable tolling.[14]  If "despite the exercise of reasonable diligence, [a plaintiff] cannot discover his injurer's (or injurers') identity within the statutory period, he can appeal to the doctrine of equitable tolling to postpone the deadline for suing until he can obtain the necessary information."  *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 930 (7th Cir. 2015) (citations omitted).  However, "[e]quitable tolling is an extraordinary remedy and so is rarely granted."  *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) (cleaned up).  Specifically, for equitable tolling to apply, plaintiff must show that (1) it was diligent in pursuing the claim; *and* (2) that an extraordinary circumstance outside of its control prevented it from being able to file a timely complaint.  *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255-57 (2016).

Plaintiff has failed to satisfy either element.  As to its diligence, plaintiff highlights its initial complaint was filed with the assumption that defendant Hakes was responsible for medication management and, had the original defendants identified Jacobson or Footprints as persons with relevant information sooner, plaintiff could have discovered Jacobson's involvement in August 2023.  However, the assumption that Hakes was *solely* responsible for medication management was based on the same documents plaintiff had in early October 2020, which identified Jacobson and Footprints as the prescriber.  Filing a

---

[14] In their moving brief, Footprints defendants argued that the relation back doctrine did not apply. Plaintiff did not raise any arguments in response; therefore, the court does not address this issue.

complaint with an assumption that is directly contradicted by records in plaintiff's possession is a far cry from reasonable diligence.

As for extraordinary circumstances, plaintiff notes that information regarding *who* provides healthcare services to the Jail is not public. However, this ignores the fact that they had Mouradian's medical and mental health records that included references to Jacobson *and* listed her as the prescriber of Mouradian's medications in October 2020. Since plaintiff identifies no other circumstances -- extraordinary or otherwise -- that would have prevented the filing of a timely complaint against the Footprints defendants, the court appears to have no basis to exercise its discretion and apply the doctrine of equitable tolling.

Having found that the doctrine of equitable tolling does not apply to plaintiff's claims against the Footprints defendants, the court will grant their first motion for summary judgment. As a result of this holding, the court also denies the following motions as moot:

- plaintiff's motion for a hearing regarding the Footprints defendants' motion for summary judgment (dkt. #90);

- Footprints defendants' second motion for summary judgment (dkt. #108); and

- plaintiff's motion to strike Footprints defendants' brief in reply, and supplemental proposed findings of fact in support of their second motion for summary judgment (dkt. #153).

25

## II.  The Estate's Federal Claims

In counts I-III, plaintiff also claims that all defendants acted in violation of Mouradian's constitutional rights by wrongfully failing to protect Mouradian against harmful prison conditions and, ultimately, suicide.  In count IV, plaintiff claims that the constitutional violations in counts I-III were the result of a custom, practice, or policy that was substantially likely to result in the constitutional violations that resulted in Mouradian committing suicide at the Jail.

The parties disagree on which legal standard applies to the claims concerning Mouradian's confinement at the time of his death, the Fourteenth Amendment or the Eighth Amendment.  To succeed under the Eighth Amendment, plaintiff must prove that: (1) "[Mouradian's] medical condition [was] objectively, sufficiently serious," and (2) "that prison officials acted with a sufficiently culpable state of mind, i.e., that they both knew of and disregarded an excessive risk to inmate health."  *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (internal citations and quotations omitted).   To succeed under the Fourteenth Amendment, plaintiff must prove that: (1) there was a strong likelihood that Mouradian would seriously harm himself; (2) the defendants failed to take reasonable measures to prevent Mouradian from harming himself, even though a reasonable person under the circumstances would have understood the risk involved, making the consequences of defendants' conduct obvious; and (3) Mouradian would have suffered less harm if the defendants had not disregarded the risk.  *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 572 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025).

