No. 25-2132

# In the
# United States Court of Appeals
## For the Seventh Circuit
———————————

ESTATE OF ANTHONY MOURADIAN,

*Plaintiff-Appellant,*

v.

JACKSON COUNTY, *et al.*,

*Defendants-Appellees.*
———————————

On Appeal from the United States District Court
for the Western District of Wisconsin, No. 3:23-cv-00167-wmc
The Honorable William M. Conley, *Judge.*
———————————

**BRIEF OF DEFENDANT-APPELLEE ASHLEY HAKES**

———————————————————————————————

Atty. Vincent J. Scipior
Coyne, Schultz, Becker & Bauer, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin 53703
Tel.: 608-255-1388
Fax: 608-255-8592

*Attorneys for Defendant-Appellee Ashley Hakes*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2132

Short Caption: Estate of Anthony Mouradian v. Jackson County, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Ashley Hakes

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Coyne, Schultz, Becker & Bauer, S.C.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Vincent J. Scipior     Date: July 17, 2025

Attorney's Printed Name: Vincent J. Scipior

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: 150 E. Gilman St. #1000, Madison, WI 53703

Phone Number: 608-255-1388     Fax Number: 608-255-8592

E-Mail Address: vscipior@cnsbb.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iv

JURISDICTIONAL STATEMENT .................................................. 1

STATEMENT OF THE ISSUES ................................................... 2

STATEMENT OF THE CASE ..................................................... 3

    I.    Factual Background ................................................. 3

    II.   Procedural History ................................................ 18

    III.  District Court Decision and Order .................................. 20

SUMMARY OF ARGUMENT ...................................................... 22

STANDARD OF REVIEW ....................................................... 24

ARGUMENT ................................................................. 25

    I.    The district court correctly granted summary judgment
        to Dr. Hakes. ..................................................... 25

        a. It was not "obvious" that Mouradian posed a serious
           risk of suicide immediately prior to his death ................. 27

        b. The Estate cannot prove that Dr. Hakes acted in an
           objectively unreasonable manner ............................... 30

        c. The Estate cannot prove its claims based on the
           testimony of its own psychology expert ........................ 35

    II.   The Eighth Amendment applies to the Estate's claims
        against Dr. Hakes .................................................. 41

III.    The Estate cannot prove that Dr. Hakes acted with
        deliberate indifference ...................................…..……........ 47

IV.     The *Youngberg* professional judgment standard applies
        to the Estate's claims against Dr. Hakes ..........................… 48

V.      The district court did not ignore binding precedent ............... 55

VI.     The Estate's appellate brief contains factual
        misrepresentations that are not supported by the record ....... 58

VII.    The Estate omits key facts in its appellate brief ................... 62

VIII.   The Estate's argument is based on speculation and
        unsupported conclusory remarks ....................................... 63

CONCLUSION ..............................…................................…........ 65

CERTIFICATE OF COMPLIANCE ...............................................….. 66

# TABLE OF AUTHORITIES

## Cases

*Ammons v. Washington Dep't of Social & Health Servs.*,
   648 F.3d 1020 (9th Cir. 2011) ............................................. 53-54

*Bell v. Wolfish*,
   441 U.S. 520 (1979) .............................................................. 43

*Berry v. City of Muskogee*,
   900 F.2d 1489 (10th Cir. 1990) ..................................... 44-45

*Brown v. Meierdirk*,
   2008 U.S. Dist. LEXIS 46751, 2008 WL 4630593
   (W.D. Wis. June 12, 2008) ................................................ 27-28

*Bublitz v. Cottey*,
   327 F.3d 485 (7th Cir. 2003) ........................................... 25, 48

*Cavalieri v. Shepard*,
   321 F.3d 616 (7th Cir. 2003) .................................................. 39

*Colbert v. City of Chicago*,
   851 F.3d 649 (7th Cir. 2017) .................................................. 61

*Collignon v. Milwaukee Cty.*,
   163 F.3d 982 (7th Cir. 1998) ...................................... 27, 30, 54

*Collins v. Seeman*,
   462 F.3d 757 (7th Cir. 2006) ........................................... 27-28

*Corley v. Rosewood Care Ctr., Inc. of Peoria*,
   388 F.3d 990 (7th Cir. 2004) .................................................. 59

*Coulter v. Vitale*,
   882 F.2d 1286 (7th Cir. 1989) ................................................. 47

*Craddock v. Cty. of Macomb,*
    718 F. Supp. 3d 683 (E.D. Mich. Feb. 26, 2024) .......................... 28

*Deck v. Missouri,*
    544 U.S. 622 (2005) ............................................................. 46

*Downard for Estate of Downard v. Martin,*
    968 F.3d 594 (6th Cir. 2020) ................................................ 28

*Erwin v. County of Manitowoc,*
    872 F.2d 1292 (7th Cir. 1989) ............................................. 47

*Est. of Wallmow v. Oneida Cty.,*
    99 F.4th 385 (7th Cir. 2024) ................................... 28-29, 31, 40

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ............................................................. 53

*Fisherman v. McGriff,*
    2020 U.S. Dist. LEXIS 49165, 2020 WL 1330176
    (D. Minn. Mar. 23, 2020) ..................................................... 44

*Gen. Motors Acceptance Corp. v. Cent. Nat'l Bank of Mattoon,*
    773 F.2d 771 (7th Cir. 1985) ............................................... 41

*Gomez v. Toledo,*
    466 U.S. 635 (1980) ............................................................. 26

*Gonzalez v. Feinerman,*
    663 F.3d 311 (7th Cir. 2011) ........................................... 55-56

*Gray v. City of Detroit,*
    399 F.3d 612 (6th Cir. 2005) ............................................... 27

*Guillot v. Russell,*
    59 F.4th 743 (5th Cir. 2023) ............................................... 58

*Haley v. Gross,*
　　86 F.3d 630 (7th Cir. 1996) ................................................ 27

*Hardeman v. Curran,*
　　933 F.3d 816 (7th Cir. 2019) ........................................... 42-43

*Johnson v. Rimmer,*
　　936 F.3d 695 (7th Cir. 2019) ........................................... 51-54

*Jump v. Village of Shorewood,*
　　42 F.4th 782 (7th Cir. 2022) ................................................ 32

*Jutzi-Johnson v. United States,*
　　263 F.3d 753 (7th Cir. 2001) ................................................ 39

*Kemp v. Fulton Cty.,*
　　27 F.4th 491 (7th Cir. 2022) ........................................... 45-46

*Kingsley v. Hendrickson,*
　　576 U.S. 389 (2015) ...................................................... *passim*

*Lewis v. Downey,*
　　581 F.3d 467 (7th Cir. 2009) ................................................ 42

*Manbourne, Inc. v. Conrad,*
　　796 F.2d 884 (7th Cir. 1986) ................................................ 41

*Manley v. Grossman,*
　　2017 U.S. Dist. LEXIS 159620, 2017 WL 4326541
　　(S.D.N.Y. Sept. 27, 2017) ................................................ 44

*Matos v. O'Sullivan,*
　　335 F.3d 553 (7th Cir. 2003) ................................................ 39

*McCann v. Ogle County,*
　　909 F.3d 881 (7th Cir. 2018) ........................................... 31, 54

*Miranda v. Cnty. of Lake,*
    900 F.3d 335 (7th Cir. 2018) ....................................... 26, 31, 45

*Norbert v. City & County of San Francisco,*
    10 F.4th 918 (9th Cir. 2021) ............................................ 43-44

*Norfleet v. Webster,*
    439 F.3d 392 (7th Cir. 2006) .................................................. 31

*O'Leary v. Accretive Health, Inc.,*
    657 F.3d 625 (7th Cir. 2011) .................................................. 24

*Ortiz v. Webster,*
    655 F.3d 731 (7th Cir. 2011) .............................................. 55-56

*Oyler v. National Guard Ass'n of the United States,*
    743 F.2d 545 (7th Cir. 1984) .................................................. 24

*Pittman by & through Hamilton v. Madison Cnty., Illinois,*
    108 F.4th 561 (7th Cir. 2024) ............................................... 47

*Pittman ex rel. Hamilton v. Cnty. of Madison,*
    746 F.3d 766 (7th Cir. 2014) ....................................... 49-51, 54

*Pulera v. Sarzant,*
    966 F.3d 540 (7th Cir. 2020) ............................................ 32, 35

*Reives v. Illinois State Police,*
    29 F.4th 887 (7th Cir. 2022) .................................................. 24

*Salazar v. Core Civic,*
    2022 U.S. Dist. LEXIS 31507, 2022 WL 541030
    (D.N.M. Feb. 23, 2022) ........................................................ 44

*Simmons v. Pryor,*
    26 F.3d 650 (7th Cir. 1993) .................................................. 24

*Steele v. Choi,*
    82 F.3d 175 (7th Cir. 1996) ...................................….d ............... 31

*Thomas v. Blackard,*
    2 F.4th 716 (7th Cir. 2021) ...................................................... 26

*United States v. Dunkel,*
    927 F.2d 955 (7th Cir. 1991) ................................................... 59

*United States v. Kills Enemy,*
    3 F.3d 1201 (8th Cir. 1993) ...............................…............... 46

*United States v. Shim,*
    2020 U.S. Dist. LEXIS 64168 (E.D. Wis. Apr. 13, 2020) ............. 46

*West Side Salvage, Inc. v. RSUI Indem. Co.,*
    878 F.3d 219 (7th Cir. 2017) ................................................... 24

*White v. United States,*
    8 F.4th 547 (7th Cir. 2021) ...................................................... 41

*Wilber v. Hepp,*
    16 F.4th 1232 (7th Cir. 2021) ...............................…............... 46

*Youngberg v. Romeo,*
    457 U.S. 307 (1982) ...................................….................. *passim*

*Zentmyer v. Kendall Cty.,*
    220 F.3d 805 (7th Cir. 2000) ................................................... 47

## Statutes

42 U.S.C. § 1983 .................................................…........... *passim*

## Other Authorities

Cir. R. 32(b) ........................................................................ 66

Cir. R. 32(c) ....................................................................... 66

Fed. R. App. P. 32(a) ....................................................... 66

Fed. R. Civ. P. 56(c) ......................................................... 24

U.S. Const. amend. VIII ...................................... *passim*

U.S. Const. amend. XIV ...................................... *passim*

# JURISDICTIONAL STATEMENT

The jurisdictional statement in the Estate's brief is complete and correct, except we disagree with the Estate's assertion that its claims "aris[e] under the *Fourteenth* Amendment to the United States Constitution." (Emphasis added.) As discussed below, the Estate's claims arise under the *Eighth* Amendment because Mouradian had already been convicted and was awaiting sentencing at the time of his death.

