**No. 25-2132**

The United States Court of Appeals
for the Seventh Circuit

────────────

THE ESTATE OF ANTHONY MOURADIAN,
by and through Special Administrator, Melissa Mouradian,

*Plaintiff-Appellant,*

v.

JACKSON COUNTY, et al.,

*Defendants-Appellees.*

────────────

Appeal from the United States District Court
for the Western 23-CV-167
Honorable Judge William N. Conley

───────────────────────────────

**BRIEF OF DEFENDANTS-APPELLEES, JACKSON COUNTY, SCOTT BOWE, LUCAS JOHNSON, LINDA KELLER, AND DUANE M. WALDERA**

───────────────────────────────

SARA C. MILLS
WI State Bar No. 1029470
*Counsel of Record*
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
MICAELA E. BRINSLEY
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendants-Appellees,
Jackson County, Scott Bowe, Lucas Johnson,
Linda Keller, and Duane M. Waldera
Milwaukee, Wisconsin 53203
Phone: (414) 271-7722
smills@crivellolaw.com
shall@crivellolaw.com
mbrinsley@crivellowlaw.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

1.  The full name of every party the attorneys represent in this case:

    Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera.

2.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

3.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee Jackson County is a municipal corporation.

*s/Sara C. Mills*
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
MICAELA E. BRINSLEY
WI State Bar No. 1118840
Attorneys for Defendants-Appellees, Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
mbrinsley@crivellolaw.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

4. The full name of every party the attorneys represent in this case:

    Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera.

5. The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

6. Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee Jackson County is a municipal corporation.

*s/Samuel C. Hall, Jr.*
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
MICAELA E. BRINSLEY
WI State Bar No. 1118840
Attorneys for Defendants-Appellees, Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
mbrinsley@crivellolaw.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellees furnishes the following list in compliance with Circuit Rule 26.1:

7.  The full name of every party the attorneys represent in this case:

    Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera.

8.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Crivello, Nichols & Hall, S.C. represents Defendants-Appellees.

9.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee Jackson County is a municipal corporation.

_s/Micaela E. Brinsley_
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
MICAELA E. BRINSLEY
WI State Bar No. 1118840
Attorneys for Defendants-Appellees, Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave.
Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com
mbrinsley@crivellolaw.com

# TABLE OF CONTENTS

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**...................................................II

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**..................................................III

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**..................................................IV

**TABLE OF CONTENTS** ................................................................................ V

**TABLE OF AUTHORITIES**..........................................................................VII

**JURISDICTIONAL STATEMENT**...................................................................1

**STATEMENT OF THE ISSUES** ....................................................................2

**STATEMENT OF THE CASE** .......................................................................2

I.   procedural backgrounD...........................................................................2

II.  FACTUAL BACKGROUND ...........................................................................5

**SUMMARY OF THE ARGUMENT** ...............................................................17

**STANDARD OF REVIEW**...........................................................................18

**ARGUMENT** ...........................................................................................19

I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE COUNTY DEFENDANTS...............................................................................19

    A.   The General Rule that Correctional Officers are Entitled to Defer to the Judgment of Medical Personnel Applies to Fourteenth Amendment Claims Analyzed Under the Objective Reasonableness Standard. ........................................................19

    B.   The District Court Properly Held that the County Defendants Were Entitled to Rely on the Jail Medical Personnel's Professional Judgment............................................21

II.  THE INDIVIDUAL COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.............................................................................................33

III.  THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S *MONELL* CLAIMS. ....... 40

    A.   Plaintiff Cannot Establish that the Jail's "New Policy" (or Any Training or Lack Thereof) Caused Mouradian's Suicide.......................................................................43

    B.   Plaintiff Cannot Establish That the Jail's Communications System Caused Mouradian's Suicide....................................................................................................50

**CONCLUSION**.........................................................................................51

**CERTIFICATE OF COMPLIANCE**................................................................................**52**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arnett v. Webster*,
    658 F.3d 742 (7th Cir. 2011) ................................................................. 19

*Ashcroft v. al–Kidd*,
    563 U.S. 731 (2011) ..................................................................... 34, 35

*Berry v. Peterman*,
    604 F.3d 435 (7th Cir. 2010) ........................................... 19, 21, 22, 23

*Borello v. Allison*,
    446 F.3d 742 (7th Cir. 2006) .................................................. 34, 35, 36

*Burritt v. Ditlefsen*,
    807 F.3d 239 (7th Cir. 2015) ................................................................. 34

*Calhoun v. Ramsey*,
    408 F.3d 375 (7th Cir. 2005) ................................................................. 41

*Cham v. Wodnick*,
    123 F.3d 1005 (7th Cir. 1997) ............................................................... 34

*City and Cty. of San Franciso, Calif. v. Sheehan*,
    575 U.S. 600 (2015) ............................................................................. 34

*City of Canton, Ohio v. Harris*,
    489 U.S. 378 (1989) ..................................................................... 45, 46

*City of Oklahoma City v. Tuttle*,
    471 U.S. 808 (1985) ............................................................................. 41

*Colaizzi v. Walker*,
    812 F.2d 304 (7th Cir. 1987) ................................................................. 36

*Colburn v. Trs. of Ind. Univ.*,
    973 F.2d 581 (7th Cir. 1992) ................................................................. 43

*Collins v. Seeman*,
    462 F.3d 757 (7th Cir. 2006) ................................................................. 39

*Connick v. Thompson*,
    563 U.S. 51 (2011) ....................................................................... 42, 45

*Cornfield by Lewis v. Consolidated High School District No. 230*,
    991 F.2d 1316 (7th Cir. 1993) ................................................................ 45

*Dean v. Wexford Health Sources, Inc.*,
    18 F.4th 214 (7th Cir. 2021) ......................................................... 40, 44

*Eagan v. Dempsey*,
    987 F.3d 667 (7th Cir. 2021) ................................................................ 19

*Ellis v. Wynalda*,
    999 F.2d 243 (7th Cir. 1993) ................................................................ 35

*Erwin v. County of Manitowoc*,
    872 F.2d 1292 (7th Cir. 1989) .............................................................. 46

*Flores v. City of South Bend*,
    997 F.3d 725 (7th Cir. 2021) ................................................................ 46

*Geva v. Leo Burnett Co.*,
    931 F.2d 1220 (7th Cir. 1991) .............................................................. 43

*Greeno v. Daley*,
    414 F.3d 645 (7th Cir. 2005) ................................................................ 20

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ............................................................................. 36

*Hayes v. Snyder*,
    546 F.3d 516 (7th Cir. 2008) ................................................................ 19

*Johnson v. City of Milwaukee*,
    41 F.Supp.2d 917 (E.D. Wis. 1999) ...................................................... 48

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) ................................................................ 39

*King v. Kramer*,
    680 F.3d 1013 (7th Cir. 2012) .............................................................. 19

*Kinglsey v. Hendrickson*,
    576 U.S. 389 (2015) ............................................................................. 20

*Loertscher v. Anderson*,
    259 F.Supp.3d 902 (W.D. Wis. 2017) ............................................ 42, 48

*Mabes v. Thompson*,
    136 F.4th 697 (7th Cir. 2025) .............................................................. 20

*Malley v. Briggs*,
    475 U.S. 335 (1986) ........................................................ 35

*Mannola v. Farrow*,
    476 F.3d 453 (7th Cir. 2007) ........................................ 34

*McGee v. Parsano*,
    55 F.4th 563 (7th Cir. 2022)............................... 19, 20, 21, 23

*McTigue v. City of Chicago*,
    60 F.3d 381 (7th Cir. 1995) .......................................... 41

*Minix v. Canarecci*,
    597 F.3d 824 (7th Cir. 2010) ........................................ 39

*Miranda v. Cnty. of Lake*,
    900 F.3d 335 (7th Cir. 2018) ...................................... 19, 20

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978) ...............................................*passim*

*Estate of Perry v. Wenzel*,
    872 F.3d 439 (7th Cir. 2017) ........................................ 20

*Pulera v. Sarzant*,
    No. 15-C-461, 2019 WL 2476978 (E.D. Wis. June 13, 2019), *aff'd*,
    966 F.3d 540 (7th Cir. 2020) ........................................ 39

*Ross v. Town of Austin, Ind.*,
    343 F.3d 915 (7th Cir. 2003) ........................................ 48

*Ross v. Town of Austin*,
    No. NA01-0015-C-BG, 2002 WL 31160139 (S.D. Ind. Sept. 23,
    2002), aff'd, 343 F.3d 915 ........................................ 49

*Saucier v. Katz*,
    533 U.S. 194 (2001) ............................................ 35, 36

*Schnese v. County of Forest*,
    No. 19-C-1385, 2021 WL 3711035 (E.D. Wis. 2021)............................ 48

*Smith v. Whitsel*,
    134 F.4th 962 (7th Cir. 2025).......................................*passim*

*Tapia v. City of Greenwood*,
    965 F.2d 336 (7th Cir. 1992) ........................................ 46

*Terry v. Cty. of Milwaukee*,
No. 17-cv-1112, 2018 WL 2567721 (E.D. Wis. Jun. 4, 2018) .............................. 42

*Teumer v. Gen. Motors Corp.*,
34 F.3d 542 (7th Cir. 1994) ........................................................................... 43

*Thomas v. Cook Cnty. Sheriff's Dept.*,
604 F.3d 293 (7th Cir. 2010) ......................................................................... 42

*U.S. v. Alvarez-Martinez*,
286 F.3d 470 (7th Cir. 2002) ......................................................................... 33

*Wallmow v. Oneida County*,
99 F.4th 385 (7th Cir. 2024)........................................................................*passim*

*Wells v. Bureau Cnty.*,
723 F. Supp. 2d 1061 (C.D. Ill. 2010)............................................................. 39

*Wilson v. Layne*,
526 U.S. 603 (1999) ...................................................................................... 35

## Statutes

28 U.S.C. § 1291.............................................................................................. 1

28 U.S.C. § 1331.............................................................................................. 1

28 U.S.C. § 1343.............................................................................................. 1

28 U.S.C. § 1367.............................................................................................. 1

42 U.S.C. § 1983......................................................................................*passim*

Wis. Stat. § 101.11 ....................................................................................... 3, 4

Wis. Stat. § 101.11, and a ............................................................................. 1, 2

Wis. Stat. § 165.85(4)(b) ................................................................................ 48

Wis. Stat. § 895.46 ......................................................................................... 3

Wisconsin Statutes Chapter 51.................................................................. 11, 24

## Other Authorities

Wis. Admin. Code § DOC 350.18(1)(a) ........................................................... 30

Wis. Admin. Code § DOC 350.18(1)(b) ........................................................... 33

Wis. Admin. Code § DOC 350.18(2) ............................................................. 31

Wis. Admin. Code § LES 3.04.................................................................... 48

## JURISDICTIONAL STATEMENT

The jurisdictional statement of Plaintiff-Appellant, the Estate of Anthony Mouradian (the "Estate"), is not complete and correct. The Estate filed this action in the United States District Court for the Western District of Wisconsin on March 15, 2023, asserting various causes of action under federal and Wisconsin state law. (R. 1). The Estate filed an Amended Complaint on November 10, 2023, which also asserted various causes of action against Defendants-Appellees ("County Defendants") under federal and Wisconsin state law. (R. 26).