26

Citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), defendants argue that because Mouradian had pleaded guilty to his felony charges, his rights at the Jail are governed by the Eighth Amendment, while citing *Echols v. Johnson*, 105 F.4th 973 (7th Cir. 2024), plaintiff argues that the Eighth Amendment does not apply until a person has been "convicted of a crime *and serving a sentence*," *id.* at 977 (emphasis added). For the purposes of the court's analysis at summary judgment, the court will apply the Fourteenth Amendment standard, although for the reasons explained below, beginning with Hakes, defendants are entitled to summary judgment as a matter of law regardless of which standard the court applies. Specifically under the Fourteenth Amendment, the court is to consider the "information available at the time, resisting the temptation to employ 'the 20/20 vision of hindsight.'" *Est. of Wallmow v. Oneida Cnty.*, 99 F.4th 385, 391 (7th Cir. 2024) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). "The facts should point directly at suicidality, for a deceased's 'general distress and history of psychiatric treatment would give a reasonable officer notice of general distress and a history of psychiatric treatment, not risk of suicide.'" *Id.* (quoting *Jump v. Vill. of Shorewood*, 42 F.4th 782, 794 (7th Cir. 2022). "Reasonableness, in turn, must be determined in light of the totality of the circumstances." *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020) (citing *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018)).

## A. Hakes

Because Hakes is a licensed psychologist with a master's and doctoral degree from the Wisconsin School of Professional Psychology, her decisions regarding Mouradian's treatment and supervision are subject to the professional judgment standard. Certainly, as

a licensed psychologist, decisions regarding an inmate's mental health treatment and suicide risk are within Hakes' area of professional expertise.  Thus, the court must consider the reasonableness of Hake's exercise of her professional judgment.  *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988-89 (7th Cir. 1998).

In the context of a claim for inadequate medical care in particular, the professional judgment standard requires essentially the same analysis as the Eighth Amendment standard: (1) "plaintiff's medical needs must have been objectively serious"; and (2) the defendant's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment" demonstrated by evidence "that the professional knew of the serious medical need" and "disregarded it."  *Id.* at 989.  A medical professional may only be found liable for a constitutional violation if "no minimally competent professional would have responded similarly under those circumstances."  *Scott v. Moss,* No. 24-1479, 2025 WL 48412, at *2 (7th Cir. Jan. 8, 2025) (citing *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)).  Moreover, a psychologist's judgment regarding an inmate's mental health needs is entitled to deference.  *Scott v. Moss*, No. 24-1479, 2025 WL 48412, *2 (7th Cir. Jan. 8, 2025).

Of course, plaintiff disputes that the professional judgment standard applies, comparing this case to *Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007), where the court refused to defer to the judgment of a jail's registered nurse in charge of mental health after she disregarded a psychiatrist's order to put a detainee on suicide watch following their discharge from the hospital.  *Id.* at 639-41.  However, this case is

28

distinguishable in three crucial ways.  First, unlike Hakes, who has a master's and doctoral degree in psychology, the nurse in *Mombourquette* could point to no evidence that she was qualified to make a mental health determination, *let alone disregard the discharge instructions from a psychiatrist. Id.* at 640.  Second, unlike Hakes' frequent evaluations of Mouradian's mental health and suicide risk, there was no record that the nurse in *Mombourquette* even evaluated the inmate's suicide risk.  Third, and most fundamentally, the only evaluation in the record came from a hospital psychiatrist instructing that the inmate be placed on suicide watch.

Plaintiff also argues that the court should not apply the professional judgment standard because Hakes does not expressly state that she made a judgment call in not recommending increased treatment or precautions for Mouradian.  This argument comes without plaintiff offering any support in case law, or otherwise.  More importantly, a reasonable trier of fact could only find that Hakes' report to Captain Bowe, including her email indicating no security concerns following her May 20, 2020, meeting with Mouradian required the exercise of professional judgment based on her personal observations of Mouradian during their 25 meetings over 40 weeks before his suicide, other information passed on to her by Jail staff, and her own detailed notes.  Thus, plaintiff fails to show that Hakes' involvement is not subject to the professional judgment standard.

To overcome professional judgment deference, plaintiff must point to evidence that shows, or at least supports a reasonable inference, that "no minimally competent professional would have responded similarly under those circumstances."  *Scott*, 2025 WL 48412 at *2.  In particular, plaintiff highlights:  the comments Mouradian made between