## STATEMENT OF THE ISSUES

Could a reasonable jury find in favor of the Estate on its claims against Dr. Hakes based on the undisputed evidence in the record?

**The district court's answer: No.**

## STATEMENT OF THE CASE

### I.     Factual Background

The Estate brought this case on behalf of Anthony Mouradian ("Mouradian"), a former inmate at the Jackson County Jail ("the Jail"). (R. 1.) Mouradian committed suicide at the Jail in the early hours of May 28, 2020. (R. 115-7; R. 115-4 at 124:6-9.)

Dr. Ashley Hakes ("Dr. Hakes") is a licensed psychologist. (R. 115-1 at 13:12-16; R. 114 at ¶ 1.) She has master's and doctoral degrees from the Wisconsin School of Professional Psychology. (R. 115-1 at 8:1-11.) From May 2016 to February 2023, she was under contract with the Jackson County Sheriff's Office to provide psychological services at the Jail one day per week, including face-to-face therapy to inmates like Mouradian. (R. 115-1 at 20:7-11, 21:22-24; R. 114 at ¶ 2; R. 115-1 at 49:22-25, 67:12-17.)

Mouradian was arrested and taken to the Jail on July 30, 2019. (R. 115-3 at 1.) On the way to jail, Mouradian told the arresting officers that he "wanted to die" and was "going to kill himself while here in jail." (*Id.*) After being booked, Mouradian was placed on suicide watch by Jail Sergeant Tom Sharp. (*Id.*) On August 1, 2019, Mouradian verbalized

suicidal ideations with a plan "that included him hanging himself with his bedsheet." (R. 115-6 at 7.)

Dr. Hakes attempted to meet with Mouradian on August 2, 2019, but he "refused to speak with [her]." (R. 115-3 at 4.) She recommended that he remain on suicide watch. (*Id*.)

Dr. Hakes assessed Mouradian for the first time on August 9, 2019. (R. 115-2 at 1-2.) He displayed depressive symptoms and endorsed passive suicidal ideation, but denied any current plan to engage in self-harm. (R. 115-2 at 1-2; R. 115-3 at 6.) Dr. Hakes released him from suicide watch. (R. 115-3 at 6.)

From August 9, 2019 to May 21, 2020, Dr. Hakes met with Mouradian almost every week. (R. 115-1 at 96:5-8; R. 115-7.) She met with Mouradian more than any other inmate at the Jail. (R. 115-1 at 72:6-11.) Their meetings lasted up to two hours. (R. 115-1 at 68:3-7.)

Dr. Hakes kept detailed SOAP notes of her meetings with Mouradian. (R. 115-1 at 28:24-29:2, 33:19-34:3; R. 115-7.) The notes document Mouradian's mood, symptoms, suicidal thoughts, and safety concerns. (*Id*.) They also document the different therapeutic techniques that Dr. Hakes employed with Mouradian, including cognitive behavioral

therapy, positive psychology, supportive psychotherapy, and dialectical behavioral therapy. (R. 115-1 at 67:12-17.)

After every meeting, Dr. Hakes sent an email to Jail staff with an update about Mouradian. (R. 115-1 at 159:19-160:4; R. 115-4 at 50:8-16; R. 115-3.) Dr. Hakes also regularly sent messages to the Jail medical provider, Patricia Jacobson, APNP ("Nurse Jacobson"), asking her to evaluate Mouradian's medication needs.[1] (R. 115-3 at 6.)

During his incarceration, Mouradian often endorsed suicidal ideation, but denied specific intent. (R. 115-2 at 6.) He said he would not tell Jail staff if he intended to harm himself. (*Id.*) Instead, he agreed to tell Jail staff he needed to speak with Dr. Hakes as a means to signal to her that he had a specific intention to harm himself. (R. 115-2 at 6, 22; R. 115-1 at 188:23-189:1; R. 115-3 at 13.) Dr. Hakes informed Jail staff of this plan and instructed them to place Mouradian on suicide watch if he asks to speak with her. (R. 115-3 at 7, 14.)

On August 30, 2019, Mouradian reported things were "going a little better." (R. 115-2 at 10-11.) His mood "appear[ed] to be improving slowly."

---

[1] As a psychologist, Dr. Hakes is not licensed to prescribe medication and was not responsible for prescribing or managing Mouradian's medication at the Jail. (R. 115-1 at 64:9-15; R. 115-4 at 114:19-25.).

(R. 115-2 at 11.) He was "more future-oriented than he has been during previous sessions." (*Id.*)

As of September 6, 2019, Mouradian's mood "seem[ed] to have plateaued somewhat." (R. 115-2 at 13.) He continued to express suicidal ideation, but there were "no current safety concerns." (R. 115-2 at 12-13; R. 115-3 at 10.) Dr. Hakes gave Mouradian a cognitive behavioral therapy (CBT) workbook as homework. (R. 115-2 at 13.)

Mouradian forgot his CBT workbook when he met with Dr. Hakes on September 13, 2019, but said he was doing his homework and "agreed to continue working in the cognitive behavioral therapy workshop." (R. 115-2 at 17-18.) Dr. Hakes was hopeful his mood would improve. (R. 115-2 at 17-18; R. 115-3 at 11.)

Mouradian expressed frustration with his CBT homework during a meeting with Dr. Hakes on September 20, 2019. (R. 115-2 at 19.) He reported feeling "down, irritable, and vulnerable," but continued to deny suicidal intent. (*Id.*) Dr. Hakes gave him a different therapeutic workbook. (R. 115-2 at 19-20; R. 115-3 at 12.)

On October 3, 2019, Mouradian told Dr. Hakes the homework was too overwhelming. (R. 115-2 at 21.) Dr. Hakes wrote that his "depression

is quite treatment-resistant," but "there is no imminent threat and therefore no reason to put him in suicide watch." (R. 115-3 at 13.)

As of October 11, 2019, Mouradian's mood had not improved. (R. 115-2 at 26.) Dr. Hakes told Jail staff that Mouradian "continues to have suicidal thoughts and plan without intent," but "the degree of dangerousness is insufficient to warrant a placement in suicide watch." (R. 115-2 at 26-27; R. 115-3 at 15.)

On October 18, 2019, Mouradian told Dr. Hakes that his mood continued to get worse. (R. 115-2 at 28.) Dr. Hakes documented that she "will continue to see him weekly, given the severity of his depression and high risk factors for suicide." (R. 115-2 at 28-29; R. 115-3 at 16.)

During a meeting with Dr. Hakes on October 25, 2019, Mouradian described feeling lonely, frustrated, hopeless, and angry. (R. 115-2 at 30.) Dr. Hakes told Jail staff there were "[n]o changes, but no imminent safety concerns." (R. 115-2 at 30-31; R. 115-3 at 17.)

On November 1, 2019, Mouradian told Dr. Hakes he had more energy and was not sleeping during the day. (R. 115-2 at 32.) He said he was thankful for television, the Packers, and his therapy sessions with her. (*Id*.) Dr. Hakes told Jail staff that Mouradian "[r]emains depressed,"

but expressed hope that his increased energy was an indication things were improving. (R. 115-3 at 18; R. 115-2 at 34-35.)

Mouradian reported no changes during a meeting on November 7, 2019. (R. 115-2 at 34.) Dr. Hakes gave him some new therapy homework. (R. 115-2 at 35.) After the meeting, she told Jail staff there was, "No Improvement … No imminent safety concerns." (R. 115-2 at 34-35; R. 115-3 at 19.)

Mouradian attended a meeting with Dr. Hakes on November 15, 2019 having completed the new homework and "did an exceptional job on it." (R. 115-2 at 39.) He reported a slight improvement in his mood, and agreed to complete additional positive psychology homework. (R. 115-2 at 39-40.) After the visit, Dr. Hakes told Jail staff there was "a slight improvement in [Mouradian's] mood." (R. 115-2 at 39-40; R. 115-3 at 20.) The plan was to "continue this course until safety concerns have been sufficiently decreased." (*Id*.)

Mouradian was "quite agitated" during a meeting with Dr. Hakes on November 22, 2019. (R. 115-2 at 41.) He had just learned the State was offering him five years in prison. (*Id*.) Dr. Hakes gave him the first two chapters of the positive psychology for long-term incarceration book

to read. (R. 115-2 at 42.)

Mouradian refused to meet with Dr. Hakes on November 29, 2019. (R. 115-3 at 22.)

During the week of December 2-6, 2019, Dr. Hakes attended training in Prairie du Chien. (*Id.*) Prior to leaving, Dr. Hakes told Jail staff to call her if there is an urgent issue. (*Id.*)

Mouradian told Dr. Hakes "things have been going the same" on December 13, 2019 and December 20, 2019. (R. 115-2 at 43, 45.) He "continue[d] to be incredibly depressed," but there were "[n]o current safety concerns." (R. 115-3 at 23.) Dr. Hakes gave Mouradian Chapter 6 of the positive psychology for long-term incarceration book. (R. 115-2 at 45.)

Mouradian refused to meet with Dr. Hakes on December 26, 2019, January 17, 2020, January 24, 2020, and January 20, 2020. (R. 115-3 at 25; R. 115-2 at 47, 53.)

On February 20, 2020, Dr. Hakes sent an email to Jail Captain Scott Bowe expressing concern for Mouradian because "he has refused to meet with me for approximately two months," and "[h]e has a plea hearing tomorrow" that could "impact his mental health." (R. 115-3 at

30.) She wrote, "Please let staff know to be cognizant of any changes in his presentation." (*Id*.)

During a plea hearing on February 21, 2020, Mouradian's attorney told the court that he "couldn't enter his plea because he tried to hang himself in the jail last night." (R. 115-3 at 31-32.) After the hearing, Mouradian denied telling his attorney he tried to hang himself and said he was not suicidal. (R. 115-3 at 31.) Dr. Hakes recommended Mouradian be placed on suicide watch. (R. 115-3 at 33.)

Mouradian was placed on suicide watch on February 21, 2020. (R. 115-3 at 38.) He began refusing medications, food, and water. (R. 115-1 at 127:1-2.) He "threatened to bang his head on the window of the side cell until he became unconscious." (R. 115-1 at 127:3-4.)