The District Court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the Fourteenth Amendment of the United States Constitution, and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983. Pursuant to 28 U.S.C. § 1367, the District Court had supplemental jurisdiction over the Estate's state law claims, because these claims were so related to the federal claims giving the District Court original jurisdiction that they formed part of the same case or controversy.

The United States Court of Appeals for the Seventh Circuit has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment or order of the United States District Court for the Western District of Wisconsin. The judgment appealed from was entered by the District Court, the Honorable William M .Conley, on June 10, 2025. (R. 161.) In that judgment, the District Court dismissed with prejudice the Estate's claims against the County Defendants arising under the Fourteenth Amendment, the Americans with Disabilities Act, the Wisconsin Constitution, safe place claims under Wis. Stat. §

101.11, and a Wisconsin common law claim for intentional infliction of emotional distress. (Id.) The District Court declined to continue to exercise supplemental jurisdiction over Plaintiff-Appellee's remaining state law against Defendants-Appellants. (Id.)

The Estate timely filed its Notice of Appeal on July 6, 2025 as to the judgment against the County Defendants solely on its individual and municipal claims arising under the Fourteenth Amendment. (R. 169.) No issues regarding the merits of the case remain before the District Court.

## STATEMENT OF THE ISSUES

1.     Did the District Court err in holding that Defendants-Appellees Johnson, Keller, and Bowe were entitled to defer to the judgment of jail health professionals under the Fourteenth Amendment's objective reasonableness standard?

2.     Were Defendants-Appellees Johnson, Keller, and Bowe entitled to qualified immunity?

3.     Did the District Court err in dismissing Plaintiff-Appellant's *Monell* claims against Jackson County and Sheriff Waldera?

## STATEMENT OF THE CASE

### I.     PROCEDURAL BACKGROUND

On March 15, 2023, the Estate, represented by counsel, filed this lawsuit under 42 U.S.C. § 1983 against Jackson County, Duane M. Waldera, Scott Bowe, Lucas Johnson, Linda Keller, Douglas Oates, Ashley Hakes, John Does 1-10, and ABC Insurance Company in the United States District Court for the Western District of

Wisconsin. (R. 1). In this Complaint, the Estate alleged that Anthony Mouradian's constitutional rights secured by the Fourteenth Amendment were violated when he was incarcerated at the Jackson County Jail when jail staff and one of its contracted medical providers, Dr. Hakes, were deliberately indifferent to Mouradian's serious medical conditions, namely suicide and severe mental illness, that resulted in Mouradian's death by suicide on May 28, 2020. The claims included individual capacity claims as well as a claim against Jackson County. The Estate also asserted claims for cruel and unusual punishment against all named defendants under the Wisconsin Constitution; failure to train and supervise against Jackson County, Waldera, and Bowe under Wisconsin common law; a claim for wrongful death against all defendants under Wisconsin law; intentional infliction of emotional distress against all defendants under Wisconsin common law; a claim for indemnification under Wis. Stat. § 895.46 against Jackson County; a claim against Jackson County alleging a violation of Wisconsin's Safe Place statute, Wis. Stat. § 101.11; a common law claim of negligence against all defendants; and a claim for legal fees.

On November 10, 2023, the Estate filed an Amended Complaint, naming as additional defendants Patricia Jacobson and her employer, Footprints In Time Midwifery Services, LLC ("Footprints"). (R. 26). The Amended Complaint added Jacobson and Footprints as a defendant for each claim other than those asserting Monell liability, Safe Place liability, and indemnification. It added claims of breach of contract against Jacobson, Footprints, and Dr. Hakes. Finally, the Amended

Complaint added a claim against all defendants alleging a violation of the Americans with Disabilities Act.

On February 7, 2025, all named defendants, including Defendants-Appellees, filed Motions for Summary Judgment seeking dismissal of all claims as a matter of law; Defendants-Appellees also affirmatively asserted the defense of qualified immunity. (R. 117-118). On June 10, 2025, the District Court issued an Order granting all Motions for Summary Judgment. (R. 160). On ruling in favor of the County Defendants, the District Court dismissed on their merits the Estate's claims under the Fourteenth Amendment, the Americans with Disability Act, the Wisconsin Constitution, Wis. Stat. § 101.11, and the claim alleging intentional infliction of emotional distress. It further relinquished supplemental jurisdiction over the remaining claims against the County Defendants, which included a state-law wrongful death claim, and common law claims alleging negligence and negligent failure to train and supervise. Those claims were dismissed without prejudice. The District Court also dismissed all claims against Doe defendants and against ABC Insurance Company.

The County Defendants now submit this response to Plaintiff-Appellant's appeal and respectfully ask the Court to affirm the District Court's decision in all respects as to the County Defendants.

## II.   FACTUAL BACKGROUND

### The Jackson County Jail

The Estate brought this case on behalf of Anthony Mouradian, a former inmate at Jackson County Jail in Black River Falls, Wisconsin. (R. 160 at 3). Mouradian pleaded guilty to four felony chargers on April 24, 2020, for felony burglary, stalking, bail jumping, and possession of methamphetamine. (*Id.*)

During the relevant time period, Jackson County contracted with multiple entities to provide all inmate healthcare at the Jail ("JCJ"). (R. 119 ¶ 11). Jackson County contracted with Footprints in Time Midwifery & Family Clinic ("Footprints") to provide medical staffing at JCJ. (R. 119 ¶ 20). Footprints provided six hours of on-site nursing services per business day for Jail inmates via a Licensed Practical Nurse ("LPN") and four hours per week of Advanced Practice Nurse Prescriber ("APNP") services to inmates that included, in part, medication management. (R. 119 ¶¶ 46, 47, 49). Footprints had overall responsibility for medical and health care services at the Jail, including prescription medications for inmates. (R. 119 ¶ 21). Footprints' APNP during the relevant time period was Nurse Patricia Jacobson, APNP. (R. 119 ¶ 48). Jackson County also contracted with Dr. Ashley Hakes, PsyD., to provide mental health services and care to inmates at the Jail on Fridays for up to 10 hours per day. (R. 119 ¶¶ 18, 33, 36). Finally, the Jackson County Sheriff's Office coordinated with Jackson County's Department of Health and Human Services ("DHHS") to provide crisis mental health services to inmates who were experiencing acute mental health issues or exhibiting behavior like suicidal ideation during times when Dr. Hakes was not on site. (R. 119 ¶¶ 14-15). Mental health professionals with

DHHS were available to provide crisis assessments of inmates on suicide watch. (R. 119 ¶¶ 12-13).

Also during the relevant time period, JCJ had polices in place for inmates to access both emergency and non-emergency healthcare. (R. 119 ¶ 37). Corrections officers and jail administrators at the Jail rely on and defer to the medical professionals with whom Jackson County contracts for all inmate-related medical decisions, diagnoses, and treatment. (R. 119 ¶ 42). Inmates at the Jail submit requests, including medical requests, via an electronic kiosk system. (R. 119 ¶ 38). Jail correctional supervisors then review inmate requests submitted via the kiosk and route them to the appropriate department or staff member. (R. 119 ¶ 39). All decisions regarding Jail inmate medical treatment and services are made by qualified healthcare professionals employed by the contracted healthcare providers identified above. (R. 119 ¶¶ 40, 41, 45). JCJ corrections officers have no involvement in providing inmates with any kind of medical care other than basic first aid or CPR in emergency situations involving potentially life-threatening medical conditions. (R. 119 ¶¶ 43, 44).

## July and August, 2019

Upon his arrival at the Jail on July 30, 2019, Mouradian threatened to kill himself during the booking process. (R. 119 ¶ 2). Jail correctional staff therefore placed Mouradian on suicide watch. (R. 119 ¶ 22). He was moved to Holding Cell M, which is a padded cell without any toilet or water access, put in a suicide smock, monitored at 15-minute intervals, and periodically assessed by mental health

professionals to determine whether he could be removed from suicide watch. (R. 119 ¶¶ 17, 19, 23, 26-28). On August 1, 2019, Mouradian was assessed by qualified mental health professionals Stephanie Kennedy and Jessica Andre from DHHS while on suicide watch to determine whether he could be released from the watch. (R. 119 ¶¶ 28, 29). As a result of their assessment, both Kennedy and Andre recommended that Mouradian remain on suicide watch. (R. 119 ¶ 29). Jail Captain Scott Bowe deferred to their recommendation and kept Mouradian on suicide watch. (R. 119 ¶ 30).

Eventually, on August 9, 2019, Dr. Hakes evaluated Mouradian and determined that he could be released from the watch because he denied current, active suicidal ideation, intent, or plan during her assessment. (R. 119 ¶ 31). Dr. Hakes emailed her August 9, 2019, conclusions about ending Mouradian's suicide watch to Captain Bowe and Nurse Jacobson that same day, confirming that she believed Mouradian had "severe depression." (R. 119 ¶¶ 34, 35, 50). Within that email, Dr. Hakes asked that Nurse Jacobson evaluate Mouradian "ASAP" for medication and advised that she (Dr. Hakes) would see Mouradian the following week. (R. 119 ¶ 51). Dr. Hakes did not recommend any continued monitoring of Mouradian when she released him from suicide watch on August 9, 2019. (R. 119 ¶ 32).

On August 12, 2019, Mouradian requested additional help, and Captain Bowe forwarded this request to Dr. Hakes. (R. 119 ¶ 53). Mouradian then met with Nurse Jacobson on August 14 and agreed to try medications to address his mental health concerns. (R. 119 ¶¶ 54, 55). Mouradian also met with Dr. Hakes for an assessment

on August 17, 2019. (R. 119 ¶¶ 56, 58). Following her August 17th visit with Mouradian, Dr. Hakes emailed Captain Bowe and Nurse Jacobson the same day confirming that Mouradian continued to report suicidal ideation and plan, "but is void of intent and has agreed that he will allow the medication some time to work as well as to inform staff persons if his thoughts become more severe." (R. 119 ¶ 58). She also noted that Mouradian had "been eating regularly for almost two weeks and has not engaged in any unsafe behavior." (R. 119 ¶ 59). Also following that visit, Dr. Hakes began emailing Captain Bowe with periodic status updates about Mouradian after her visits with him. (R. 119 ¶ 60). As of that same date, jail staff decided to temporarily house Mouradian in Holding Cell L, which is used to house inmates who may benefit from increased visibility or observation, such as inmates with special medical issues or elderly inmates who may not be suited for housing in general population. (R. 119 ¶¶ 61, 63).