29

August and December of 2019 regarding suicidal ideations with a plan; Hakes' concerns that Mouradian may worsen around his plea and sentencing hearings; Hakes' advising Jail staff before Mouradian's February 21, 2020, plea hearing to pay attention to behavioral changes, *including* improvements; Mouradian's statement on February 28, 2020, that he "inten[ds] to kill himself"; his emergency commitment under Wisconsin Chapter 51 from February 28, 2020, to March 18, 2020; Hakes's March 2, 2020, email indicating that she would not be surprised if Mouradian had a plan to commit suicide before any transfer from the Jail to state prison; observations made by Jail staff of Mouradian wrapping a towel around the bars of his cell on April 14, 2020; Mouradian's statement to Hakes on April 17, 2020, that he "wants to die"; Mouradian's worsened mood following his guilty plea on April 24, 2020; the termination of Mouradian's 90-day settlement agreement under Chapter 51 on May 7, 2020; his subsequent decision to not meet with Hakes on May 13, 2020; after her final meeting with Mouradian on May 21, 2020, Hakes' note that Mouradian's thoughts "still evidenced depressive content"; and finally, the opinion of plaintiff's expert, Dr. Eugene Braaksma, that there were a variety of significant risk factors that would have prompted him to place Mouradian on suicide watch.

By comparison, Hakes highlights: the frequent oscillations in Mouradian's mental health during his time at the Jail; the numerous methods utilized by Hakes to combat Mouradian's resistant depression symptoms, including behavioral therapy, positive psychology, supportive psychotherapy, and dialectical behavioral therapy; evidence of Mouradian doing laundry, reading, and exercising in April of 2020; the extreme frustration that Mouradian expressed after being placed on suicide watch; Mouradian having never

attempted suicide before or while in jail; Hakes' contemporaneous observation that their final session together was very productive; Hakes' use of her professional judgment to continue treating Mouradian through both pharmacological and therapeutic intervention; *and* Dr. Braaksma's concession that under the circumstances of this case, other reasonable psychologists would have agreed with Hakes' decision *not* to place Mouradian on suicide watch.

This latter evidence wholly undermines plaintiff's reliance on Dr. Braaksma's opinion that *he* would have placed Mouradian on suicide watch following his behavior in April. Specifically, "[w]hile such a dispute might state a negligence cause of action, it *cannot* make out a substantive due process claim." *Collignon*, 163 F.3d at 990 (citing *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)) (emphasis added). Rather, Dr. Braaksma's acknowledgement that other reasonable psychologists would agree with Hakes' judgment and refrain from putting Mouradian on suicide watch essentially *precludes* a jury from finding that *no* minimally competent professional would have responded similarly under the circumstances, at least absent a qualified expert's opinion to the contrary. (Dkt. #151, ¶ 177.)

Despite Braaksma's concessions, plaintiff still argues that this court should allow a lay jury to second guess Hakes' judgment because she ignored her own, previous opinions regarding Mouradian shortly before his suicide. *See Ortiz v. Webster*, 655 F.3d 731, 735-36 (7th Cir. 2011) (reversing summary judgment on the grounds that the medical provider "ignored his own opinion"). However, Hakes' opinions that plaintiff argues were contradictory -- Mouradian having a plan to commit suicide before any transfer to prison

and his anticipating that the time around his plea and anticipated sentencing would be difficult -- both of which were offered during Mouradian's Chapter 51 commitment in February 2020, were no more or less her opinions regarding Mouradian's mental health and suicide risk *at that time*.

After Mouradian's Chapter 51 commitment, however, he was released under a 90-day settlement agreement with *no* instruction to be put on suicide watch or take other extraordinary measures, including following a different prescription regimen.  Further, Mouradian continued to have no documented suicide or self-harm attempts, took on work responsibilities at the jail, and met regularly with Hakes, during which times, she noted ebbs and flows in Mouradian's mental health.  Finally, during their last session, Mouradian showed improvement and did not mention any current safety concerns, which in hindsight might have been a red flag but at the time Hakes viewed positively.  Thus, the undisputed record shows that Hakes had concerns about Mouradian's mental health in February that ultimately led to his Chapter 51 commitment, when that commitment ended, Hakes' *concerns had been mitigated and yet she continued to evaluate* Mouradian regularly using her medical judgment to recommend different levels of scrutiny for his safety.  This differs materially from the medical provider defendant in *Ortiz* who opined that plaintiff, depending on further evaluation of his vision, would need surgery in the next two years, then *never* reevaluated the plaintiff nor performed surgery.  *Id.* at 735.