On February 28, 2020, Mouradian told Dr. Hakes his mood had "plummeted" and "expressed extreme frustration with being on [suicide watch] precautions." (R. 115-2 at 54.) Dr. Hakes contacted Northwest Connections (a 24/7 emergency crisis hotline that contracted with Jackson County to provide mental health services and controls Chapter 51 emergency detentions) and requested an assessment for a Chapter 51 emergency detention. (R. 115-2 at 55; R. 115-1 at 62:24-25.) Mouradian

was assessed by Northwest Connections and immediately transferred to Sacred Heart Hospital in Eau Claire. (R. 115-6 at 8-15.)

On March 2, 2020, Dr. Hakes sent an email to Sacred Heart Hospital documenting Mouradian's history of depression and suicidal ideation at the Jail and expressed concern that "they would release him prematurely from the hospital." (R. 115-1 at 78:1-3; R. 115-3 at 47-48.) On March 5, 2020, Dr. Hakes sent an email to Jackson County Social Worker Stephanie Kennedy stating that Mouradian has a "very high chance of suicide attempts or completion" without "a more intensive level of treatment," and recommended "he be placed at a mental health hospital." (R. 115-3 at 46-47.)

Mouradian was transferred to Winnebago Mental Health Institute (WMHI) for further treatment on March 13, 2020. (R. 115-3 at 50; R. 115-1 at 138:8-9.) He was discharged five days later on March 18, 2020 and returned to the Jail under a 90-day settlement agreement with Jackson County. (R. 115-3 at 52-53.) Under the agreement, Mouradian agreed to take his medications as prescribed and to meet with Dr. Hakes regularly. (R. 115-1 at 116:21-24.)

Upon his return, Dr. Hakes recommended that Mouradian be

placed in a two-man cell rather than the normal dorm-style housing so Jail staff could keep a closer eye on him. (R. 115-3 at 53.)

Dr. Hakes met with Mouradian on March 20, 2020. (R. 115-1 at 62-63.) He was "better than [he] had ever been." (R. 115-4 at 47:8-11.) He "appear[ed] to have improved and [was] evidencing fewer symptoms of depression." (R. 115-2 at 63.) Dr. Hakes sent an email to Jail staff stating that Mouradian's "mood has definitely improved with the hospitalization." (R. 115-2 at 55.)

Mouradian reported decreased suicidal ideation to Dr. Hakes on March 27, 2020. (R. 115-2 at 64-65.) Dr. Hakes documented that Mouradian "continues to have suicidal ideation, but it has reduced with regard to frequency and intensity." (R. 115-2 at 64-65; R. 115-3 at 57.)

Ms. Kennedy sent an email to Dr. Hakes on April 6, 2020 asking for an update on Mouradian. (R. 115-3 at 59.) Dr. Hakes responded, "He is more stable than I've ever seen him in the past year." (*Id*.)

Mouradian "presented as fairly agitated" on April 10, 2020. (R. 115-2 at 66-67; R. 115-3 at 60.) He thought a new medication was "making him worse." (R. 115-2 at 66.) Dr. Hakes asked Nurse Jacobson to reevaluate him. (R. 115-3 at 60.) She also recommended Mouradian for a

laundry job. (*Id.*) Working in the laundry room is considered a privilege for inmates at the Jail. (R. 115-4 at 75:13.) It gets inmates out of their cell, gives them an activity, and they can write letters and listen to the radio between laundry loads. (R. 115-4 at 75:13-23.)

On April 14, 2020, Mouradian was observed by a correctional officer "wrapping a towel around the bars of his cell as if he intended to tie it." (R. 115-3 at 61-62.) The correctional officer reported the behavior to Jail Sergeant Kaylan Rich. (R. 115-3 at 61.) Sergeant Rich reported the behavior to command staff via email and told night shift "to be extra diligent in camera/rounds observation." (R. 115-3 at 61; R. 115-1 at 8.) The next day, Sergeant Rich informed Dr. Hakes that she had "instructed night shift to keep an extra diligent eye on Anthony Mouradian [… and to] use one of our monitors after lockdown just for enlarging the view of Mouradian's cell/bunk area as an extra precaution." (R. 115-4 at 107:9-108:14; R. 115-3 at 63-64.)

Dr. Hakes met with Mouradian next on April 16, 2020. (R. 115-2 at 70-71.) She asked him about his recent behavior. (R. 115-2 at 70.) He complained about Jail staff "watching him" and waking him up in the middle of the night to check on him. (*Id.*) Dr. Hakes told Mouradian that

staff are watching him because "they are concerned about him." (*Id.*)

During the meeting, Dr. Hakes gave Mouradian resources for mental

health programming in the prison system should he be convicted. (R. 115-

1 at 112:5-113:2; R. 115-2 at 70.) They discussed the Wisconsin OARS

(Opening Avenues to Re-Entry Success) Project which supports the

prison-to-community transition of people living with a mental illness, the

federal DOES (Department of Employment Services) Project which

provides housing, food, and community-based resources upon re-entry,

and the Wisconsin Resource Center which provides specialized treatment

services to people referred from the DOC. (R. 115-1 at 112:22-113:2,

115:3-9; R. 115-2 at 70.) At the end of the meeting, Mouradian said to Dr.

Hakes, "You win. You've instilled some hope." (R. 115-1 at 113:2-4; R.

115-2 at 70.) To Dr. Hakes, the comment meant he "had future

orientation looking beyond his prison sentence" which "was a strong

protective factor." (R. 115-1 at 115:12-16, 127:17-25.) In Dr. Hakes'

opinion, Mouradian's presentation did not warrant placing him on

suicide watch on April 16, 2020. (R. 115-1 at 175:23-25, 177:23-24.) After

the meeting, Dr. Hakes sent an email to Jail staff informing them that

Mouradian's mood was improved by the end of their session and that he

agreed to take the laundry job. (R. 115-3 at 68.)

At a plea hearing on April 24, 2020, Mouradian entered no contest pleas to felony burglary, stalking, bail jumping, and possession of methamphetamine charges. (R. 115-7.) A sentencing hearing was scheduled for July 2, 2020. (*Id.*)

Dr. Hakes met with Mouradian again on April 30, 2020. (R. 115-2 at 72.) Mouradian informed her that he had started working in the laundry room. (*Id.*) He said he was processing the fact that he was "now a felon" and was "likely to be sentenced to 5 years in prison." (*Id.*) His mood was "impaired" and "slightly depressed." (R. 115-2 at 72-73.) After the meeting, Dr. Hakes sent an email to Jail staff informing them that Mouradian was still "somewhat depressed," but there are no current safety concerns. (R. 115-2 at 72-73; R. 115-3 at 69.)

Ms. Kennedy asked Dr. Hakes for another status update on May 1, 2020. (R. 115-3 at 70.) On May 4, 2020, Dr. Hakes told Ms. Kennedy that "Mouradian had a bit of a setback with his plea hearing, but his mood is still slightly better than it was prior to his hospitalization." (*Id.*) Since returning from WMHI, Mouradian was "doing laundry, reading, [and] exercising." (R. 115-1 at 117:13-15.) Dr. Hakes told Ms. Kennedy that she

"anticipate[s] a similar setback as he approaches his sentencing hearing in July," and wanted to ensure that he would continue doing well. (R. 115-1 at 117:13-18; R. 115-3 at 74.) Dr. Hakes asked Ms. Kennedy if the 90-day settlement agreement could be extended. (R. 115-1 at 116:16-17, 135:18-21; R. 115-3 at 74.) Ms. Kennedy told Dr. Hakes that the settlement agreement could not be extended. (R. 115-3 at 73.)

During a meeting on May 7, 2020, Mouradian told Dr. Hakes he was doing "ok," he was getting along with his cellmate, he was doing the laundry, and rated his mood 3 out of 10. (R. 115-3 at 73.) Dr. Hakes documented that Mouradian's mood was "not great," but "better than it has been." (R. 115-2 at 74-75; R. 115-3 at 75.)

Mouradian declined to see Dr. Hakes on May 13, 2020. (R. 115-3 at 76; R. 115-2 at 76.)

Dr. Hakes' last therapy session with Mouradian was on May 21, 2020. (R. 115-2 at 80; R. 115-3 at 82; R. 114 at ¶ 5.) At that time, he was eating and drinking appropriately, taking his medications, and was still working in the laundry room. (R. 115-2 at 80.) He described having "substantial guilt and shame" for things he had done to his family during the session. (*Id.*) Dr. Hakes commended Mouradian for his "openness and

efforts during the session," provided him with positive reinforcement, and educational resources on coping with low self-esteem, guilt, and shame. (R. 115-2 at 80-81.) Mouradian "was fairly cooperative throughout the duration of the session" and "did not mention any current safety concerns." (R. 115-2 at 80.) After the meeting, Dr. Hakes sent an email to Jail staff stating that she and Mouradian "actually had a very productive session," that he was "more open and participatory than he has been in the past," that she "believe[s] we will see some improvement," and reported that Mouradian "denied any safety concerns." (R. 115-3 at 82.)

Dr. Hakes did not see or speak to Mouradian after May 21, 2020. (R. 114 at ¶ 6.) She was not contacted by anyone at the Jail about Mouradian between May 21, 2020 (her last session with him) and May 28, 2020 (the date of his death) (R. 114 at ¶ 7.)

Mouradian used a bed sheet to hang himself from the bars of his cell at the Jail on May 28, 2020 at approximately 2:00 a.m.[2] (R. 115-4 at 124:6-9.) Investigators found a suicide note in Mouradian's cell, in which

---

[2] As to the facts surrounding the suicide, Dr. Hakes adopts that part of the co-appellee's brief. *See* App. R. 2.

he wrote, "No blame should be cast anywhere other than myself. No blame to the jail staff who for the most part treated me with nothing but respect. Nobody sue in my name." (R. 115-6 at 16-22.)

Mouradian is the only patient of Dr. Hakes' who has committed (or even attempted) suicide. (R. 115-1 at 51:22-52:6.) He is also the only suicide at the Jail in the last ten years. (R. 115-4 at 32:17-22.)

## II. Procedural History

Three years after Mouradian's death, his Estate filed this lawsuit against Jackson County and various jail officials, including Dr. Hakes. (R. 1.) The Estate alleges in the complaint that Dr. Hakes "engaged in extreme and outrageous conduct [by] refusing and failing to adequately care for and observe [Mouradian], failing to respond to his serious medical needs, and being deliberately indifferent to his suffering." (R. 26 ¶ at 155.) The following claims were asserted against Dr. Hakes:

(1) A claim under 42 U.S.C. § 1983 for an alleged violation of Mouradian's constitutional rights under the U.S. Constitution;

(2) A claim for an alleged violation of Mouradian's constitutional rights under the Wisconsin Constitution;

(3) A wrongful death claim under Wis. Stat. § 895.04;

(4) A claim for intentional infliction of emotional distress;

(5)    A negligence claim;

(6)    A breach of contract claim;

(7)    A claim for an alleged violation of Mouradian's civil rights under the Americans with Disabilities Act ("ADA"); and

(8)    A punitive damages claim.