On August 22, 2019, Mouradian submitted a request via the kiosk system asking to see the nurse who prescribed him medication, which was forwarded to JCJ medical staff by Captain Bowe on the same day. (R. 119 ¶¶ 64, 65). On August 23, 2019, Dr. Hakes emailed Captain Bowe and Nurse Jacobson about Mouradian and noted that his "mood does seem to have improved slightly. No current safety concerns." (R. 119 ¶ 66). Similarly, on August 30, 2019, Dr. Hakes emailed Captain Bowe and Nurse Jacobson stating that his "mood is slowly improving, although he does still experience some suicidal ideation." (R. 119 ¶ 67).

## September 2019 through January 2020

Over the next six months, Mouradian continued to regularly meet with Dr. Hakes and continued to receive medication management from Nurse Jacobson. (R. 119 ¶¶ 61-84). In each of her emails to Captain Bowe following her visits with Mouradian, Dr. Hakes confirmed that she had no safety concerns for Mouradian, and she never recommended placing him on any type of special observation or watch. (R. 119 ¶¶ 71-84). No Jail correctional staff observed Mouradian exhibiting behavior that suggested an imminent risk of suicide during that time period. (R. 119 ¶¶ 71-84). At times, Mouradian refused to meet with Dr. Hakes, which was out of Jail staff's control. (*See* R. 119 ¶¶ 80, 81, 84).

## February and March, 2020

On February 20, 2020, Dr. Hakes emailed Captain Bowe advising him that Mouradian had a plea hearing the following day and that she was concerned about how the hearing could impact Mouradian's mental health. (R. 119 ¶ 85). She also noted that Mouradian had refused to meet with her for approximately two months. (R. 119 ¶ 85). Dr. Hakes asked Captain Bowe to let jail staff know to be cognizant of any changes in Mouradian's presentation, and Captain Bowe forwarded Dr. Hakes' email to the Jail's three correctional sergeants: Kaylan Rich, Thomas Sharp, and Annalisa Hizer. (R. 119 ¶¶ 86, 87).

The following day, February 21st, Captain Bowe received an email from a Jackson County Assistant District Attorney Emily Hynek asking, "Is it true Mouradian attempted to hang himself in the jail last night?" (R. 119 ¶ 88). Through

their email conversation, Attorney Hynek told Captain Bowe that Mouradian's criminal defense lawyer "just said [Mouradian] couldn't enter his plea because he tried to hang himself in the jail last night." (R. 119 ¶ 90). Captain Bowe then spoke with Jail staff about the report, but no one was aware of any such incident. (R. 119 ¶¶ 89, 91). Captain Bowe also spoke with Mouradian on February 21, 2020, about the report. (R. 119 ¶ 92). Mouradian denied that he attempted to hang himself and denied that he made the alleged comment to his lawyer. (R. 119 ¶ 92). Mouradian said he was not currently suicidal and did not want to be put on suicide watch. (R. 119 ¶ 93). Nonetheless, Captain Bowe investigated further.

Captain Bowe observed Mouradian and noted that Mouradian did not have any marks on his neck that might suggest he had attempted suicide by hanging. (R. 119 ¶ 94). Jail staff then conducted a cell check of Mouradian's cell block and did not find any items that would indicate Mouradian attempted to hang himself or cause himself bodily harm. (R. 119 ¶ 95). That same day, Captain Bowe also spoke with Mouradian's cell mate, who said he was unaware of any potential suicide attempts by Mouradian. (R. 119 ¶ 96). Captain Bowe then consulted with Dr. Hakes about the report from Attorney Hynek and the information learned from his investigation. (R. 119 ¶ 97). Dr. Hakes emailed, "I would err on the side of caution and put [Mouradian] on precautions." (R. 119 ¶ 97).

Captain Bowe was then able to reach Mouradian's criminal defense attorney, Travis Satorious, to discuss the veracity of Attorney Hynek's report. (R. 119 ¶ 98). Attorney Satorious clarified that Mouradian had told him he was looking around for

something to hang himself with but did not actually say he had attempted to hang himself. (R. 119 ¶ 98). However, Attorney Satorious told Captain Bowe that he had concerns about Mouradian's state of mind. (R. 119 ¶ 99). Based on his review of the matter and his consultation with Dr. Hakes, Captain Bowe emailed Dr. Hakes again stating, "We're thinking of a modified suicide watch in the side cell (not padded cell) with 30 minute checks and no bedding, etc." (R. 119 ¶ 100). Dr. Hakes responded to Captain Bowe by email on February 21, 2020, stating, "That'll work." (R. 119 ¶ 101). On the afternoon of February 21, 2020, Sergeant Sharp emailed all jail staff advising of Mouradian's modified suicide watch, the precautions being put in place, and the reasons for them. (R. 119 ¶ 102).

On February 24, 2020, Dr. Hakes emailed Captain Bowe for an update about Mouradian and Captain Bowe responded, in part, "Apparently he's doing OK. He decided he would refuse to eat anything on Friday, but has been eating some since then. He also refused to shower on Friday, but did last night." (R. 119 ¶ 103).

Following a visit with Mouradian in the side cell on February 28, 2020, Dr. Hakes advised Jail supervisors that Mouradian had expressed that he was experiencing active suicidal ideation. (R. 119 ¶ 104). She recommended that they initiate an emergency detention under Chapter 51 of the Wisconsin Statutes based on Mouradian's mental state. (R. 119 ¶¶ 105, 108). Therefore, that same day, the Jackson County Sheriff's Office took Mouradian into custody for purposes of an emergency detention. (R. 119 ¶ 106). He was initially admitted to Sacred Heart Hospital and was later accepted for admission to Winnebago Mental Health Institute

for treatment. (R. 119 ¶¶ 107, 109). Mouradian was discharged back to JCJ almost three weeks later, on March 18, 2020, after he had been stabilized. (R. 119 ¶ 110).

On March 18, 2020, upon learning that Mouradian was going to be discharged back to the Jail, Captain Bowe emailed Dr. Hakes and asked, "what do you think the appropriate housing option would be for him at this time?" (R. 119 ¶ 111). Dr. Hakes recommended that Mouradian be placed in a two-person cell block, because she believed that housing him with more than one person could be overwhelming to him. (R. 119 ¶ 112)[1]. She did not recommend any special watch or precautions. (R. 119 ¶ 112). Dr. Hakes then met with Mouradian at the Jail on March 20, 2020, and she reported to Captain Bowe afterwards that Mouradian was doing a lot better than he had been. (R. 119 ¶¶ 116, 117).

### April and May 2020

By April 6, 2020, Dr. Hakes copied Captain Bowe on an email to a DHHS social worker in which Dr. Hakes advised that Mouradian was "more stable than I've ever seen him in the past year." (R. 119 ¶¶ 118, 119). Then, on April 14, 2020, Sergeant Rich emailed Jail supervisors, including Captain Bowe, advising them to "keep an extra eye on Mouradian" because officers observed him looking around his cell almost as if he was looking for a place to tie something. (R. 119 ¶¶ 121, 122). Sergeant Rich stated in her email that she notified the night shift, or "B shift," of the concerns and

---

[1] Plaintiff incorrectly claims that Mouradian was placed in a two-man cell block because he was previously on a special mental health watch—instead, Dr. Hakes recommended that he be placed in a two-person cell block because she believed that housing him with more than one person could be overwhelming to him. (R. 119 ¶ 112).

to be extra diligent in their observations. (R. 119 ¶ 123). Captain Bowe forwarded Sergeant Rich's email to Dr. Hakes the following day. (R. 119 ¶ 124). Sergeant Rich then spoke with Dr. Hakes by phone about Mouradian on April 15, 2020, and she sent a follow-up email to Dr. Hakes the same day confirming their conversation. (R. 119 ¶¶ 125, 126). In that email, Sergeant Rich confirmed that she instructed Jail night shift to keep an extra diligent eye on Mouradian and asked night shift officers to "use one of our monitors after lockdown just for enlarging the view of Mouradian's cell/bunk area as an extra precaution." (R. 119 ¶ 126).

By April 16, 2020, Dr. Hakes emailed Captain Bowe an update about Mouradian in which she noted that Mouradian had agreed to give a laundry job a try, which she believed "would definitely benefit him." She also confirmed that Mouradian denied any safety concerns. (R. 119 ¶¶ 120, 129, 130). On April 24, 2020, Mouradian had his plea hearing in his underlying criminal case in which he pled guilty to four felonies. (R. 119 ¶ 131). On April 30, 2020, Dr. Hakes emailed Captain Bowe advising that Mouradian had declined to discuss his plea hearing but concluding that there were no safety concerns. (R. 119 ¶ 132). And by May 7, 2020, Dr. Hakes emailed Captain Bowe an update about Mouradian stating, "He would like to continue doing laundry, and I think it would definitely benefit his mental health. His mood isn't great, but it is better than it has been. No current safety concerns." (R. 119 ¶¶ 127, 128, 133). On May 13, 2020, Dr. Hakes emailed Captain Bowe advising that Mouradian declined to meet with her and confirming that she would see him the following week. (R. 119 ¶ 134).

Dr. Hakes had what ended up being her final visit with Mouradian on Thursday, May 21, 2020. (R. 119 ¶ 135). Following that session, Dr. Hakes emailed Captain Bowe with an update as usual, advising "We actually had a very productive session. Mr. Mouradian was more open and participatory than he has been in the past. I did give him some additional treatment materials, and if he is able to work through what I've now identified, I believe we will see some improvement. He denied any safety concerns." (R. 119 ¶ 135). She concluded that she would be back at the Jail in one week. (R. 119 ¶ 136).

## May 27-28, 2020

Corrections Officers Linda Keller and Lucas Johnson were working the night shift at JCJ on May 27-28, 2020, from 6:00 p.m. to 6:00 a.m. (R. 119 ¶¶ 138, 142-145). As of that date, Officers Keller and Johnson were aware that Mouradian had been on a suicide watch at some point earlier during his incarceration and that he had been admitted to and then discharged from a mental health care facility a few months earlier. (R. 119 ¶¶ 130, 140). They were also aware that Mouradian was not on a special watch or suicide watch as of that evening. (R. 119 ¶ 141).