Additionally, plaintiff points to *Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011), for the proposition that a properly instructed jury *may* reasonably infer that Hakes knew Mouradian's current treatment plan was not working and failed to exercise sound

32

professional judgment by not altering his treatment.  *Id.* at 314-15.  At the time plaintiff filed his complaint in *Gonzalez*, however, he had been suffering from a hernia for seven years.  *Id.* at 314.  Further, during the first five years, plaintiff's condition was manageable with mild pain medication, but even after plaintiff's condition and pain worsened markedly in the last two years, his physicians persisted in the same treatment and denied his increasingly ardent requests for surgery.  *Id.* at 314-15.  Here, unlike these key facts in *Gonzalez*, Hakes documented the many therapy techniques she applied *and* her requests to Jacobson to have Mouradian's medication adjusted to treat Mouradian's condition.  In hindsight, Hakes may well have been mistaken in her assessment as to both Mouradian's treatment and risk of suicide, but a jury could not reasonably find *no* minimally competent psychologist would have responded similarly, much less that Hakes had failed to exercise professional judgment at all.  To the contrary, the evidence shows Hakes reasonably believed she was bringing about a positive change to Mouradian's overall mental health through the treatment she prescribed.

Also citing *Est. of Hill v. Richards*, 525 F. Supp. 2d 1076 (W.D. Wis. 2007), plaintiff argues that determining whether the failure to prevent Mouradian's suicide was a constitutional violation "is a simple issue -- one that expert testimony and medical judgment is not needed."  However, in *Est. of Hill*, this court actually commented that "the court of appeals has never held that expert testimony is dispositive or even particularly important" in determining whether the failure to prevent a suicide was a *potential* constitutional violation.  525 F. Supp. 2d. at 1086 (citing *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557-58 (7th Cir. 2003).  However, this statement was in relation to whether

33

a defendant knew of the risk, *not* whether defendant's response to a possible suicide risk was reasonable.  Regardless of the necessity for expert testimony to prove whether Hakes' judgment was reasonable, the facts here are simply not extreme enough for a lay jury to disregard plaintiff's *own* expert's acknowledgement that other reasonable psychologists may have agreed with Hakes' treatment approach.

Having determined that a reasonable trier of fact would be compelled on this record to find Hakes' decisions regarding Mouradian's mental health and level of observation at the Jail were well within her area of expertise as a licensed psychologist, *and* that a minimally competent psychologist could have acted similarly, this court will not second guess Hakes' exercise of professional judgment.  Accordingly, Hakes is entitled to summary judgment as a matter of law on the federal claims against her.

## B.   Correctional Officers and County Defendants

Next, plaintiff claims that the correctional officers on duty on the night of Mouradian's death (Officers Johnson and Keller and Captain Bowe) are liable for failing to prevent his suicide.  More generally, plaintiff claims that Jackson County and Sheriff Waldera, as policymakers, are liable under *Monell* for failing to have an effective policy to prevent suicides like Mouradian's.

### 1.   Correctional Officer Defendants

As correctional officers at the Jail are subject to the Fourteenth Amendment's objective reasonableness standard, defendants Johnson, Keller and Bowe are entitled to defer to the judgment of jail health professionals, so long as they did not ignore

34

Mouradian's request to be seen by those professionals. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Here, the undisputed facts show that each of the correctional officers met this standard. Specifically, there is no dispute that following Hakes' meeting with Mouradian on May 21, 2020, she did *not* recommend more frequent observations of Mouradian. Further, between Hakes' last meeting with Mouradian and his suicide, there is no evidence of behaviors pointing toward his need for a mental health intervention or an increased risk of suicide. Finally, during the night of his death, the records shows: (1) defendants Johnson and Keller performed cell checks at time intervals compliant with Jail policy; and (2) as soon as Johnson and Keller noticed Mouradian's condition, they both took action to provide care as promptly as they reasonably could.

Nevertheless, plaintiff contends, again without citation to any case law or statute, that these jail officer defendants should not be able to rely on the medical opinions of others, having received their own training in suicide prevention and being required to follow policy, as well as the commands of supervisors, such that any reasonable officer would have recognized the need for heightened observation. Unfortunately for plaintiff, this contention is unpersuasive for at least two reasons. First, while the correctional officers here had some training regarding suicide prevention, they never formerly evaluated Mouradian, nor did they have the depth of knowledge and experience that Psychologist Hakes had, to determine a detainee's suicide risk. Second, and more importantly, the Seventh Circuit has repeatedly held that "the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments

of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry*, 604 F.3d at 441 (collecting cases).