(*Id.*) The state constitution claim, intentional infliction of emotional distress claim, breach of contract claim, and ADA claim were voluntarily dismissed. (R. 37 at 12; R. 48 at 17; R. 141 at 1, 38.) The only claims remaining were the § 1983 claim, the wrongful death claim, the negligence claim, and the punitive damages claim. (*Id.*)

Dr. Hakes filed a motion for summary judgment on February 7, 2025. (R. 112.) She argued in the motion that no reasonable jury could find in the Estate's favor based on the undisputed facts in the record. (R. 116.) In particular, Dr. Hakes argued the Estate cannot prove its claims based on the sworn testimony of its own psychology expert, Dr. Eugene Braaksma, Ph.D. (*Id.*) Dr. Braaksma admitted at his deposition that Dr. Hakes was "actively involved with [Mouradian]," was trying to make him better, worked very hard to improve his mental health, and "advocated strongly for him." (R. 115-12 at 42:4-9.) Dr. Braaksma further testified

that Dr. Hakes acted as "a reasonable person would do under the same or similar circumstances" and that other reasonable psychologists would have made the same choices as Dr. Hakes. (R. 115-12 at 42:25-43:8, 50:17-23; R. 141 at 44.)

### III.  District Court Decisions and Orders

On June 10, 2025, the district court issued an Opinion and Order granting Dr. Hakes' summary judgment motion. (R. 160/App. A.) It ruled that the Estate failed to show that Dr. Hakes acted objectively unreasonable in her treatment of Mouradian. (R. 160/App. A at 2.) The district court agreed with Dr. Hakes that "Dr. Braaksma's acknowledgment that other reasonable psychologists would agree with Hakes' judgment and refrain from putting Mouradian on suicide watch essentially *precludes* a jury from finding that *no* minimally competent professional would have responded similarly under the circumstances …" (R. 160/App. A at 31) (emphasis in original.) Additionally, the district court ruled that Dr. Hakes' decisions as a licensed psychologist are subject to the *Youngberg* professional judgment standard, and that the Estate cannot prove that her decisions were "such a substantial departure from accepted professional judgment, practice, or standards as

to demonstrate that the person responsible actually did not base the decision on such judgment." (R. 160/App. A at 27-34.) Having determined that a reasonable trier of fact would be compelled to find Dr. Hakes' decisions regarding Mouradian's mental health and level of observation at the Jail were well within her area of expertise as a licensed psychologist, and that a minimally competent psychologist could have acted similarly, the district court declined to second guess Dr. Hakes' exercise of professional judgment. (R. 160/App. A at 34.)

The Estate filed a Notice of Appeal on July 6, 2025. (R. 169.) The Estate argues in its appellate brief that the district court improperly applied the *Youngberg* professional judgment standard to its claims against Dr. Hakes. (App. R. 15 at 27.) The Estate does not acknowledge the district court's ruling that it cannot prove its claims based on Dr. Braaksma's testimony or even mention Dr. Braaksma in its appellate brief. (App. R. 15.)

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment to Dr. Hakes. The undisputed evidence shows that Dr. Hakes worked tirelessly to help Mouradian, met with him more than any other inmate, routinely communicated with Jail staff and others about Mouradian, tried several different therapeutic techniques with Mouradian, and strongly advocated for his mental health needs in many ways. When she thought he needed to be placed on suicide watch, she requested it. When she thought he needed to be placed on a Chapter 51 commitment, she requested it. During their last meeting before his death, Mouradian was cooperative, open, and participatory. His mood had improved since returning from WMHI. He denied any safety concerns Dr. Hakes determined that no additional safety precautions were warranted. The Estate asks this Court to second guess Dr. Hakes' professional judgment. The Estate speculates that she "could have" done something different. That is not the standard. It is well-established law that Dr. Hakes's decisions are presumptively valid. The Estate can survive summary judgment only if her decisions were a substantial departure from accepted professional judgment, practice, or standards. Similarly, in

order to prove the objective prong of its § 1983 claim, the Estate must be able to prove that no minimally competent professional would have responded similarly under the circumstances. The Estate cannot meet its burden based on the testimony of its own psychology expert, Dr. Braaksma. Dr. Braaksma conceded at his deposition that other reasonable psychologists would agree with Dr. Hakes' decisions. Based on this record, the district court ruled that no reasonable jury could find in favor of the Estate on its claims against Dr. Hakes. This Court should affirm.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). On summary judgment, the court construes the record in the light most favorable to the nonmoving party and draws all reasonable inferences in her favor. *Reives v. Illinois State Police*, 29 F.4th 887, 891 (7th Cir. 2022). Summary judgment is appropriate if the pleadings, depositions, affidavits, and other submissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Because this Court examines the case *de novo*, it is not constrained by the district court's reasoning. *Oyler v. National Guard Ass'n of the United States*, 743 F.2d 545, 555 (7th Cir. 1984). The Court may affirm summary judgment on any ground supported by the record, even one the district court did not rely on, as long as the issue was adequately raised below and the nonmoving party had an opportunity to contest it. *West Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 222 (7th Cir. 2017); *Simmons v. Pryor*, 26 F.3d 650, 653 (7th Cir. 1993).

# ARGUMENT

The Estate asks this Court to conduct an unnecessary analysis of the *Youngberg* professional judgment standard. The Estate argues that the district court improperly applied the *Youngberg* professional judgment standard to its claims. Dr. Hakes is entitled to summary judgment regardless of whether the *Youngberg* professional judgment standard applies or not. Based on the undisputed evidence, the Estate cannot prove the objective prong of its § 1983 claim.[3] The claim therefore fails as a matter of law and must be dismissed.

## I.  The district court correctly granted summary judgment to Dr. Hakes.

The Estate has asserted claims against Dr. Hakes under 42 U.S.C. § 1983 for alleged violations of Mouradian's constitutional rights. Section 1983 creates a private cause of action for deprivations of a specific right or interest secured by the Constitution or laws of the United States. *Bublitz v. Cottey,* 327 F.3d 485, 491 (7th Cir. 2003). To establish a cause of action under § 1983, the Estate must show that Dr. Hakes was acting

---

[3] After dismissing the Estate's § 1983 claim, the district court relinquished jurisdiction over the Estate's state law claims. (R. 160/App. A at 37-38.) The Estate has not challenged that part of the district court's decision. (*See* App. R. 15.)

under the color of state law[4] and deprived Mouradian of a federal right. *Gomez v. Toledo*, 466 U.S. 635, 640 (1980).

Depending on how the Court rules, Mouradian's § 1983 claim is based on his constitutional right to adequate medical care under the Eighth Amendment or the Fourteenth Amendment. Under the Eighth Amendment's prohibition against cruel and unusual punishment, convicted inmates are entitled to adequate medical care. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021). Similarly, pretrial detainees who have not yet been convicted of a crime are entitled to adequate medical care under the Due Process Clause of the Fourteenth Amendment. *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018).

Whether analyzed under the Eighth Amendment or the Fourteenth Amendment, the Estate cannot prove its § 1983 claim against Dr. Hakes. Under both the Eighth Amendment and the Fourteenth Amendment, the Estate must show (1) that Mouradian suffered from an objectively serious medical condition; and (2) that Dr. Hakes acted in an objectively unreasonable manner. *See Miranda*, 900 F.3d at 351-53; *Kingsley v.*

---

[4] Dr. Hakes does not dispute she was acting under the color of state law in her role at the Jail.

*Hendrickson*, 576 U.S. 389, 397 (2015). The Estate cannot make either showing.

### a. It was not "obvious" that Mouradian posed a serious risk of suicide immediately prior to his death.

To succeed on its claim, the Estate must prove that Mouradian suffered from an objectively serious medical condition, *i.e.*, that he "posed a substantial risk of committing suicide." *See Brown v. Meierdirk*, 2008 U.S. Dist. LEXIS 46751, 2008 WL 4630593, at *9 (W.D. Wis. June 12, 2008); *Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006); *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 990 (7th Cir. 1998) (citing *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996)). A "possibility of suicide" or "some risk of suicide" is not enough. *Id*. This is because "[s]uicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). "No one can predict suicide with any level of certainty; medical professionals at jails, based on limited information, must decide whether a person is little, some, or a serious risk of suicide." *Collignon*, 163 F.3d at 990.

To be held liable under § 1983, there must be a "significant likelihood that an inmate may *imminently* seek to take his own life."

*Brown*, 2008 U.S. Dist. LEXIS 46751, at *9 (quoting *Collins*, 462 F.3d at 761) (emphasis added). "Past suicidal ideation or suicide attempts do not necessarily make a current one clearly foreseeable." *Craddock v. Cty. of Macomb*, 718 F. Supp. 3d 683, 699 (E.D. Mich. Feb. 26, 2024). Even an inmate's recent threats of suicide do not make it obvious that he poses a strong likelihood of suicide if he expressly denies feeling suicidal at the time. *Downard for Estate of Downard v. Martin*, 968 F.3d 594, 601 (6th Cir. 2020); *Collins*, 462 F.3d at 761 (imminent threat posed by inmate's suicidal comment was substantially abated fifteen minutes later when inmate said he would be all right). Similarly, "an inmate's membership in a high-risk group does not alone make it obvious that he will attempt suicide." *Downard*, 968 F.3d at 601.

Even in cases where the defendant's last conversation with the inmate "ended on a disturbing note," courts have ruled that the risk of suicide was not "obvious." *See Est. of Wallmow v. Oneida Cty.*, 99 F.4th 385, at *10 (7th Cir. 2024). For example, in *Wallmow*, the inmate was booked into a county jail after he violated the terms of his probation. *Id.* at *1-2. At intake, he denied thoughts of suicide. *Id.* at *2. Two days later, the inmate started acting oddly. *Id.* at *3. He began to alternately laugh

and cry, say "demonic" things, and hit himself. *Id.* He worried aloud that his parents planned to "psionically" harm him, that medical personnel might force him to drink his intestines from a cup, and that he felt his skin burning as he entered hell. *Id.* The jail sergeant told staff to "keep an eye on" him, but did not place him on suicide watch. *Id.* at *4. The inmate's cell was visible on closed-circuit camera to correctional officers who safely sat and watched his cell from a monitor. *Id.* Two days later, the inmate hung himself in his cell with his pants and it took nearly an hour for officers to discover him. *Id.* at *5-6. The inmate's estate brought claims against the jail sergeant and officers under § 1983 under the theory that they failed to keep him safe. *Id.* This Court affirmed a grant of summary judgment to the defendants because the record did not support that "the consequences of the defendant's conduct [were] obvious." *Id.* at *10. The court acknowledged that the last conversation with the inmate "ended on a disturbing note," but ruled that the defendants were not on notice that the inmate posed a substantial risk of an imminent suicide. *Id.* at *11-15.