Officer Keller was the Control Officer assigned to the Control Room at the Jail between 6:00 p.m. and 10:00 p.m. on May 27, 2020. (R. 119 ¶ 154, 155). The Control Officer has several responsibilities, including locking and unlocking jail doors to facilitate officer and inmate movements inside the jail, answering radio traffic from dispatch and from officers within the jail, answering incoming phone calls to the jail, and monitoring at least 55 camera feeds on monitors located in the Control Room. (R.

119 ¶¶ 148, 149). The camera feeds in the Jail's Control Room include 35 feeds from inside the jail facility and additional camera feeds that include the main lobby of the Jackson County Sheriff's Office and multiple camera feeds of the exterior of the Jail and Sheriff's Office. (R. 119 ¶¶ 148, 149). During her time as the Control Officer that night through 10:00 p.m., Officer Keller did not observe Mouradian exhibiting any unusual or concerning behavior. Similarly, during the 10:00 p.m. to 2:00 a.m. shift rotation as floor officers, neither Officer Keller nor Officer Johnson observed Mouradian exhibiting any unusual or concerning behavior. (R. 119 ¶ 156). Officer Johnson conducted a walk-through of the facility for wellness checks at 1:20 a.m. and did not observe anything amiss. (R. 119 ¶¶ 157, 158). Officer Johnson then assumed the post of Control Officer at 2:00 a.m. on May 28, 2020. (R. 119 ¶ 159).

For approximately ten to twelve minutes after he assumed the post of Control Officer, Officer Johnson, Sergeant Oates, and Officer Keller talked about various jail-related items in the Control Room area. (R. 119 ¶¶ 147, 161-162). Officer Keller then began conducting the hourly wellness checks at approximately 2:13 a.m. by walking through each cell block and visually observing each inmate. (R. 119 ¶¶ 146, 168). Also shortly after the 2:00 a.m. shift change, Officer Johnson, as the Control Officer, had to facilitate Officer Frey's and Sergeant Oates' exit from the Jail building by watching the cameras to monitor their location within the building so he could unlock the various doors within the facility to allow them to exit. (R. 119 ¶¶ 148-153, 160, 165, 166). At that time, Officer Johnson was also monitoring an intoxicated citizen in the

front lobby of the Jail to ensure that Officer Frey and Sergeant Oates were able to exit the facility safely. (R. 119 ¶¶ 163, 164, 167).

Just after Officer Keller had left to begin her rounds, at approximately 2:13 a.m., Officer Johnson noticed on the monitors in the Control Room what appeared to be an inmate in E Block who was kneeling next to the cell bars. (R. 119 ¶¶ 115, 169, 170). While it is not unusual for inmates to be awake and moving around their cells in the middle of the night, Officer Johnson could not tell if the inmate in E Block needed assistance and his position was unusual. He therefore radioed Officer Keller and told her to go to E Block. (R. 119 ¶ 171). Officer Keller did not receive Officer Johnson's 2:13 a.m. radio transmission, but at approximately 2:14 a.m., she entered E Block to conduct wellness checks in that two-man block. (R. 119 ¶¶ 172, 173). She then observed Mouradian in cell E1 hanging from a sheet from the cell bars of the cell door. (R. 119 ¶ 173). Officer Keller immediately used her radio to transmit to Officer Johnson that she needed assistance in E Block for an inmate hanging. (R. 119 ¶ 174). Officer Keller requested help twice via her radio, because she did not believe she received an acknowledgement from Officer Johnson to her first transmission. (R. 119 ¶ 175). Officer Keller then ran across the hallway to A Block to obtain the cut-down kit and CPR kit that were located there. (R. 119 ¶¶ 113, 114, 176). As she did so, she also yelled down the corridor for Officer Johnson to assist, because she did not believe that Officer Johnson received her radio transmissions. (R. 119 ¶ 177).

However, Officer Johnson had received the radio transmissions and immediately notified dispatch that assistance was needed. (R. 119 ¶ 178). Officer

Johnson then responded to E Block and began assisting Officer Keller in cutting Mouradian down. (R. 119 ¶ 179). However, Mouradian had tied his sheet and two towels to the cell bars in three separate spots so that the cell door could not be opened without cutting through multiple knots of fabric. (R. 119 ¶ 180). The officers were able to get the door open and cut Mouradian down by 2:19 a.m., just as additional deputies arrived to assist. (R. 119 ¶ 181). EMS arrived at JCJ at approximately 2:28 a.m. (R. 119 ¶ 182). Mouradian was transported from the Jail and arrived at the hospital at approximately 2:50 a.m. (R. 119 ¶ 183). At 3:12 a.m. on May 28, 2020, a nurse from the hospital called the Jail and advised Officer Johnson that Mouradian had passed. (R. 119 ¶ 184).

## SUMMARY OF THE ARGUMENT

The District Court assessed the Estate's claims under the Fourteenth Amendment and correctly held that the County Defendants properly deferred to the judgment of Dr. Hakes and Nurse Jacobson. In so holding, the District Court found that while the correctional officers in this case had training regarding suicide prevention, they did not have the depth of knowledge and experience that Dr. Hakes had to determine a detainee's suicide risk. Additionally, the District Court found that there is no evidence of record to support the Estate's contention that Sergeant Rich's instruction to night staff on April 14, 2020—to keep an extra diligent eye on Mouradian after he had been observed looking around his cell—lasted through Mouradian's death. And it accordingly held that Officer Johnson did not defy

Sergeant Rich's April 14th instruction during his time in the control room the night of Mouradian's suicide, May 27-28, 2020.

Although the District Court did not address the issue, the County Defendants also maintain that Johnson, Keller, and Bowe are entitled to qualified immunity.

Finally, the District Court also properly held that Jackson County and Sheriff Waldera are entitled to summary judgment on the Estate's Fourteenth Amendment claims because the court had already found that the correctional officer defendants did not violate Mouradian's Fourteenth Amendment rights. As claims under *Monell* must be supported by an underlying constitutional violation, the *Monell* claims against Sheriff Waldera and Jackson County necessarily failed as a matter of law.

## STANDARD OF REVIEW

This Court reviews a "district court's summary judgment ruling[s] de novo." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). In so reviewing, this Court asks whether the movant has shown "that there is no genuine dispute as to any material fact." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). The Court also considers all of the evidence in the record in the light most favorable to the non-moving party, and draws all reasonable inferences from that evidence in favor of the party opposing summary judgment. *Feliberty v. Kemper Corp.*, 98 F.3d 274, 277 (7th Cir. 1996) (citation omitted).

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE COUNTY DEFENDANTS.

### A. The General Rule that Correctional Officers are Entitled to Defer to the Judgment of Medical Personnel Applies to Fourteenth Amendment Claims Analyzed Under the Objective Reasonableness Standard.

Initially, Plaintiff argues that "the rule that correctional officers may avoid liability if the inmate is being treatment [sic] by a medical professional does not apply to Fourteenth Amendment claims." (App. Br. at 42). Plaintiff cites no support for this statement.

To the contrary, Seventh Circuit case law supports this general rule:

> A prison official, however, generally does not act with deliberate indifference if she reasonably relied on the judgment of medical personnel. Non-medical officials are presumptively entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.

*Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (internal quotations/citations omitted) (quoting/citing *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); and *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)). While *Eagan* involved Eighth Amendment claims, other cases upholding this general rule involve Fourteenth Amendment claims. *See, e.g.*, *Miranda*, 900 F.3d at 343; *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) ("… the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional judgments of the physicians and nurses … without the fear of liability for doing so."). This

presumption holds that there is generally no deliberate indifference where the officers relied on the medical professionals' opinions. *See Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) ("Perhaps it would be a different matter if [the non-medical prison official] had ignored [the plaintiff's] complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns.").

Plaintiff contends that because the Supreme Court in *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015) "removed any subjective analysis from the Fourteenth Amendment standard, the medical deference rule does not apply to Fourteenth Amendment claims." (App. Br. at 43). This argument fails following the decision in *Miranda*—decided after *Kingsley*—involving Fourteenth Amendment claims analyzed under the newly-established objective reasonableness standard. Even when applying the objective reasonableness standard, this Court has repeatedly held that the officers are entitled to rely on the medical providers' professional judgments. *Miranda*, 900 F.3d at 343; *McGee*, 55 F.4th at 569; *see also Estate of Perry v. Wenzel*, 872 F.3d 439, 458-9 (7th Cir. 2017).

This Court has since affirmed that this general rule applies following the implementation of the objective reasonableness standard in the context of Fourteenth Amendment inadequate medical care claims. *See, e.g., Mabes v. Thompson*, 136 F.4th 697, 710 (7th Cir. 2025) ("And we have recognized that state officials may reasonably rely on the judgment of medical professionals without exposing themselves to liability" in the context of a Fourteenth Amendment due process claim); *Smith v.*

*Whitsel*, 134 F.4th 962 (7th Cir. 2025) (noting that the defendant correctional officer escapes liability where he "reasonably relied" on the judgment of medical professionals in the context of a Fourteenth Amendment inadequate medical care claim); *McGee*, 55 F.4th at 566 ("Established circuit precedent entitles a corrections officer to defer to the judgment of medical professionals" in the context of a Fourteenth Amendment inadequate medical care claim).

### B. The District Court Properly Held that the County Defendants Were Entitled to Rely on the Jail Medical Personnel's Professional Judgment.

Plaintiff argues that the County Defendants did not rely on Dr. Hakes' professional judgment, but it also asserts that the officers should have observed Mouradian on the night of his suicide regardless of Dr. Hakes' opinion about Mouradian's observation status. (App. Br. at 43). Plaintiff further argues that the District Court "erroneously based its conclusion on *Berry v. Peterman*" because "*Berry* is factually different" and "any reliance or deference to Hakes' professional judgment does not extend to the County Defendants [sic] ordinary jail staff duties or responsibilities." (*Id.* at 43-44). This argument fails because (1) *Berry* merely relies on the well-established standard that correctional officers may defer to and rely on medical personnel's professional judgment, and (2) this Court is not confined to the District Court's analysis.