As for plaintiff's contention that other policy or direction from supervisors required additional monitoring of Mouradian, plaintiff points this court to Captain Kaylan Rich's instruction to night staff on April 14, 2020 (six seeks prior to Mouradian's suicide) to keep an extra diligent eye on him after he had been observed looking around his cell as if he was searching for a place to tie something. Plaintiff argues that this directive persisted through Mouradian's death and that Officer Johnson defied it during his time in the control room that night. However, there is no evidence of record to support this inference. If anything, when asked how long this directive was for, Captain Rich clarified that she, "Didn't put a limit on it. Just a couple of days, more or less monitoring. If there were any other concerning things since that directive, then it would have been continued." (Dkt. #99, at 108:15-21.) However, in the days and nights immediately following this directive, including a session with Psychologist Hakes, no concerning behaviors were observed. Thus, there is no view of this instruction that would allow a reasonable jury to infer that any special notice was in effect on the evening of Mouradian's suicide.

Having found that the correctional officer defendants were entitled to rely on Hakes' decision not to elevate Mouradian's observation status on the night of his death, no trier of fact could reasonably infer that the officer defendants' actions were objectively unreasonable under the totality of the circumstances. Accordingly, defendants Bowe, Johnson, and Keller are entitled to summary judgment on plaintiff's claim of a Fourteenth Amendment violation as a matter of law as well.

36

2. **Jackson County and Sheriff Waldera**

To succeed on its claims against Jackson County and Sheriff Waldera under *Monell*, plaintiff must show that Mouradian's injuries were the result of: "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404–07 (1997)). Having found that the correctional officer defendants did not violate Mouradian's Fourteenth Amendment rights, the court necessarily also holds that plaintiff's *Monell* claims against defendants Jackson County and Sheriff Waldera must fail as a matter of law. *See Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-07 (1997)) (claims under *Monell* must be supported by an underlying constitutional violation). Therefore, these defendants are also entitled to summary judgment on plaintiff's Fourteenth Amendment claims.

### III. The Estate's State Law Wrongful Death Claims

Plaintiff also asserts a wrongful death claim under Wisconsin law against defendants resting on their allegations that: (1) Hakes and the correctional officer defendants were negligent in preventing Mouradian's suicide; and (2) defendants Jackson County and Waldera negligently trained and supervised the Jail staff. Under 28 U.S.C. § 1367(c)(3), the court may decline jurisdiction over these remaining state law claims. Indeed, the general rule is that, when the federal claims drop out before trial, the district court should

relinquish jurisdiction. *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). This is particularly true where a defendant has raised specific state law defenses, such as discretionary immunity, or it is not readily apparent that the claims fail as a matter of law on the merits. Therefore, the court will relinquish jurisdiction over plaintiff's remaining supplemental state-law claims and dismiss them without prejudice.

## ORDER

IT IS ORDERED that:

1) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's motion to supplement affidavit (dkt. #91) is GRANTED;

2) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's first motion for summary judgment based on statute of limitations (dkt. #63) is GRANTED;

3) Plaintiff's motion for a hearing on Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's first motion for summary judgment (dkt. #90) is DENIED as moot;

4) Defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's second motion for summary judgment on the merits (dkt. #108) is DENIED as moot;

5) Plaintiff's motion to strike defendants Patricia Jacobson and Footprints in Time Midwifery Services LLC's reply brief and supplemental facts in reply to their second motion for summary judgment (dkt. #153) is DENIED as moot;

6) Defendant Hakes' motion for summary judgment (dkt. #112) is GRANTED with respect to plaintiff's Fourteenth Amendment, Americans with Disabilities Act, Wisconsin Constitution, intentional infliction of emotional distress, and breach of contract claims;

7) Defendants Bowe, Johnson, Keller, Waldera, and Jackson County's motion for summary judgment (dkt. #117) is GRANTED with respect to plaintiff's Fourteenth Amendment, Americans with Disabilities Act, Wisconsin Constitution, intentional infliction of emotional distress, and safe place claims;

8)   The court relinquishes jurisdiction over plaintiff's remaining state-law wrongful death, negligence, and negligent failure to train and supervise claims against defendants Hakes, Bowe, Johnson, Keller, Waldera, and Jackson County, which are DISMISSED WITHOUT PREJUDICE;

9)   Defendants John Does 2-10 and ABC Insurance Company are DISMISSED; and

10)    The clerk of court is directed to enter judgment and close this case.

Entered this 10th day of June, 2025.

BY THE COURT:
/s/

_____

WILLIAM M. CONLEY
District Judge