While Mouradian had a history of depression and suicidal ideation, it was not clearly foreseeable that he posed an *imminent* risk of suicide

when Dr. Hakes last saw him. Their last therapy session was "actually … very productive." (R. 115-3 at 82.) Mouradian was "more open and participatory than he [had] been in the past." (R. 115-2 at 80-81.) He "was fairly cooperative throughout the duration of the session." (R. 115-2 at 80.) Most importantly, Mouradian "denied any safety concerns" during the visit. (R. 115-2 at 80; R. 115-3 at 82.) Dr. Hakes left the meeting "believe[ing] we will see some improvement." (R. 115-3 at 82.) The Court cannot conclude from these facts that it would have been "obvious" to a reasonable psychologist that Mouradian posed a substantial risk of imminent suicide. The Court must resist the temptation to employ "the 20/20 vision of hindsight." *See Kingsley*, 576 U.S. at 397.

### b. The Estate cannot prove that Dr. Hakes acted in an objectively unreasonable manner.

Even if the Court finds that Mouradian posed a substantial risk of suicide on May 21, 2020, the Estate cannot prove that Dr. Hakes' actions were "objectively unreasonable." In the context of a claim for inadequate medical care under the Eighth or Fourteenth Amendment, a medical professional acts "objectively unreasonable" when his or her conduct is a substantial departure from accepted standards. *Collignon*, 163 F.3d at 989 (citing *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). The plaintiff

must show that no minimally competent professional would have made the same decisions. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citing *Youngberg*, 457 U.S. at 321). Evidence that some medical professionals would have chosen a different course of treatment is insufficient to meet this burden. *Id.* (citing *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996)); *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (A "mere difference of opinion" between two medical professionals is not enough to prove a constitutional violation). Similarly, a mere showing of inadvertent error, negligence, gross negligence, or ordinary malpractice will not suffice. *Miranda*, 900 F.3d at 353; *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018).

In past cases involving jailhouse suicides, this Court has set forth key principles for assessing objective unreasonableness. *Wallmow*, 99 F.4th 385, at *9. First, the "on-the-ground circumstances" of jails and prisons must be recognized. *Id.* "Practically speaking, not every prisoner who shows signs of depression can or should be put on suicide watch." *Id.* (internal quotation omitted). Second, general depression and a history of psychiatric treatment gives a reasonable officer notice of general depression and a history of psychiatric treatment, not risk of suicide. *Id.*

(quoting *Jump v. Village of Shorewood*, 42 F.4th 782, 794 (7th Cir. 2022)). For that reason, "when an officer has no reason to think a detainee is suicidal, it is not objectively unreasonable to take no special precautions." *Jump*, 42 F.4th at 793. Lastly, "[a]n express statement that the deceased was not considering suicide from the deceased himself weighs heavily against objective unreasonableness." *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

The Estate cannot prove that Dr. Hakes acted objectively unreasonable. Dr. Hakes met with Mouradian almost every week for nine months—more than any other inmate. (R. 115-1 at 72:6-11, 96:5-8; R. 115-7.) During each meeting, Dr. Hakes kept detailed SOAP notes. (R. 115-1 at 28:24-29:2, 33:19-34:3; R. 115-7.) After each meeting, Dr. Hakes sent an email to Jail staff with an update about Mouradian. (R. 115-1 at 159:19-160:4; R. 115-4 at 50:8-16; R. 115-3.) The SOAP notes and emails document Mouradian's mood, symptoms, suicidal thoughts, and safety concerns. (R. 115-1 at 28:24-29:2, 33:19-34:3; R. 115-7.) They also document the different therapeutic techniques that Dr. Hakes employed with Mouradian, including cognitive behavioral therapy, positive psychology, supportive psychotherapy, and dialectical behavioral

therapy. (R. 115-1 at 67:12-17.) The record demonstrates that Dr. Hakes was thorough, diligent, and thoughtful.

The record also demonstrates that Dr. Hakes was actively assessing Mouradian's mood and making deliberate decisions based on her ongoing assessments. When Mouradian denied any current safety concerns, she kept him in general population or released him from suicide watch. (R. 115-3 at 6.) To help with his mood, she gave him psychology workbooks and got him a job in the laundry room because she thought it would improve his mood and "be great for him." (R. 115-2 at 13, 19-20, 39-40, 42; 115-3 at 12, 60.) When Mouradian expressed a plan and specific intent to engage in self-harm, Dr. Hakes recommended he be placed or remain on suicide watch. (R. 115-3 at 4.) While on suicide watch, Dr. Hakes advocated for Mouradian's basic needs. (R. 115-1 at 83:5-6.) For example, she made sure he was allowed to cut his fingernails and shave under supervision, as well as have access to new books to read and supplies to write letters. (R. 115-3 at 8.) When Dr. Hakes thought Mouradian needed to be placed on a Chapter 51 commitment, she contacted Northwest Connections and requested an assessment. (R. 115-2 at 55; R. 115-1 at 62:24-25.) The Estate's contention that Dr. Hakes

"fail[ed] to take any preventative measures" is outright absurd.

The fact that Mouradian had been actively suicidal in the past does not mean he posed a safety risk on May 21, 2020 when Dr. Hakes last saw him. Mouradian's mental health "wasn't a straight trajectory." (R. 115-1 at 106:9-10.) There were "vacillations in [his] mood." (R. 115-1 at 63:16-64:5, 106:1-15.) Some therapy sessions "were much lighter and his thoughts weren't as fixed," and other sessions "were more difficult, a challenge." (R. 115-1 at 106:13-15.) There were "continuous ongoing assessments done on Mouradian during his incarceration period." (R. 115-4 at 48:8-10.) When he first arrived at the Jail, he was actively suicidal and was placed on suicide watch. (R. 115-3 at 1.) He improved and the restrictions were lifted. (R. 115-2 at 1-2; R. 115-3 at 6.) His mood was fairly stable for about four months. (R. 115-2 at 6-40; R. 115-3 at 1-20.) During those four months, he regularly attended weekly therapy sessions with Dr. Hakes. (*Id*.) At the end of 2019, however, he began refusing therapy. (R. 115-3 at 22, 25, 28-30; R. 115-2 at 47, 51-53.) In February of 2020, he began refusing food, water, and medication. (R. 115-1 at 127:1-2.) On February 28, 2020, he was placed on a Chapter 51 commitment. (R. 115-2 at 55; R. 115-1 at 62:24-25; R. 115-6 at 8-15.)

During the three-week hospitalization, Mouradian's condition was stabilized. (R. 115-6 at 15; R. 115-1 at 78:1-3, 116:21-24, 138:8-9; R. 115-3 at 46-48, 50, 52-53; R. 115-2 at 62-63; R. 115-4 at 47:8-11.) He returned to the Jail on March 18, 2020 "better than [he] had ever been." (R. 115-4 at 47:8-11.) His mood had improved, he was evidencing fewer symptoms of depression, and he was reporting less suicidal thinking. (R. 115-2 at 63.) He was "doing laundry, reading, [and] exercising." (R. 115-1 at 117:13-15..) Mouradian's last meeting with Dr. Hakes on May 21, 2020 was "very productive" and Mouradian "denied any safety concerns." (R. 115-3 at 82.) The fact that Mouradian denied safety concerns "weighs heavily against objective unreasonableness." *See Pulera*, 966 F.3d at 551.

Based on this record, no reasonable jury could conclude that Dr. Hakes' decisions were "a substantial departure" from accepted standards and that "no minimally competent professional" would have made the same decisions. As such, the Estate's § 1983 claim fails and the district court properly granted summary judgment to Dr. Hakes.

### c. The Estate cannot prove its claims based on the testimony of its own psychology expert.

If there was any doubt about whether the Estate could prove its § 1983 claim, that doubt disappeared when the Estate's psychology expert,

Dr. Eugene Braaksma, Ph.D., was deposed. Dr. Braaksma testified that he believes he would have done things differently than Dr. Hakes, but was unable to say that "no minimally competent professional" would have made the same decisions as her. (R. 106 at 25:23-5, 106:23-107:23.) When asked if "no reasonable professional" would have made the same decisions as Dr. Hakes, Dr. Braaksma was not willing to say that either. (R. 106 at 33:4-18.) Instead, Dr. Braaksma conceded that that other reasonable psychologists would have made the same decisions as Dr. Hakes. (R. 106 at 42:25-43:8, 50:17-23.) When asked about Dr. Hakes' therapeutic techniques, Dr. Braaksma further conceded that she acted as "a reasonable person would do under the same or similar circumstances." (R. 106 at 30:15-23, 42:25-43:8.) Finally, when asked if the standard of care required Dr. Hakes to place Mouradian on suicide watch immediately prior to his death, Dr. Braaksma testified that "[t]here was not something that would require someone in our professional judgment" to do that. (R. 106 at 48:13-49:2.)

Despite claiming he would have done things differently, Dr. Braaksma testified he is not critical of any aspect of Dr. Hakes' work. He testified that Dr. Hakes was qualified for her position at the Jail and that

she fulfilled her contractual obligations. (R. 106 at 15:10-18, 16:4-7.) He testified that Dr. Hakes met with Mouradian at an appropriate frequency and for an appropriate amount of time each meeting. (R. 106 at 18:10-19:1, 19:15-20.) He testified that Dr. Hakes tried several different therapeutic techniques with Mouradian, all of which were appropriate. (R. 106 at 42:10-43:2.) He testified that Dr. Hakes' SOAP notes contain an adequate amount of information. (R. 106 at 19:21-20:7, 21:1-4.) He testified that Dr. Hakes communicated with Jail staff about Mouradian with appropriate regularity and her communications contained an adequate amount of information. (R. 106 at 20:11-21, 22:6-8.)