Plaintiff contends that *Berry* is "factually different" because Mouradian never requested to see the Jail's mental health professionals. (App. Br. at 43). The County Defendants agree that *Berry* is factually distinguishable from this case; however, this

does not eliminate the broad presumption established by the Seventh Circuit (as stated above) that correctional officers are entitled to defer to the judgments of medical professionals. Indeed, in re-affirming this standard, the Seventh Circuit in *Berry* cited *multiple* prior cases upholding the rule that officers may defer to and rely on the judgements of health professionals so long as they do not ignore the inmate. *See* 604 F.3d at 440 (citing *Hayes v. Snyder*, 546 F.3d 516, 527-28 (7th Cir. 2008); *Johnson v. Doughty*, 433 FF.3d 1001, 1010-11 (7th Cir. 2006); *Greeno*, 414 F.3d at 655-56; *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

Moreover, the *Berry* decision does not state that the standard requires the inmate to specifically request to see a jail health professional in order for the correctional officers to defer to those health professionals' judgment. Rather, *Berry* broadly confirms that "[a]s a nonmedical administrator, [the jail administrator] was entitled to defer to the judgment of jail health professionals so long as he did not ignore Berry." *Id*. at 440. In fact, if courts were to adhere to Plaintiff's suggested interpretation of *Berry* (that correctional officers may not defer to the judgments of health professionals unless the inmate requests to see those health professionals), the standard would never apply in emergency situations or in situations like the present: where the inmate has not necessarily asked for intervention but is otherwise under the ongoing care of a trained medical professional. In turn, Plaintiff's proffered version of the rule is ultimately nonsensical: it would penalize non-medical correctional staff for relying on trained medical professionals' opinions in medical emergencies or where an inmate has not proactively sought medical intervention. But

this Court has "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff." *McGee*, 55 F.4th at 563 (quoting *Miranda*, 900 F.3d at 343). Plaintiff does not explain why this Court should depart from this well-established rule. Nor does it explain why different medical situations should be treated differently—a particularly glaring omission given that the goal is to ensure that inmates' medical needs are met.

Moreover, even if Plaintiff is correct that the District Court improperly relied on *Berry* in granting summary judgment to the County Defendants, this Court is not confined to the District Court's analysis in reviewing the grant of summary judgment. *See Abdullahi*, 423 F.3d at 769. The record before this Court is clear: the County Defendants (1) *did* defer to Dr. Hakes', Nurse Jacobson's, and DHHS staff's professional recommendations and judgments about Mouradian's care; and (2) went above and beyond in ensuring that Mouradian received proper mental health treatment.

In fact, while Plaintiff argues that "there were no requests for the County Defendants to ignore," Plaintiff conveniently ignores the months of attention and observation correctional officers gave to Mouradian during his incarceration at the Jail preceding his death. The first day that Mouradian was booked into JCJ, correctional staff placed him on suicide watch given his threats to kill himself during the booking process. (R. 119 ¶¶ 2, 22). Shortly afterward, Jail staff arranged for Mouradian to be assessed by mental health professionals Stephanie Kennedy and Jessica Andre while he was still on suicide watch. (R. 119 ¶¶ 28-29). On August 12,

2019, when Mouradian requested additional mental health assistance, Captain Bowe immediately forwarded the request to Dr. Hakes. (R. 119 ¶ 53). Mouradian met with Nurse Jacobson two days after his request and agreed to try medications on top of his meetings with Dr. Hakes to address his mental health concerns. (R. 119 ¶¶ 54, 55). Several days later, Dr. Hakes again met with Mouradian and discussed this meeting with Captain Bowe and Nurse Jacobson. (R. 119 ¶ 58).

Over the following months, Jail staff coordinated Mouradian's mental health care with Dr. Hakes, members of DHHS, and Nurse Jacobson. Jail staff also continued to observe Mouradian for any signs that suggested an imminent risk of suicide during this time period. (R. 119 ¶¶ 71-84). When Jail staff learned that Mouradian had allegedly attempted to hang himself in the Jail in February 2020 (a claim of which Jail staff had no knowledge until the Jackson County Assistant District Attorney emailed Captain Bowe to ask him if he had heard), Captain Bowe immediately commenced an investigation into the issue, which included speaking with Jail staff, Mouradian himself (who denied the attempt), Mouradian's cellmate, and Mouradian's criminal defense attorney. It also involved personally observing Mouradian's physical appearance for marks on his neck and inspecting his cell for items that might indicate that he had attempted suicide. (R. 119 ¶¶ 89-96). Captain Bowe further consulted with Dr. Hakes about his findings and the report, and Dr. Hakes decided that Mouradian should be placed on precautions. (R. 119 ¶ 97).

Shortly after this incident, Dr. Hakes recommended an emergency detention under Chapter 51, which the Jackson County Sheriff's Office immediately

commenced. (R. 119 ¶¶ 104-106). When Mouradian returned to JCJ in March 2020, Jail staff deferred to Dr. Hakes' recommendation that Mouradian be placed in a two-person cell block and that he did not need special precautions at that time. (R. 119 ¶¶ 112). By April 14, 2020, Sergeant Rich emailed Jail supervisors advising them to "keep an extra eye on Mouradian" because officers observed him looking around his cell almost as if he was looking for a place to tie something. (R. 119 ¶¶ 121, 122). But she did not wait to get that direction from Dr. Hakes before sending her email; instead, she relied on her own observations and judgment to ensure Mouradian's safety. Specifically, Sergeant Rich instructed Jail night shift officers to "use one of our monitors after lockdown just for enlarging the view of Mouradian's cell/bunk area as an extra precaution." (R. 119 ¶ 126).

When Dr. Hakes recommended that Mouradian give a laundry job a try because it could help his mental health, Jail staff accommodated this recommendation. (R. 119 ¶¶ 127, 128, 133). Jail staff continued to defer to Dr. Hakes' professional opinion that Mouradian was improving based on her report on May 21, 2020 (six days before his death) that he was more open and participatory than he had been in the past and that there were no current safety concerns. (R. 119 ¶ 135). Following his return to JCJ in March until the moment of his death on May 28th, Mouradian made no further threats to commit suicide, no correctional officer observed any kind of suicidal behavior, and no medical professional suggested that more or different intervention or observation was necessary.

Nevertheless, Plaintiff focuses on the fact that the County Defendants, as corrections officers, have observation responsibilities that fall within their ordinary jail staff duties or responsibilities. (App. Br. at 44). In so arguing, Plaintiff incorrectly states that "the conclusion essentially is that Lucas Johnson did not need to perform his ordinary Jail staff duties . . . because Mouradian's observation status was not elevated." (*Id.*) This "conclusion" is not based on evidence or fact. Instead, the record shows that Officer Johnson's duties in the Control Room included much more than just unblinkingly monitoring at least 55 camera feeds. As explained, *supra*, the Control Officer is required to lock and unlock doors to facilitate officer and inmate movements inside the Jail, answer radio traffic from dispatch and from officers within the Jail, answer incoming phone calls to the Jail, *and* monitor the camera feeds in the Control Room. (R. 119 ¶¶ 148-149). These camera feeds include 35 feeds from inside the facility and additional camera feeds including the main lobby of the Sheriff's Office and multiple camera feeds of the exterior of the facility. (*Id.*)

From 10:00 p.m. until 2:00 a.m., Officer Keller was the Control Officer on duty, and she confirmed that she did not observe Mouradian exhibiting any unusual or concerning behavior during those four hours. (R. 119 ¶ 156). While Officer Johnson was on duty, but before he took position as the Control Officer, he conducted a walk-through of the facility for wellness checks at 1:20 a.m. and did not observe anything amiss. (R. 119 ¶¶ 157, 158). He then assumed his post as Control Officer at 2:00 a.m. (R. 119 ¶ 159). After he assumed his post, he conducted a variety of his duties as Control Officer including facilitating Officer Frey's and Sergeant Oates' exit from the

Jail. (R. 119 ¶¶ 148-153, 160, 165, 166). But this does not somehow mean that Officer Johnson failed in his observation responsibilities.

Next, Officer Keller began her rounds at about 2:13 a.m. and almost immediately Officer Johnson noticed the monitors in the Control Room show what appeared to be an inmate in E Block who was kneeling next to the cell bars. (R. 119 ¶¶ 115, 169, 170). He radioed Officer Keller and told her to go to E Block. (R. 119 ¶ 171). At about 2:14 a.m., Keller entered E Block to conduct wellness checks and observed Mouradian hanging from a sheet from the cell bars. (R. 119 ¶ 173). Officer Keller immediately jumped into action and began life-saving efforts. (R. 119 ¶¶ 174-177). Nothing about her actions demonstrate that she failed in her observation duties or otherwise acted unreasonably.

Plaintiff fails to demonstrate how Officer Johnson failed to perform his ordinary Jail staff duties on the night of Mouradian's suicide or otherwise acted unreasonably. Plaintiff appears to imply that Officer Johnson should have been doing nothing other than staring at the monitor which depicted Mouradian's cell—but, again, this contention is not supported by the record identifying the multiple duties Officer Johnson had as Control Officer and how he reasonably fulfilled them.

Plaintiff cites *Smith v. Whitsel* in an attempt to support its position that Officer Johnson failed to perform his duties as a Control Officer, but that case is distinguishable. *See Smith*, 134 F.4th 962. In *Smith*, the plaintiff was detained at a county jail. During the intake process, she told staff that she was receiving methadone for opioid use disorder and had experienced withdrawal symptoms in the

past. *Id.* at 964. At first, she was placed on the jail's withdrawal protocol, which consisted of periodic assessments and medication to manage symptoms of withdrawal, but later nursing staff ended the protocol. *Id.* A few days after the protocol ended, the plaintiff refused to eat and reported vomiting, so jail staff moved her to the medical unit. *Id.* The unit had cells that were equipped with motion-activated video cameras that allowed correctional staff to watch the occupants remotely. *Id.*

Over the night, the plaintiff vomited more than 25 times. *Id.* Nursing staff gave her anti-nausea medication first thing in the morning, then again around 1:00 p.m. *Id.* Beginning at 2:30 p.m., the defendant correctional officer was assigned to the post responsible for the medical unit and was required to conduct well-being checks every 30 minutes, during which he was to observe each detainee for 10 to 12 seconds, paying special attention to their movements and breathing to asses their health and safety. *Id.* When not conducting these well-being checks, the defendant-officer testified he spent the "majority" of his shift monitoring the video feeds. *Id.*

The defendant-officer opened the plaintiff's cell at 2:48 p.m. for a nurse to give the plaintiff commissary items and toilet paper. *Id.* The record did not reveal any further interactions between medical staff and the plaintiff until she was found unresponsive just under four hours later, at approximately 6:35 p.m. *Id.* The defendant-officer testified that he did not see anything out of the ordinary during his well-being checks and he did not recall seeing the plaintiff vomiting on the video feed during those hours. *Id.* However, the defendant-officer's supervisor testified that the

defendant-officer told him the plaintiff was vomiting around 3:30 p.m., and the defendant-officer noticed vomit on the plaintiff's bed around 4:15 p.m. *Id.* The defendant-officer also saw via video around 5:15 p.m. that the plaintiff was on the floor, and a few minutes later when he delivered her dinner, he saw her hands were cramping. *Id.* He did not inform the nurse of any of these symptoms or observations, never asked her to examine the plaintiff, and did not know whether she checked on her. *Id.*