Not only did Dr. Braaksma have no criticisms of Dr. Hakes at his deposition, he sang her praises. He admitted that Dr. Hakes "certainly was actively involved with [Mouradian]," was "invested in trying to make him better," was "concerned about his stability," and "strongly advocated for him":

> Q:  Other than your disagreement with her conclusion as to his level of risk for suicide, would you agree with me that she did everything that she could to try to improve his mental health?
>
> MS. BEDDER: I'm going to object to form, but you can answer.

A:    I'm not sure how to answer that in that **she certainly was actively involved with him, she tried a number of different techniques, she was concerned about his stability and in that sense I think advocated strongly for him, yes**.

(R. 106 at 44:18-45:3) (emphasis added.)

Q:    You would agree with me, as a general proposition, that Dr. Hakes advocated for Mr. Mouradian?

A:    Yes. I believe in general I would agree with that, yes.

(R. 106 at 23:13-16.)

Q:    You would agree with me that Dr. Hakes advocated for Mr. Mouradian; correct?

A:    Yes.

Q:    She was invested in trying to get him -- trying to make him better; correct?

A:    Yes.

(R. 106 at 42:4-9.) When asked about the ways in which Dr. Hakes advocated for Mouradian, Dr. Braaksma testified that Dr. Hakes had "no real requirement, so to speak, to do those things," but that those things were "helpful to Mr. Mouradian" and "were positive things certainly that she attempted to do to make his circumstances more livable." (R. 106 at 46:11-21.) When asked whether he saw any evidence that Dr. Hakes

ignored Mouradian, Dr. Braaksma testified, "No, not that I saw." (R. 106 at 44:9-14.) Finally, contrary to the Estate's claims, Dr. Braaksma agreed that Dr. Hakes "worked very hard to try to improve [Mouradian's] mental health":

> Q: She worked very hard to try to improve his mental health; right?
>
> A: Yes, I would agree with that.

(R. 106 at 44:15-17.)

Dr. Braaksma testified that assessing an inmate's risk for suicide is a complex, difficult, and challenging evaluation. (R. 115-12 at 23:17-21.) "As a population, prison inmates are around nine times more likely to commit suicide than free persons [ ]." *Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) (citing *Cavalieri v. Shepard*, 321 F.3d 616, 621 (7th Cir. 2003); *Jutzi-Johnson v. United States*, 263 F.3d 753, 757 (7th Cir. 2001)). Just because an inmate was at high risk for suicide last year does not mean they are at high risk for suicide today. (R. 115-12 at 24:20-23.) Likewise, "not every prisoner who shows signs of depression or exhibits strange behavior can or should be put on suicide watch." *Matos*, 335 F.3d at 558. It depends on many factors, including the patient's history, prior attempts at suicide or self-harm, their current behaviors,

and their statements about suicidal plan and intent. (R. 115-12 at 26:6-17, 52:3-21, 101:5-18.) These factors change over time. (R. 115-12 at 24:17-19.) In assessing someone's risk factors, a mental health provider exercises his or her own professional judgment. (R. 115-12 at 24:4-16, 32:5-21.)

Dr. Braaksma also testified that reasonable mental health providers can disagree in their assessment of a patient's suicide risk. (R. 115-12 at 25:9-11.) Whether someone is at high risk for suicide is an opinion, not a fact. (R. 115-12 at 24:4-16, 25:4-7.) Similarly, whether to place an inmate on suicide watch is not a "black and white" decision. (R. 115-1 at 114:22-24.) It is a balancing of risk factors, restricting liberties, and the "on-the-ground circumstances" of jails and prisons. (R. 115-1 at 114:22-23, 124:19-20, 131:4-7.) *Est. of Wallmow v. Oneida Cty.*, 2024 U.S. App. LEXIS 9294, at *9 (7th Cir. Apr. 17, 2024). Presented with the same risk factors, reasonable mental health providers can come to different conclusions. (R. 115-12 at 25:9-22.) Just because mental health providers disagree does not mean one of them is wrong or acted unreasonably. (R. 115-12 at 25:9-22.)

The district court ruled that Dr. Braaksma's testimony "essentially

precludes" a jury from finding in favor of the Estate on its § 1983 claim against Dr. Hakes. (R. 160/App. A at 31) This Court should reach the same conclusion.

Dr. Braaksma's name is conspicuously absent from the Estate's appellate brief. (App. R. 15.) By failing to address the district court's finding that it cannot meet its burden based on Dr. Braaksma's testimony, the Estate has conceded the point. *See General Motors Acceptance Corp. v. Central National Bank of Mattoon*, 773 F.2d 771, 778 n.5 (7th Cir. 1985); *Manbourne, Inc. v. Conrad*, 796 F.2d 884, 888 (7th Cir. 1986). Additionally, the Estate is precluded from raising the argument for the first time in its reply brief. *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021). "[A]rguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." *Id*.

## II. The Eighth Amendment applies to the Estate's claims against Dr. Hakes.

As demonstrated above, the Estate cannot prove the objective element of its § 1983 claim, regardless of whether it arises under the Eighth or Fourteenth Amendment. No further analysis is necessary. If the Court reaches the issue, however, it should rule that Mouradian's claim arises under the Eighth Amendment.

The law is unsettled as to whether Mouradian—who was neither a pretrial detainee nor a sentenced prisoner—was entitled to the Eighth Amendment's limited protection against "cruel and unusual" punishment or the Fourteenth Amendment's broader protection against any punishment. When Mouradian committed suicide, he had been found guilty and was in a county jail awaiting sentencing. In *Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009), this Court noted that the Supreme Court "has not directly addressed" this issue, but ruled that a presentencing detainee is probably entitled to Fourteenth Amendment protections. At the time, however, it did not matter whether a § 1983 claim arose under the Eighth Amendment or the Fourteenth Amendment because they were treated the same. *Id*. at 475; *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019). Since then, the Supreme Court ruled in *Kingsley* that a different standard applies to convicted prisoners under the Eighth Amendment and pretrial detainees under the Fourteenth Amendment. *Kingsley*, 576 U.S. at 397. Under the new standard, a pretrial detainee need only show that the defendant's conduct was objectively unreasonable, while a convicted prisoner must show that the

defendants conduct was both objectively and subjectively unreasonable. *Hardeman*, 933 F.3d at 822.

Based on the Supreme Court's ruling in *Kingsley*, this Court should rule that the Estate's claim falls under the Eighth Amendment because Mouradian had already been "convicted" at the time of his suicide. In *Kingsley*, the Supreme Court drew a bright-line distinction between convicted prisoners and persons who have been accused but not convicted of a crime. The distinction lies in the fact that pretrial detainees who have not yet been convicted of a crime may not be punished by the state in any way, whereas a convicted inmate may be punished (albeit not "cruel and unusual" punishment). *Id.* at 400; *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A pretrial] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). The *Kingsley* court based its decision solely on a prisoner's "conviction" status; nowhere in the decision did the court limit its holding to inmates who have been convicted <u>and</u> sentenced. Since *Kingsley* was decided in 2015, several courts have ruled that the Eighth Amendment applies to convicted inmates awaiting sentencing. *See, e.g., Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) ("For [a

plaintiff], who is convicted and awaiting sentencing, the Eighth Amendment supplies the relevant standard."); *Fisherman v. McGriff*, 2020 U.S. Dist. LEXIS 49165, 2020 WL 1330176, at *2 (D. Minn. Mar. 23, 2020) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished."); *Salazar v. Core Civic*, 2022 U.S. Dist. LEXIS 31507, 2022 WL 541030, at *14 (D.N.M. Feb. 23, 2022) ("While the Due Process Clause governs claims challenging a pretrial detainee's confinement conditions, a person who has been adjudicated guilty but is awaiting sentencing can challenge their confinement conditions under the Eighth Amendment."); *Manley v. Grossman*, 2017 U.S. Dist. LEXIS 159620, 2017 WL 4326541, at *8 (S.D.N.Y. Sept. 27, 2017).

The Estate asserts in its appellate brief that "individuals who have not been sentenced … cannot yet be punished." (App. R. 15 at 35.) First, the Estate cites no authority for this assertion. Second, the assertion is nonsensical. A person who has been adjudicated guilty and is awaiting sentencing can absolutely "be punished," which is why the State can sentence him or her. *See Berry v. City of Muskogee*, 900 F.2d 1489, 1493

(10th Cir. 1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, who are detained primarily to ensure their presence at trial and who cannot be punished; and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced. **The critical juncture is conviction, either after trial or … by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated**.") (emphasis added).

This Court's post-*Kingsley* decisions in *Miranda v. Cnty. of Lake*, 900 F.3d 335 (7th Cir. 2018), and *Kemp v. Fulton Cty.*, 27 F.4th 491, 495 (7th Cir. 2022), support the conclusion that a convicted inmate awaiting sentencing is only entitled to Eighth Amendment protections. In *Miranda*, the Court applied *Kingsley*'s objective unreasonableness test to medical-care claims brought by a pretrial detainee under the Fourteenth Amendment. *Miranda*, 900 F.3d at 352. In doing so, the court explained that "[p]retrial detainees stand in a different position" than convicted prisoners because "they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence." *Id*. at 350. Similarly, in *Kemp*, the Court explained that the new standard

announced by the Supreme Court in *Kingsley* "stems from the fact that pretrial detainees remain entitled to the presumption of innocence, and so the Constitution protects them from any punishment for the acts that led to their detention." *Kemp*, 27 F.4th at 495. Here, Mouradian had already been convicted of a crime, and therefore was no longer entitled to a presumption of innocence. *See Deck v. Missouri*, 544 U.S. 622, 632 (2005) ("[T]he defendant's conviction means that the presumption of innocence no longer applies."); *United States v. Shim*, 2020 U.S. Dist. LEXIS 64168, at *2 (E.D. Wis. Apr. 13, 2020) ("Because [plaintiff] has been convicted, he no longer enjoys a presumption of innocence ..."); *Wilber v. Hepp*, 16 F.4th 1232, 1254 (7th Cir. 2021) ("[T]he presumption of innocence was no longer at issue once [the individual] had been convicted ..."); *United States v. Kills Enemy*, 3 F.3d 1201, 1203 (8th Cir. 1993) (noting that the defendant had pleaded guilty and was awaiting sentencing and thus distinguishable from a pretrial detainee awaiting trial and reasoning that a "convicted person awaiting sentence is no longer entitled to a presumption of innocence or presumptively entitled to his freedom."). Accordingly, this Court should take an Eighth Amendment approach (*i.e.*, objective harm plus subjective intent) to the

Estate's constitutional claims.