The video the defendant-officer was monitoring showed that the plaintiff vomited at least seven times between 2:30 and 6:00 p.m., including onto the floor three times and onto her bed. *Id.* at 964-65. The plaintiff was also shown falling three times. *Id.* at 965. Each time, she remained on the floor for more than fifteen seconds. *Id.* During the second fall, she hit her head on the concrete floor before she lay motionless. *Id.* She eventually got back on her bed, but just before the defendant-officer's 5:56 p.m. well-being check (which lasted about three seconds, instead of 10 to 12) the plaintiff removed her soiled pants, leaving her naked from the waist down, with her bare buttocks clearly visible. *Id.* At 6:01 p.m., she rolled onto her back and did not move again. *Id.* However, the defendant-officer did not notice the plaintiff's nudity for over ten minutes. *Id.* When he used the intercom to command the plaintiff to put her pants back on (twice, over seven minutes), she did not respond. *Id.* The defendant-officer informed his supervisor, but he did not inform medical staff. *Id.* At 6:22 p.m., the defendant-officer conducted a one-to-two second well-being check and testified he saw the plaintiff's chest rising at that time, but did not report to the

medical staff that she was half-naked and not responsive to him. *Id*. He then went on his meal break. *Id*. Less than five minutes later, at approximately 6:35 p.m., the nurse looked into the plaintiff's cell and noticed she was pale and not breathing. *Id*. Staff began CPR and called an ambulance to take her to the hospital, where she was pronounced dead. *Id*.

In *Smith*, the Seventh Circuit reasoned that a jury could find that the defendant-officer had reason to know that medical staff failed to treat the plaintiff. *Id*. at 967. He witnessed her escalating symptoms and knew that medical staff were not aware of her situation because he never saw them administering care and he did not inform them of her condition. *Id*. Ultimately, however, the Seventh Circuit dismissed the appeal for lack of appellate jurisdiction, since the district court's denial of qualified immunity turned on disputes of material fact. *Id*. at 968.

The *Smith* case is readily distinguishable from the present case, because the defendant-officer in *Smith* spent *four hours* ignoring the plaintiff's severe withdrawal symptoms and failed to report them to medical staff. Here, however, Officer Johnson and Officer Keller did not observe Mouradian begin the process of hanging himself or take any other actions that might suggest that medical intervention was necessary. Further, Officer Johnson had only been in the Control Room for *thirteen minutes*, and right at the beginning of a shift change with other responsibilities to tend to, before noticing that something might be amiss in Mouradian's cell. Officer Keller had just begun her rounds, which were timely pursuant to Wisconsin DOC requirements, when she saw Mouradian and immediately jumped into action. *See* Wis. Admin. Code

§ DOC 350.18(1)(a). Plaintiff cannot point to any unusual or strange behavior that Mouradian engaged in on the night of his suicide that Officer Keller or Officer Johnson failed to notice until Mouradian began to tie the sheets in his cell at 2:00 a.m. In other words, Plaintiff's position on liability is premised on officers failing to observe an inmate who was not on any special precautions during this 13-minute period. But Plaintiff has not—and cannot—cited any legal authority requiring correctional officers to *constantly* observe inmates within a jail, *even if* those inmates are placed on precautions or suicide watch.[2]

JCJ staff is trained that the appropriate frequency for monitoring video feeds in the Control Room is based upon common sense and the expectation that the Control Officer continues to monitor the video feeds in light of all of their other responsibilities and obligations. (R. 119 ¶ 153); *see Wallmow v. Oneida County*, 99 F.4th 385, 391 (7th Cir. 2024) ("[T]he inquiry takes a broad view, looking at any 'objective circumstances potentially relevant to a determination' of reasonableness . . . . These include the prevailing penal circumstances at the facility, accounting for the need to 'preserve internal order and discipline and to maintain institutional security.'"). Indeed, even the applicable Wisconsin Administrative Code provision

---

[2] Plaintiff incorrectly states that Officer Johnson "admitted that he should have observed Mouradian tie the bedsheet to his cell door and hang himself." (App. Br. at 45-46). Instead, Officer Johnson was shown screenshots from surveillance video from about 18 seconds after 2:00 a.m. during his deposition and merely testified that it looked like Mouradian was "manipulating the doors of some sort" but that he did not recall seeing this contemporaneously. (R. 148, pp. 50-51, ¶ 159, Response).

confirms that video monitoring of inmates may be used "to supplement but not replace personal observations." Wis. Admin. Code § DOC 350.18(2).

To the extent that Plaintiff argues that Mouradian should have been placed on precautions or suicide watch at the time of his death, this position directly conflicts with a wealth of binding precedent. Taken to its logical conclusion, Plaintiff's position would have required Jail correctional staff to reject and depart from the recommendations of the medical professionals actively treating Mouradian, and it would require Jail staff to indefinitely confine an inmate on suicide watch if the inmate has *ever* made a suicidal statement—regardless of whether the inmate *remains* suicidal. Such a result ignores the facts and circumstances that must be considered when analyzing objective reasonableness; namely, the prevailing penal circumstances at the facility, accounting for the need to preserve internal order and discipline and to maintain institutional security. *Wallmow*, 99 F.4th at 391.

Contrary to what Plaintiff implies, a history of suicidal ideations and general distress is categorically insufficient to warrant placing an inmate on suicide watch indefinitely. *Wallmow*, 99 F.4th at 391 (noting that an inmate's "general distress and history of psychiatric treatment" only serves to place a reasonable officer on notice of general distress and a history of psychiatric treatment, *not risk of suicide*). In fact, if Jail staff had done so, Mouradian may possibly have argued that his constitutional rights were being unreasonably violated by Jail staff's continued deprivation of his right to certain materials, such as blankets, sheets, clothing, etc., for an indefinite period of time without justification.

Moreover, the 13 to 14 minutes that elapsed between when Mouradian began tying a bedsheet to his cell bar doors (2:00 a.m.) to when he was observed by Jail staff (2:13 a.m. for Officer Johnson and 2:14 a.m. for Officer Keller) was less than the typical 15-minute time between checks of an inmate who is on suicide watch. (R. 119 ¶ 26); *see also* Wis. Admin. Code § DOC 350.18(1)(b). In fact, even modified suicide watches sometimes include checks only every *thirty* minutes. (R. 119 ¶ 100). And the evidence is clear that the last check, performed by Officer Johnson, occurred less than one hour before Officer Keller found Mouradian at 2:14 a.m. (R. 119 ¶¶ 158, 168).

Based on the above, the record is clear that the County Defendants were objectively reasonable in (1) deferring to the medical professional's judgments over the course of Mouradian's treatment, and (2) responding to Mouradian's suicide on May 28, 2020. This Court should affirm the District Court's grant of summary judgment.

## II. THE INDIVIDUAL COUNTY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

In the alternative, qualified immunity presents an additional basis upon which this Court may affirm the District Court's grant of summary judgment to the individual County Defendants[3]. At the outset, Plaintiff has waived any arguments against the application of qualified immunity, because it did not address the issue in its moving brief. *See U.S. v. Alvarez-Martinez*, 286 F.3d 470, 475 (7th Cir. 2002) (arguments raised for the first time in an appellate reply brief "are too late."). For

---

[3] The District Court did not reach the County Defendants' qualified immunity argument.

this reason alone, this Court may affirm the District Court's grant of summary judgment. But additionally, under existing precedent, the individual County Defendants' conduct did not violate any clearly established law or rights belonging to Mouradian.

The Seventh Circuit instructs that "[a]lthough the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *Mannola v. Farrow*, 476 F.3d 453, 357 (7th Cir. 2007). Thus, the plaintiff always bears the burden of establishing the existence of a clearly established constitutional right and that it was violated by the public official. *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).

"Government officials performing discretionary functions are immune from suit if their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006). An official is entitled to immunity if, when he acted, "he reasonably could have believed that his action did not violate a clearly established law." *Cham v. Wodnick*, 123 F.3d 1005, 1008 (7th Cir. 1997). A prior case exactly on point is not necessarily required. *See, e.g., Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). However, "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it." *City and Cty. of San Franciso, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015) (internal quotations omitted).

In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (internal citations omitted). In fact, public officials are shielded from suit where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993). Thus, "if officers of reasonable competence could disagree . . . immunity should be recognized." *Malley*, 475 U.S. at 341. This standard "gives government officials breathing room to make reasonable but mistaken judgments" by "protect[ing] all but the plainly incompetent or those who knowingly violate the law." *Ashcroft*, 563 U.S. at 743 (internal quotations omitted).

In determining whether the officers are entitled to qualified immunity, the trial court conducts a two-step inquiry. First, the court must determine whether the disputed conduct violated a constitutional right. *Borello*, 446 F.3d at 746. Second, the court must determine whether the right was "clearly established" at the time of the alleged conduct. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Whether the law was "clearly established" turns on the "objective legal reasonableness of the action" given the contemporaneous legal rules. *Wilson v. Layne*, 526 U.S. 603, 614 (1999). Thus, a defendant government official is entitled to qualified immunity for unconstitutional conduct so long as there could be a reasonable, albeit mistaken, belief about the legality of his or her conduct. *Saucier*, 533 U.S. at 205-06.

Here, qualified immunity shields the County Defendants from liability. The inquiry stops at the first prong of the analysis for all of the reasons discussed in detail above. Nevertheless, even if Plaintiff could establish that there was some violation of Mouradian's constitutional rights, these rights were not clearly established at the time of the alleged conduct. "It is insufficient for a plaintiff simply to point out a recognized constitutional right and claim that the right has been violated." *Borello*, 446 F.3d at 750 (citing *Brosseu v. Haugen*, 543 U.S. 194 (2004)). The Supreme Court instructs that the "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The inquiry is narrow and assesses whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Saucier*, 533 U.S. at 201; *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity [is] whether the law was clear in relation to the specific facts confronting the public official when he acted.").

Without resorting to hindsight or speculation, no reasonable official in the County Defendants' position would believe that their actions would violate Mouradian's constitutional rights. Each time they learned of information suggesting that Mouradian may be at a risk of self-harm, they consulted with trained medical professionals to ensure that Mouradian's needs were addressed. The County Defendants reasonably relied on and deferred to Dr. Hakes, Nurse Jacobson, and each of the medical professionals with whom Mouradian had routine contact to provide appropriate and timely care. Nothing in the record suggests that Mouradian was not

receiving treatment or that he was receiving inadequate treatment—or that the officers had reason to know as much. Similarly, nothing in the record suggests that the County Defendants should have second-guessed the treatment Mouradian was receiving. To the contrary, the record shows that Mouradian received constant and continuous care for his mental illness, and medical staff kept Captain Bowe apprised of their determinations that they had no safety concerns.