### III.  The Estate cannot prove that Dr. Hakes acted with deliberate indifference.

Because the Estate's § 1983 claim arises under the Eighth Amendment, it must be able to prove that Dr. Hakes acted with "deliberate indifference." *See Kingsley*, 576 U.S. 389. The "deliberate indifference" standard requires a showing that the defendant had a "sufficiently culpable state of mind" and asks whether the official actually believed there was a significant risk of harm. *Pittman ex rel. Hamilton v. Cnty. of Madison*, 746 F.3d 766, 775-76 (7th Cir. 2014). Deliberate indifference is an onerous standard for a plaintiff to prove. *Zentmyer v. Kendall Cty.*, 220 F.3d 805, 812 (7th Cir. 2000).

The undisputed facts do not support a negligence claim against Dr. Hakes, let alone a deliberate indifference claim.[5] As the Estate's own expert admits, Dr. Hakes was actively involved with Mouradian, was trying to make him better, worked very hard to improve his mental

---

[5] The same can be said for the Estate's punitive damages claim. Punitive damages may be awarded in § 1983 actions if the jury finds "conduct motivated by evil intent or callous indifference to the federally-protected rights of plaintiffs." *Coulter v. Vitale*, 882 F.2d 1286, 1289 (7th Cir. 1989) (citing *Erwin v. County of Manitowoc,* 872 F.2d 1292, 1299 (7th Cir. 1989)). It is inconceivable that the Estate would allege that Dr. Hakes acted with "evil intent or callous indifference" toward Mouradian who she worked so hard to help.

health, and "advocated strongly for him." (R. 115-12 at 42:4-9.) Dr. Hakes met with Mouradian almost every week for nine months, more than any other inmate. (R. 115-1 at 72:6-11, 96:5-8; R. 115-7.) There is nothing to suggest that Dr. Hakes believed there was a significant risk of harm and disregarded it. "[A] deliberately indifferent act must be one which is conscience-shocking." *Bublitz*, 327 F.3d at 490. There is no evidence from which a jury could conclude that Dr. Hakes acted with deliberate indifference.

## IV. The *Youngberg* professional judgment standard applies to the Estate's claims against Dr. Hakes.

Regardless of whether the Estate's claims arise under the Eighth Amendment or the Fourteenth Amendment, the *Youngberg* professional judgment standard still applies. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court was confronted with an involuntarily committed mental patient at a state hospital who accused hospital professionals of violating his constitutional rights by failing to take appropriate measures to keep him safe from his own self-injurious behaviors. *Id.* at 310. The *Youngberg* court began its decision by ruling that the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, applied to the patient's claims. *Id.* at 325. Under the

Fourteenth Amendment, the hospital had a duty to "protect its residents" from injury. *Id.* at 320. That is because "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. Next, the court considered the proper standard for determining whether the patient's constitutional rights had been violated. *Id.* at 321-23. Weighing the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety, the court ruled that a medical professional's decision "is presumptively valid" and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* This is known as the "*Youngberg* professional judgment standard."

The Estate argues that the *Youngberg* professional judgment standard does not apply to its claims based on this Court's decision in *Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561 (7th Cir. 2024). In *Pittman*, the Court ruled that "a pretrial detainee does

not have to show a defendant's subjective awareness of the risk of harm" to prevail on a Fourteenth Amendment Due Process claim, relying on the U.S. Supreme Court's decision in *Kingsley*. *Pittman*, 108 F.4th at 568-69. The Estate interprets this rule to mean that "it [is] a reversible error to include **any** subjective analysis in a Fourteenth Amendment claim." (App. R. 15 at 29) (emphasis in original.) The Estate then argues that the *Youngberg* professional judgment standard is a "subjective standard" rendered "inapplicable" by *Pittman* and *Kingsley*. (App. R. 15 at 29-30.) In essence, the Estate is arguing that *Youngberg* was overruled by *Kingsley*. Alternatively, the Estate is asking this Court to ignore *Youngberg*, which is binding Supreme Court precedent.

To begin, the *Youngberg* professional judgment standard is not mentioned in *Pittman*. In *Pittman*, a pretrial detainee attempted suicide at a county jail. *Pittman*, 108 F.4th at 564. He survived but suffered a severe brain injury. *Id*. He sued two guards under § 1983 alleging they violated his Fourteenth Amendment by ignoring his requests to see crisis counseling before the suicide attempt. *Id*. at 564. Unlike the present case, *Pittman* did not involve any claims against any medical professionals. *See id*. Because the plaintiff in *Pittman* was denied counseling, there is

no discussion about whether a counselor exercised his or her professional judgment. *See id*. It is therefore inapplicable to the issues presented in this appeal.

Unlike *Pittman*, there is at least one case in which this Court applied the *Youngberg* professional judgment standard to medical claims arising under the Fourteenth Amendment post-*Kingsley*: *Johnson v. Rimmer*, 936 F.3d 695 (7th Cir. 2019). *Johnson* involved a plaintiff who voluntarily admitted himself to a county medical facility due to symptoms of depression, delusional thoughts, auditory hallucinations, and suicidal ideations. *Johnson*, 936 F.3d at 698. He had a history of suicide attempts and self-harm. *Id*. While in the care of the facility, the plaintiff mutilated himself with a pair of scissors. *Id*. at 702-03. He then sued the facility psychologist under § 1983 for alleged violations of his substantive due process rights under the Fourteenth Amendment. *Id*. at 704. The plaintiff alleged that the psychologist's care "was constitutionally inadequate because removing him from 1:1 observation status and allowing him to possess scissors created the circumstances that permitted him to injure himself." *Id*. On summary judgment, this Court applied the *Youngberg* professional judgment standard and

concluded "that no reasonable fact finder could find that [the psychologist's] decision was outside the bounds of a competent medical professional's judgment." *Id.* at 708.

Like the Estate, the plaintiff in *Johnson* argued that a jury question existed because he said he "wanted to die" and expressed his wish to harm himself multiple times at the facility, his records documented that he was depressed, and he had not met his treatment goals. *Id.* at 708-09. Additionally, the plaintiff's expert in *Johnson* opined that it was "premature" to remove him from 1:1 observation and that the plaintiff should have remained on that status for at least a couple of weeks. *Id.* at 709. Even viewing the record in the light most favorable to the plaintiff, this Court ruled that the plaintiff could not prove that no minimally competent psychologist would have removed him from 1:1 observation status. *Id.* at 710. In reaching this conclusion, the Court noted that the plaintiff underwent frequent assessments, his medical team noticed an improvement in his condition, the plaintiff was sleeping better and eating more, the plaintiff denied that he had any harmful ideations, and the plaintiff was "cooperative" and "future-oriented" during one of his last

meetings with the psychologist. *Id*. at 709. On this record, the plaintiff could not meet its burden. *Id*. at 710.

Applying *Johnson* to the present case, it is clear that the Estate cannot meet its burden either. First, the facts in *Johnson* are incredibly similar to the facts in the present case. Second, *Johnson* was issued four years after the Supreme Court announced in *Kingsley* that a pretrial detainee in a Fourteenth Amendment case has to show only that the defendant acted objectively unreasonable. It therefore shows that the *Youngberg* professional judgment standard still applies.

The Estate conflates the subjective prong of a deliberate indifference claim with the *Youngberg* professional judgment standard. They are not the same. Deliberate indifference requires proof that the defendant was subjectively aware that a substantial risk of serious harm existed and disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In contrast, the *Youngberg* professional judgment standard requires proof that no minimally competent professional would have made the same choices as the defendant. *Youngberg*, 457 U.S. at 321. It considers whether the defendant's conduct "diverges from that of a reasonable professional." *Ammons v. Washington Dep't of Social &*

*Health Servs.*, 648 F.3d 1020, 1027 (9th Cir. 2011). It is a different inquiry. The Estate's argument that "the professional judgment standard is based entirely on a subjective awareness analysis" is simply not true. It does not matter, for purposes of the *Youngberg* professional judgment standard, whether the defendant recognized a risk of harm and/or disregarded the risk. It only matters whether the defendant's treatment decisions were "a substantial departure from the accepted professional standard." *See Johnson*, 936 F.3d at 707.

*Kingsley* and *Pittman* do not bar a jury from considering any evidence of "subjective knowledge," as the Estate contends. To the contrary, whether a medical professional acted objectively unreasonable must be determined from the facts and circumstances faced by the defendant, including what the defendant knew at the time. *McCann*, 909 F.3d at 888; *Kingsley*, 576 U.S. at 397. A jury must be informed about what the defendant knew and the decisions reached by the defendant to determine whether a "minimally competent professional would have so responded under those circumstances." *Collignon*, 163 F.3d at 989. It would be impossible for a jury to determine whether Dr. Hakes' care was

constitutionally adequate without being informed about her "subjective knowledge" and opinions.

For these reasons, the Court should rule that the district court properly applied the *Youngberg* professional judgment standard to this case.

## V. The district court did not ignore binding precedent.

The Estate argues that the district court "ignored binding precedent," citing to *Ortiz v. Webster*, 655 F.3d 731 (7th Cir. 2011), and *Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011). In *Ortiz*, this Court ruled that an eye doctor was not entitled to summary judgment because he "ignored his own opinion." *Id.* at 735. In *Gonzalez*, this Court ruled that two prison doctors were not entitled to summary judgment because they "persist[ed] in ineffective treatment." *Id.* at 314. *Ortiz* and *Gonzalez* are both distinguishable from the present case. In *Ortiz*, the defendant concluded that the plaintiff needed surgery for corneal distortion but never reevaluated the plaintiff or performed surgery. *Ortiz*, 655 F.3d at 735. In *Gonzalez*, the defendants never altered their response to the plaintiff's hernia as the condition and associated pain worsened over a seven-year period. *Gonzalez*, 663 F.3d at 314-15. Unlike the defendants

in *Ortiz* and *Gonzalez*, Dr. Hakes continually reevaluated Mouradian, tried many different therapeutic techniques, and repeatedly asked the jail medical provider to reassess Mouradian's medications. Neither *Ortiz* nor *Gonzalez* required the district court to reach a different outcome.