Additionally, contemporaneous legal rules confirm the constitutionality of the County Defendants' actions. This Court recently confirmed that an inmate's history of psychiatric treatment – even when accompanied by distress – is insufficient to put officers on notice of an increased risk of suicide. *See Wallmow*, 99 F.4th at 391 (noting that an inmate's "general distress and history of psychiatric treatment" only serves to place a reasonable officer on notice of general distress and a history of psychiatric treatment, not risk of suicide). Other examples abound. In *State Bank of St. Charles v. Camic*, officers knew that the plaintiff-inmate was intoxicated and uncooperative during the booking process, and the plaintiff had actually attempted to assault them. *Camic*, 712 F.2d 1146, 1140 (7th Cir. 1983). At least one officer noted that the plaintiff was "acting in a 'freaky' manner." *Id.* But as a matter of law, this was insufficient to put the officers on notice of a risk of suicide. *Id.*

In *Estate of Novack v. Wood County*, authorities brought the plaintiff to jail and told jail officers during booking that the plaintiff had been at a mental health facility earlier that day and that he was a potential risk of suicide. *Novack*, 226 F.3d 525, 530 (7th Cir. 2000). The plaintiff was also under the care of a psychiatrist, who

called the jail the next day and prescribed medication for the plaintiff. Other inmates told jail officers that the plaintiff was behaving strangely by pounding on the walls of his cell and giggling. *Id.* But no jail officer observed or was aware of any suicidal behavior exhibited by the plaintiff, and the plaintiff told officers during booking that he was not contemplating suicide and had never attempted suicide. *Id.* As a matter of law, this "strange behavior alone, without indications that that behavior has a substantial likelihood of taking a suicidal turn" was insufficient to show that any officer was on notice of a substantial risk of suicide. *Id.*

Similarly, in *Mathis v. Fairman*, the plaintiff was incarcerated in a protective custody tier. During rounds, an officer saw that the plaintiff was mumbling to himself. *Mathis*, 120 F.3d 88, 89 (7th Cir. 1997). The plaintiff then told the officer that someone was going to kill him. The officer decided that the inmate should have a psychological evaluation. Shortly after the officer saw the plaintiff mumbling to himself, a paramedic spoke with the plaintiff and the plaintiff told the paramedic "that he was hearing voices of somebody wanting to kill him or he wanted to kill himself." *Id.* The paramedic requested a psychiatric consultation, during which the plaintiff denied any suicidal impulses and revealed no history of psychological problems. *Id.* at 90. The mental health specialist concluded that the plaintiff was stable and did not need any treatment. *Id.* When the plaintiff was returned to his tier, he remained concerned that someone was going to kill him and called his family expressing this worry. *Id.* Due to the plaintiff's continued concerns, jail staff were

directed to keep an eye on the plaintiff. Staff did visual checks of the plaintiff about every 30 minutes, but the plaintiff still ended up committing suicide.

Ultimately, the *Mathis* Court held that even if officers had not been checking on the plaintiff every 30 minutes, "such a finding would not by itself suffice to" overcome summary judgment. *Id.* at 91. Further, even if the mental health specialist had not communicated her conclusions to jail staff, it was "no matter." *Id.* at 92. And even though the plaintiff's odd behavior continued into the afternoon, there was "no evidence that his behavior changed in a way that made the jail staff aware that he might harm himself." *Id.* As such, the court concluded that "[t]he most that can be said, then, is that Jenkins and his colleagues were negligent in failing to keep a closer eye on Mathis than they did." *Id.* But negligence is insufficient to state a claim under 42 U.S.C. § 1983. *Id.*; *see also Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988).

Precedential case law is replete with additional examples of courts finding that correctional officers acted in an objectively reasonable manner even under facts demonstrating far more evidence of questionable behavior and/or a history of mental health issues. *See, e.g., Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1076 (C.D. Ill. 2010); *Collins v. Seeman*, 462 F.3d 757, 760-61 (7th Cir. 2006); *Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010); *Pulera v. Sarzant*, No. 15-C-461, 2019 WL 2476978 (E.D. Wis. June 13, 2019), *aff'd*, 966 F.3d 540 (7th Cir. 2020).

Accordingly, even when all inferences are taken in Plaintiff's favor, it has not shown that the County Defendants violated any clearly established right in relation

to the specific facts confronting them about Mouradian's condition and needs. For these reasons, the County Defendants are entitled to qualified immunity on the individual capacity claims.

### III. THE DISTRICT COURT PROPERLY DISMISSED PLAINTIFF'S *MONELL* CLAIMS.

As an initial matter, the District Court properly dismissed Plaintiff's *Monell* claims against Jackson County and Sheriff Waldera, because it correctly held that the correctional officer defendants did not violate Mouradian's Fourteenth Amendment rights. (R. 160 at 37) (citing *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020) (citing *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-07 (1997) (claims under *Monell* must be supported by an underlying constitutional violation)). This Court should affirm. But even in the event that this Court holds that the correctional officer defendants are not entitled to summary judgment, Plaintiff's *Monell* claims nevertheless fail as a matter of law.

While the Supreme Court has held that municipalities are susceptible to liability under § 1983, *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), strict constraints limit the liability of Jackson County for the unconstitutional acts of its employees or others under § 1983. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Under *Monell*, municipal liability exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. In other words, a *Monell* plaintiff must show that some municipal action *directly*

*caused* him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021).

A municipality can violate § 1983 (1) through an express policy, statement, ordinance, or regulation that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). However, as a preliminary matter, any *Monell* claim is contingent upon an underlying constitutional violation; without the same, the claim falls flat. *See, e.g., City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."). Despite Plaintiff's best efforts to create one, there is no underlying constitutional violation here for all of the reasons set forth above. Plaintiff's *Monell* claims fail before leaving the gate, and thus the District Court's judgment should be affirmed.

Regardless, even if the Court is inclined to proceed beyond this initial prerequisite, under every theory offered, Plaintiff's *Monell* claims still fail on multiple fronts. As the Supreme Court has explained: "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the [omission in the

policy] and the [federal rights] deprivation." *City of Oklahoma City*, 471 U.S. at 824; *see also Calhoun v. Ramsey,* 408 F.3d 375, 380 (7th Cir. 2005) ("the claim requires more evidence than a single incident to establish liability"). For purposes of a *Monell* claim, "[a] practice is not a random event, and isolated acts by individual employees are not sufficient to establish a widespread practice" of unconstitutional conduct as required to state a claim under § 1983. *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303-304 (7th Cir. 2010). Moreover, the alleged pattern must consist of "*similar* constitutional violations." *Connick v. Thompson*, 563 U.S. 51, 62-3 (2011) (emphasis added). A plaintiff may not "splatter-paint a picture of scattered violations" without common features. *Terry v. Cty. of Milwaukee,* No. 17-cv-1112, 2018 WL 2567721, at *8 (E.D. Wis. Jun. 4, 2018) (citation omitted).

As the District Court for the Western District of Wisconsin explained, "two examples of 'severe sanctions' do not a widespread and well-settled practice make." *Loertscher v. Anderson*, 259 F.Supp.3d 902, 923-924 (W.D. Wis. 2017). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." *Thomas*, 604 F.3d at 303 (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). Two or three examples are "simply not enough" to show a pattern or widespread practice so entrenched and well-known that it carries the force of a municipal policy. *Loertscher*, 259 F.Supp.3d at 924.

On appeal, Plaintiff presents two theories of liability under *Monell*: (1) that the Jail's suicide policy constitutes a harmful practice or custom; and (2) that the Jail's

communications system was a known defect that the County was aware of. (App. Br. at 47-51). Because Plaintiff cannot demonstrate any widespread pattern or practice of unconstitutional conduct and because they cannot produce any evidence of causation, Plaintiff's *Monell* claims necessarily fail.

### A. Plaintiff Cannot Establish that the Jail's "New Policy" (or Any Training or Lack Thereof) Caused Mouradian's Suicide.

First, Plaintiff argues the alleged deficiency of the Jail's suicide policy for the first time on appeal. This Court has previously held that "[t]he failure to draw the district court's attention to an applicable legal theory waives pursuit of that theory" on appeal. *Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 546 (7th Cir. 1994); *see also Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 588 (7th Cir. 1992) ("In general, we will not consider an argument which is presented for the first time on appeal."); *Geva v. Leo Burnett Co.*, 931 F.2d 1220, 1225 (7th Cir. 1991) (holding that an issue not "properly preserved below" in the district court is generally waived). Because Plaintiff presents the argument that the Jail's suicide policy constitutes a harmful practice or custom for the first time on appeal, this argument is waived and should not be considered.

Nevertheless, should the Court decide to evaluate this claim, it still fails due to the lack of any legal or factual support. Plaintiff argues that the Jail's "new policy" was "unclear to most" but fails to cite any portion of the record in support of this conclusory statement. (App. Br. at 47). Plaintiff appears to take issue with the policy's take on placing an inmate on suicide watch; namely, Plaintiff contends that "[t]here is a significant lack of understanding on how, when, and with what approval an officer

is allowed to place an inmate on suicide watch." (*Id.*) According to Plaintiff, Dr. Hakes "believed her role was simply to make recommendations to the sergeant who she deemed to be a danger to themselves, but the County Defendants believed that suicide watch had to first be confirmed by that same mental health professional." (*Id.*) Again, Plaintiff does not cite any portion of the record in support of this statement.

Additionally, Plaintiff misrepresents the Jail's policy in place at the time of Mouradian's death. Plaintiff asserts that JCJ's policy "was that any correctional officer could place an inmate on suicide watch based on articulated facts that the inmate was showing signs of distress." (App. Br. at 18). However, this was the policy until February 2020, when Policy 723 was revised – a point Plaintiff omits entirely. After February 2020 and through to the date of Mouradian's death, JCJ's policy stated that "[i]nmates should only be housed on suicide watch with the approval of a qualified mental health care professional and the Sergeant. If a qualified mental health care professional is not present in the jail, the Sergeant may make the decision to place an inmate on suicide watch but should notify a qualified mental health care professional as soon as practicable, but no less than within 12 hours." (R. 120-1 at 2). Moreover, Captain Bowe confirmed that any staff member could make the initial determination about placement on suicide watch, but then that staff member must communicate that information, with articulable reasons for the placement, to the sergeant or mental health professional. (R. 148 at pp. 1-2, ¶ 1, Response).