Contrary to the Estate's argument, Dr. Hakes did not "ignore her own opinion." The Estate argues that Dr. Hakes "knew that her course of treatment at the Jail was not working" and "never tried anything different." (App. R. 15 at 40.) The Estate also argues that Dr. Hakes knew "that Mouradian would not make it to Dodge Correctional." (App. R. 15 at 37.) During the Chapter 51 commitment in February, Dr. Hakes told Mouradian's doctors she "would not be surprised if he has a plan to suicide before any transfer to Dodge Correctional." There are many reasons why that statement does not prove the Estate's case. First, Dr. Hakes did not say Mouradian had a plan or that he had expressed a plan to her. Second, Dr. Hakes made that statement three months before Mouradian committed suicide. During those three months, Mouradian had no suicide attempts. In fact, Mouradian had no prior documented attempts at suicide or self-harm at all. Third, after making that statement, Mouradian was deemed appropriate to be released from the

Chapter 51 commitment by his doctors at Winnebago. Fourth, after being released from the Chapter 51 commitment and returning to the jail, Mouradian appeared "better than [he] had ever been." (R. 115-4 at 47:8-11.) Fifth, during their last therapy session, Mouradian showed improvement and denied any safety concerns. Based on the information available to her at the time, there was no basis to place Mouradian on suicide watch on May 21, 2020. The district court correctly concluded that Dr. Hakes' opinion in February of 2020 that Mouradian had a plan to commit suicide before any transfer to prison was nothing more than her opinion "at that time."

Accepting the Estate's argument would lead to bizarre and unfair consequences. If the Court accepts the Estate's logic, Mouradian was a constant imminent risk of suicide from the day he arrived at the Jail on July 30, 2019 until the day of his death on May 28, 2020, and should have been on suicide watch (or under an emergency Chapter 51 detention) the entire time. According to the Estate, Dr. Hakes was subjectively aware of an imminent risk because Mouradian had been diagnosed with depression and had expressed suicidal ideology in the past. (R. 141 at 25, 28.) This is an untenable position. Placing Mouradian on suicide watch

indefinitely regardless of his current presentation would have violated his constitutional rights. *See Guillot v. Russell*, 59 F.4th 743, 757 (5th Cir. 2023) ("[S]uicide watch imposes tremendous restraints on a prisoner's activity, significantly changes the conditions of his confinement, and imposes a great amount of strain on a prison's resources. … [P]risoners in suicide-watch cells have little interaction with others, have no personal possessions, are not permitted a blanket, and are under constant observation. As a result, placing an inmate under suicide watch is a decision not taken lightly, as officials must balance the danger the inmate poses to himself and others, the restraints on his activities, and the cost to the mental health resources of the prison. Ideally, inmates are not held under suicide watch indefinitely.").

## VI. The Estate's appellate brief contains factual misrepresentations that are not supported by the record.

To try to create a triable issue, the Estate alleges facts in its appellate brief that are not supported by the record. Throughout its appellate brief, the Estate impermissibly cites to its Proposed Findings of Fact ("PFOF") (R. 138) rather than actual evidence, making it extremely difficult to verify factual assertions, many of which are

incendiary and inappropriately argumentative. (App. R. 15.) For this reason alone, the Estate's appeal may be denied. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in" the record.); *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004).

The Estate alleges that Mouradian "attempted suicide by tying a bedsheet in several knots" at the Jail in July of 2019:

> During that same month, <u>Mouradian attempted suicide by tying a bedsheet in several knots</u>; this was known to Hakes because Mouradian told her that he wanted to tie so many knots that it would prevent him from aborting the attempt. R. 138, ¶ 16.

(App. R. 15 at 11) (emphasis added.) That is not true. Mouradian never attempted suicide at the Jail prior to his death. The Estate cites to Paragraph 16 of its PFOF for this assertion, which says nothing about Mouradian "attempt[ing] suicide":

> 16. Anthony also described that he would tie the bedsheet in so many knots so it would prevent him from being able to abort the suicide attempt. (ECF No. 115-6, hereinafter "Jail Records" at 7.)

(R. 138 at ¶ 16.) The PFOF references Page 7 of Mouradian's Jail Records, which states the following:

> At this time, it is recommended that Anthony remain on precautions. … Anthony verbalized suicidal ideations with a plan that included him hanging himself with his bedsheet. He further described how he would tie the bedsheet in so many knots, which would prevent him from being able to abort the attempt.

(R. 115-6 at 7.) This document does <u>not</u> say that Mouradian "attempted suicide by tying a bedsheet in several knots" at the Jail. Rather, it says Mouradian "verbalized suicidal ideations with a plan that included him hanging himself with his bedsheet." (*Id.*) This is a very important distinction.

The Estate alleges that a county social worker told Dr. Hakes to "contact them" if "Mouradian does not cooperate with medications pursuant to the Settlement Agreement." (App. R. 15 at 14.) Again, that is not true. The Estate cites to Paragraph 98 of its PFOF for this assertion, which repeats the same allegation. (R. 138 at ¶ 98.) The PFOF references Page 46 of Dr. Hakes' emails, which is an email from county social worker Stephanie Kennedy to Dr. Hakes. (R. 115-3 at 46.) In the email, Ms. Kennedy wrote the following:

> With a 90 day settlement agreement, while Anthony is in the Jackson County jail, if he is not cooperating with medications or meeting with you, then we can reassess and determine whether or

not he needs to be sent back to an inpatient unit.
(*Id.*) Ms. Kennedy does not say, "[I]f Mouradian does not cooperate with medications pursuant to the Settlement Agreement, Hakes should contact them …" (*Compare* R. 115-3 at 46 *with* App. R. 15 at 14.) This is an important distinction because Dr. Hakes was <u>not</u> responsible for prescribing or managing Mouradian's medications; that was the responsibility of Nurse Jacobson, APNP. (R. 115-1 at 64:9-15; R. 115-4 at 114:19-25.). Moreover, Dr. Hakes cannot be held liable under § 1983 for the acts or omissions of others. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

The Estate also alleges that "[Dr.] Hakes did not tell anyone that Mouradian stopped his medication without Nurse Jacobson's approval." (App. R. 15 at 16, 41.) That is an untrue and misleading statement. After Mouradian returned from WMHI, he told Dr. Hakes that he "no longer wants to take the fluphenazine." (R. 115-2 at 66.) Dr. Hakes sent an email to Nurse Jacobson the same day about Mouradian's "medication complaints." (R. 115-2 at 67; R. 115-3 at 60.) Dr. Hakes also notified Jail staff the same day that Mouradian "wants to stop the fluphenazine medication." (R. 115-3 at 60.) On April 15, 2020, Nurse Jacobson saw

Mouradian about the fluphenazine and agreed to discontinue it. (R. 115-2 at 68-69.) Thus, the Estate's allegation that Dr. Hakes "did not tell anyone that Mouradian stopped his medication without Nurse Jacobson's approval" is demonstrably false. Simply put, the record does not support the Estate's representation that Dr. Hakes was told to contact the county if Mouradian was not med compliant, that Hakes knew he was not med compliant, and that Hakes did not tell anyone. (*Compare* App. R. 15 at 14, 16, 41 *with* R. 115-3 at 46 and 115-2 at 67-69.)

## VII. The Estate omits key facts in its appellate brief.

In addition to not mentioning Dr. Braaksma, the Estate completely omits any reference to Dr. Hakes' last meeting with Mouradian in its appellate brief. The Estate jumps from May 13, 2020 to his death on May 29, 2020. (App. R. 15 at 17-18.) There is no discussion of the May 21, 2020 meeting. (*Id*.) This Court has stricken briefs which do not "give the entire story." *Palmquist v. Selvik*, 111 F.3d 1332, 1337 (7th Cir. 1997); *see also Avitia v. Metropolitan Club of Chicago*, 49 F.3d 1219, 1224 (7th Cir. 1995) (warning appellants not to treat contested testimony of losing party's witnesses as facts or risk having brief stricken).

The Estate argues that Mouradian's health leading up to his death was a "negative trajectory" without any improvement. (App. R. 15 at 15.) That is not true. Dr. Hakes' last meeting with Mouradian on May 21, 2020 was "very productive." (R. 115-3 at 82.) Mouradian "was fairly cooperative," "more open and participatory than he has been in the past," and "did not mention any current safety concerns." (R. 115-2 at 80; R. 115-3 at 82.) Dr. Hakes commended Mouradian for his "openness and efforts during the session." (R. 115-2 at 80-81.) After the meeting, Dr. Hakes sent an email to Jail staff stating that she "believe[s] we will see some improvement." (R. 115-3 at 82.) At that time, Mouradian was eating and drinking appropriately, taking his medications, and was still working in the laundry room. (R. 115-2 at 80.) The Estate's bald assertion that Dr. Hakes "knew that her course of treatment at the Jail was not working" is simply not supported by the evidence.

## VIII. The Estate's argument is based on speculation and unsupported conclusory remarks.

The Estate wants this Court to ignore the evidence and accept its false narrative that Dr. Hakes was deliberately indifferent to Mouradian's mental health needs. But the Estate's arguments are not

evidence. And the Estate's attorneys are not under oath. The actual evidence does not support the Estate's claims.

The Estate speculates that Dr. Hakes "could have" done something different. It argues that Dr. Hakes "could have" contacted Northwest Connections or the county social worker, which "could have" resulted in another evaluation and led to another commitment. (App. R. 15 at 16, 38-39.) It argues that Dr. Hakes "could have" recommended 15-minute or 30-minute observations. (App. R. 15 at 18.) Whether Dr. Hakes "could have" done something different is not the standard. To prove its claims, the Estate must be able to show that the action taken by Dr. Hakes was objectively unreasonable, which it cannot do. The Estate's own expert testified that other reasonable psychologists would have made the same decisions as Dr. Hakes. There is no basis beyond pure speculation for a jury to reach a different conclusion.

# CONCLUSION

For the foregoing reasons, the district court's decision should be AFFIRMED.

Dated: <u>October 6, 2025</u>   Respectfully Submitted,

*/s/ Vincent J. Scipior*
Vincent J. Scipior, SBN 1085069
Coyne, Schultz, Becker & Bauer, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin 53703
Tel.: 608-255-1388
Fax: 608-255-8592

*Attorneys for Defendant-Appellee*
*Ashley Hakes*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as modified by Circuit Rule 32(c), because this brief contains <u>13,997</u> words according to the word-count function of Microsoft Word 2016.

I further hereby certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6), as modified by Circuit Rule 32(b), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with 14-point Century Schoolbook font in the body and 12-point Century Schoolbook font in footnotes.

Dated: <u>October 6, 2025</u>     Respectfully Submitted,

*/s/ Vincent J. Scipior*
Vincent J. Scipior, SBN 1085069
Coyne, Schultz, Becker & Bauer, S.C.
150 East Gilman Street, Suite 1000
Madison, Wisconsin 53703
Tel.: 608-255-1388
Fax: 608-255-8592

*Attorneys for Defendant-Appellee*
*Ashley Hakes*