This does not demonstrate any confusion. And more importantly, Plaintiff must demonstrate that the policy—or some associated widespread pattern and

practice—directly and proximately *caused* the underlying alleged constitutional violation. *Dean*, 18 F.4th at 236. But Plaintiff has not done so. Plaintiff has not explained how anything in the policy in place at the time of Mouradian's death, or any confusion about it, caused Mouradian's death. Thus, its Monell claim about JCJ's policy fails.

To the extent that Plaintiff also mentions training at various points throughout its brief, and to the extent that Plaintiff intended to assert a *Monell* claim based on training related to the Jail's policies, this also fails. Plaintiff generally alleged in the District Court that Jackson County had inadequate official training policies, that employees were inadequately trained, and that Sheriff Waldera did nothing to correct the inadequacies. (R. 26, ¶¶ 129-130, 134). "[A] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Oklahoma City*, 471 U.S. at 822–23 (plurality opinion)) ("[A] policy of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*."). The Seventh Circuit has written that municipal liability must be "be based on a finding that the policymakers have actual or constructive notice that a particular omission that is likely to result in constitutional violations. Otherwise, we would risk creating *de facto respondeat superior* liability, which is contrary to *Monell*." *Cornfield by Lewis v. Consolidated High School District No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).

In evaluating a failure-to-train claim, the focus must be on the adequacy of the training program, not on an individual's actions. *City of Canton, Ohio v. Harris*, 489

U.S. 378, 390-91 (1989). To adopt any lesser standard would open municipalities to "unprecedented liability under Sec. 1983" and would require "second-guessing municipal employee training programs." *Id.* at 391-92. Thus, a municipality may be liable for its allegedly inadequate training through evidence of "a known pattern of tortious conduct demonstrating the need for additional training, 'rather than a one-time negligen[ce].'" *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm. of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 407-8 (1997)). Evidence of a pattern is required to show that the municipality "has actual knowledge of a pattern of criminally reckless conduct and there is an obvious need to provide training to avert harm…" *Id.* at 733.

And of course, even when inadequate training is established, that inadequate training must cause the injury in question. *Tapia v. City of Greenwood*, 965 F.2d 336, 338-9 (7th Cir. 1992). With respect to the causal connection between the alleged deficiency and any injury, the alleged deficiency in training must be "closely related to the ultimate injury." *Canton*, 489 U.S. at 391. It is not enough to point to something that the County "could have done" to prevent the injury or that more training could have better equipped the officer. *Id.* at 391-92. "After all, in almost every instance where a Sec. 1983 plaintiff has suffered a violation of his constitutional rights by a government employee the plaintiff can point to something the government could have done to protect against that unfortunate incident." *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989).

Any arguments made about deficient training rely on a misrepresentation of the record. For example, Plaintiff incorrectly claims that Jail staff were not trained on suicide prevention until June 2020. But the training materials in the record confirm that during the 2019-2020 training year between July 1, 2019 and June 30, 2020, Scott Bowe and Lucas Johnson received a minimum of three hours off suicide prevention training; Douglas Oates completed at least 2.5 hours of suicide prevention training; and Kaylan Rich completed a minimum of three hours of suicide prevention training. (R. 148 at pp. 24-25, ¶ 77, Response). In other words, although Policy 723 was updated in February 2020, that does not establish that JCJ officers were not trained on suicide prevention, that their training was otherwise insufficient, or that training led to a deprivation of Mouradian's constitutional rights.

It also appears that Plaintiff takes issue with the manner in which JCJ employees were required to acknowledge they reviewed any new policy and broadly concludes that officers *must* have been inadequately trained. (*See*, *e.g.*, App. Br. at 20). Plaintiff's argument is nothing but a red herring. The undisputed facts show that when Juneau County rolls out any updates to its policies, employees are expected to review the policies and acknowledge the same. (Dkt. 119 ¶ 4). While Plaintiff points to the fact that a single officer, Officer Keller, did not acknowledge the May 2020 policy prior to Mouradian's suicide, one tardy acknowledgement does not amount to a constitutional failure on the part of the County to train. Again, one instance does not constitute a pattern, nor does it suggest some failing in the suicide policy or training program.

Additionally, the claim about JCJ's policies (and any related training claim) fails for two crucial reasons: first, Plaintiff cannot establish any "pattern and practice" of any prior similar incidents. As of May 28, 2020, there had only been one other suicide at JCJ: almost a decade earlier, to the day, a female inmate committed suicide at JCJ on May 30, 2010. As discussed above, two or three examples of similar prior incidents are "simply not enough" to show a pattern or widespread practice so entrenched and well-known that it carries the force of a municipal policy. *Loertscher*, 259 F.Supp.3d at 924.

Second, regardless of Plaintiff's attempts to muddy the waters about JCJ's policy and training, the training claim fails because each of the County Defendants had completed all training required by the Wisconsin Law Enforcement Standards Board as of May 28, 2020. In Wisconsin, training of jail officers is governed by state law. The Wisconsin legislature established the Law Enforcement Standards Board to prescribe minimum requirements for jail officer training. *See* Wis. Stat. § 165.85(4)(b). The Board has issued regulations governing jail officer training standards in such areas as maintaining security, supervising inmates, and assisting in healthcare programs. *See* Wis. Admin. Code § LES 3.04.

Where a municipality requires its officers to meet the minimum standards of training under state law, there is no deliberate indifference to training needs. *Schnese v. County of Forest*, No. 19-C-1385, 2021 WL 3711035, at *13 (E.D. Wis. 2021) (citing *Tapia*, 965 F.2d at 339 and *Johnson v. City of Milwaukee*, 41 F.Supp.2d 917, 931 (E.D. Wis. 1999)). Regardless of whether the municipality provided additional or different

training above and beyond the state requirements, "compliance by a municipality with such standards defeats any possibility that a reasonable jury could uphold a charge of deliberate indifference." *Johnson*, 41 F.Supp.2d at 931; *see also Ross v. Town of Austin, Ind.*, 343 F.3d 915, 918-9 (7th Cir. 2003). A plaintiff "cannot avoid summary judgment merely by proving that the injury could have been averted had [defendants] received more or better training." *Ross v. Town of Austin*, No. NA01-0015-C-BG, 2002 WL 31160139, at *8 (S.D. Ind. Sept. 23, 2002), aff'd, 343 F.3d 915. Therefore, any *Monell* theory of liability based on allegedly inadequate training fails.

Moreover, it is undisputed that at the time of Mouradian's suicide, Dr. Hakes had not recommended any precautionary measures, but continued to meet with him weekly. (R. 148 ¶ 148). It is also undisputed that Mouradian displayed no suicidal behaviors in the 24 hours prior to his death which would have indicated that he should have been placed on suicide watch.[4] In fact, Sergeant Rich testified that, at the time of his death, he was not on suicide watch because her "personal observations in interacting with Mr. Mouradian was, things were better than they had ever been during his incarceration period." (R. 148 ¶ 10, Response). As Plaintiff cannot cite anything in the record establishing or even suggesting that Mouradian was displaying suicidal behavior within 24 hours before his death (until the moment he began to commit suicide), Plaintiff cannot establish that any confusion or lack of

---

[4] It is undisputed that the Jail officers "defer to mental health professionals to make decisions for individuals that they're meeting with on a regular basis. And then, also, we would go off of if there were any indicators from officers that there was an issue or that somebody would need to go on a watch." (R. 148 ¶ 9).

training about the new policy language directly caused his death. Thus, Plaintiff's *Monell* claim as to the Jail policy (or training) necessarily fails.

### B. Plaintiff Cannot Establish That the Jail's Communications System Caused Mouradian's Suicide.

Plaintiff also argues that the Jail's communication system was flawed and the County knew about it—again, failing to cite to any portion of the record. (App. Br. at 50). Officer Keller testified in her deposition that it was her belief that there was "an issue with the radios in terms of communicating with the control room from certain parts of the jail." (R. 148 at pp. 53-54, ¶ 166, Response). Moreover, Sergeant Rich testified in her deposition that the radios were known to have "dead spots" "[a]t times." (R. 148 at p. 54, ¶ 167, Response). But there is nothing within the record that supports the statement that it was common knowledge that the "Jail's communication system was flawed," as Plaintiff suggests without support from the record.

Moreover, the record objectively establishes that any radio transmission failure on the night of Mouradian's death did not contribute to Mouradian's death or cause any additional harm. When Officer Keller began her rounds at approximately 2:13 a.m., Officer Johnson simultaneously noticed on the monitors in the Control Room what appeared to be an inmate in E Block who was kneeling next to the cell bars. (R. 119 ¶¶ 115, 169, 170). He radioed Officer Keller and told her to go to E Block. (R. 119 ¶ 171). While she did not receive this radio transmission, at approximately 2:14 a.m.—*one minute* after Johnson's radio transmission—she entered E Block anyway to conduct wellness checks. (R. 119 ¶¶ 172, 173). She then observed

Mouradian in his cell hanging from a sheet from the cell bars of the cell door. (R. 119 ¶ 173). Officer Keller immediately radioed twice to Officer Johnson that she needed assistance for an inmate hanging. (R. 119 ¶ 175). Although she was not sure at the time if Officer Johnson had received her radio transmissions because he did not acknowledge the request, Officer Johnson testified that he *had* received her transmissions and immediately notified dispatch that assistance was needed. (R. 119 ¶ 178). Thus, at most Officer Johnson's radio transmission failure at 2:13 a.m. caused an approximately one-minute delay. Plaintiff has failed to present any evidence—via expert or otherwise—that this one-minute delay caused or contributed to Mouradian's death. Thus, Plaintiff has not established the requisite causation for its *Monell* claim to survive.

## CONCLUSION

For all of the reasons set forth above, this Court should AFFIRM the District Court's dismissal of the Estate's claims against the County Defendants.

Dated this 6th day of October, 2025.

 s/Sara C. Mills
SAMUEL C. HALL, JR.
State Bar No. 1045476
SARA C. MILLS
State Bar No. 1029470
MICAELA E. BRINSLEY
WI State Bar No. 1118840
Attorneys for Defendants-Appellees, Jackson County, Scott Bowe, Lucas Johnson, Linda Keller, and Duane M. Waldera
Crivello, Nichols & Hall, S.C.
710 N. Plankinton Ave., Suite 500
Milwaukee, WI 53203-2404
(414) 271-7722
shall@crivellolaw.com
smills@crivellolaw.com

**CERTIFICATE OF COMPLIANCE**

I hereby certify that:

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32, because this document contains 13,986 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-volume requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point Century Schoolbook.

Dated: October 6, 2025.

       *s/Sara C. Mills*
SARA C. MILLS
One of the Attorneys for Defendants-Appellees