**CASE NO. 25-2132**

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

THE ESTATE OF ANTHONY MOURADIAN, by and through
Special Administrator, Melissa Mouradian,

       Plaintiff-Appellant,

  v.

JACKSON COUNTY, et al.,

       Defendants-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
CASE NO. 23-CV-167
HON. WILLIAM N. CONLEY

**REPLY BRIEF OF PLAINTIFF-APPELLANT**

**CADE LAW GROUP LLC**

Nathaniel Cade, Jr.*
Annalisa Pusick
Attorneys for Plaintiff-Appellant
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

Attorneys for Appellant
*Lead Counsel of Record*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................... ii

TABLE OF AUTHORITIES....................................................iii

ARGUMENT ...................................................................... 6

   I.    SUMMARY JUDGMENT WAS IMPROPERLY GRANTED TO HAKES........ 6

       a.    Mouradian was a Pretrial Detainee, Requiring a Fourteenth Amendment Analysis................................................................ 6

       b.    The Professional Standard Is Inconsistent With A Fourteenth Amendment Analysis Post-Pittman. ........................................ 9

       c.    Assuming The Professional Judgment Standard Applies As Is, Hakes Is Not Deserving Of Deference Because She Ignored Her Own Medical Opinion. ...................................................... 13

       d.    The Estate's Appeal is Rooted in Factual Representations................. 16

   II.   SUMMARY JUDGMENT MUST BE REVERSED WITH RESPECT TO THE COUNTY DEFENDANTS........................................................ 19

       a.    The District Court's Analysis Was Inadequate as it Relates to the Correctional Officers. ........................................ 19

       b.    Qualified Immunity is Inappropriate Here. ........................................ 22

       c.    Monell Liability Extends to Jackson County. ...................................... 25

CONCLUSION .................................................................... 31

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7), FRAP RULE 32(G), AND FRAP RULE 32(C) ........................................... 33

CERTIFICATE OF SERVICE .................................................. 34

# TABLE OF AUTHORITIES

*Acosta v. City of Chicago,*
2018 WL 3630011 (N.D. Ill. July 31, 2018) ............................................ 21

*Anderson v. Creighton,*
483 U.S. 635, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987) ......................... 23

*Ashcroft v. al-Kidd,*
131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011) ............................................ 23

*Border v. Trumbull Cnty. Bd. of Comm'rs,*
414 Fed.Appx. 831 (6th Cir. 2011) ......................................................... 21

*Bradford v. City of Chi.,*
2017 WL 2080391 (N.D. Ill. 2017) ......................................................... 29

*Braun v. Village of Palatine,*
56 F.4th 542 (7th Cir. 2022) ................................................................... 21

*Burwell v. City of Lansing, Michigan,*
7 F.4th 456 (6th Cir. 2021) ..................................................................... 21

*Carroll v. Carman,*
135 S. Ct. 348, 190 L.Ed.2d 311 (2014) ................................................ 23

*Cavalieri v. Shepard,*
321 F.3d 616 (7th Cir. 2003) ................................................................. 24

*City of Canton v. Harris,*
109 S.Ct. 1197 (1989)............................................................................. 28

*Collignon v. Milwaukee Cnty.,*
163 F.3d 982 (7th Cir. 1998) ................................................................... 8

*Dobbey v. Mitchell-Lawshea,*
806 F.3d 938 (7th Cir. 2015) ........................................................... 22, 23

*Dorman v. District of Columbia,*
888 F.2d 159 (D.C.Cir.1989)................................................................... 28

*Eagan v. Dempsey,*
987 F.3d 667 (7th Cir. 2021) ........................................................... 10, 19

*Echols v. Johnson,*
105 F.4th 973, 974-75 (7th Cir. June 27, 2024)...................................... 8

*Est. of Clark v. Walker,*
865 F.3d 544 (7th Cir. 2017) ................................................................. 24

*Est. of Perry v. Wenzel,*
872 F.3d 439 (7th Cir. 2017) ................................................................. 21

*Est. of Williams v. Cline,*
902 F.3d 643 (7th Cir 2018) ................................................................... 22

*Gil v. Reed,*
535 F.3d 551 (7th Cir. 2008) ................................................................ 12

*Gonzalez v. Feinerman,*
663 F.3d 311 (7th Cir. 2011) ........................................................ 11, 14

*Goodloe v. Sood,*
947 F.3d 1026 (7th Cir. 2020) ...................................................... 10, 14

*Greeno v. Daley,*
414 F.3d 645 (7th Cir. 2005) ........................................................ 11, 14

*Hall v. Ryan,*
957 F.2d 402 (7th Cir. 1992) ................................................................ 24

*Harlow v. Fitzgerald,*
457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ........................... 23

*Hinkfuss v. Shawano County,*
772 F.Supp. 1104 (E.D. Wis. 1991) ...................................................... 28

*Johnson v. Jones,*
515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) ......................... 22

*Johnson v. Rimmer,*
936 F.3d 695 (7th Cir. 2019) ................................................................ 11

*Jones v. Chicago,*
856 F.2d 985 (7th Cir. 1988) ................................................................ 25

*Kemp v. Fulton County,*
27 F.4th 491 (7th Cir. 2022) .................................................................. 8

*Kingsley v. Hendrickson,*
576 U.S. 389 (2015) ............................................................................... 8

*Landstrom v. Illinois Dep't of Children & Family Servs.,*
892 F.2d 670 (7th Cir. 1990) ................................................................ 23

*Lankamer v. Lalley,*
2024 WL 4119152 (N.D. Ill. Sept. 9, 2024 ............................................ 21

*Lewis v. Downey,*
581 F.3d 467 (7th Cir. 2009) ............................................................. 6, 9

*Milestone v. City of Monroe,*
665 F.3d 774 (7th Cir. 2011) ................................................................ 25

*Monell v. Dept. of Social Servs.,*
436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d. 611 (1978) ......................... 25

*Neely v. Garza,*
2017 WL 959014 (N.D. Ill. Mar. 13, 2017) ........................................... 21

*Ortiz v. Webster,*
655 F.3d 731 (7th Cir. 2011) ........................................................ 13, 20

*Paine v. Cason,*

678 F.3d 500 (7th Cir. 2012) ................................................................ 22

*Pearson v. Callahan,*
555 U.S. 223, 129 S. Ct. 808, 172 L.Ed.2d 565 (2009) ........................... 23

*Petties v. Carter,*
836 F.3d 722 (7th Cir. 2016) ................................................................ 10

*Pittman by & through Hamilton v. Madison Cnty., Illinois,*
108 F.4th 561 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025) ........passim

*Sanville v. McCaughtry,*
266 F.3d 724 (7th Cir. 2001) ................................................................ 24

*Smith v. Whitsel,*
134 F.4th 962 (7th Cir. 2025) ............................................................... 22

*Snukis v. Taylor,*
2022 WL 2305697 (S.D. Ind. June 27, 2022) ......................................... 21

*Thomas v. Dart,*
39 F.4th 835 (7th Cir. 2022) ................................................................... 8

*Thomas v. Town of Davie,*
847 F.2d 771 (11th Cir. 1988) ............................................................... 27

*Wilber v. Hepp,*
16 F.4th 1232 (7th Cir. 2021) ................................................................. 9

*Williams v. Rodriguez,*
509 F.3d 392 (7th Cir. 2007) ................................................................ 20

*Zaya v. Sood,*
836 F.3d 800 (7th Cir. 2016) ................................................................ 10

## ARGUMENT

The district court erred when granting Hakes and the County Defendants' summary judgment motions. First, the district court erroneously analyzed the motion under the guise that the Fourteenth Amendment applies the professional judgment standard, which considers a professional's subjective state of mind. Second, even if the professional judgment standard applies to the Fourteenth Amendment, the district court erroneously side-stepped binding precedent that precludes the standard from applying based on Hakes' conduct. Third, the district court erroneously applied deference to Hakes, requiring an incompatible subjective analysis. Finally, the district court failed to consider the County Defendants' inadequacies in observing Mouradian properly which prevents the County Defendants from avoiding liability. This Court should reverse.

## I. SUMMARY JUDGMENT WAS IMPROPERLY GRANTED TO HAKES. [1]

### a. Mouradian was a Pretrial Detainee, Requiring a Fourteenth Amendment Analysis.

Mouradian was a pretrial detainee. The Fourteenth Amendment applies to those individuals who have not yet been sentenced for a crime. In contrast, the Eighth Amendment applies after formal adjudication, requiring both a conviction and sentence. *See Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009) (discussing that the

---

[1] Hakes suggests the Estate has not challenged the district court's decision to relinquish jurisdiction over its state law claims. Hakes Br., at 25, n.3. However, pursuant to Wis. Stat. Sec. 893.15(3), the statute of limitations for state claims is tolled during the pendency of a federal appeal. Therefore, subject matter jurisdiction over the state law claims were never required to be challenged on appeal to be preserved.

Eighth Amendment applies after a formal adjudication, which requires a conviction and sentence.) The district court appeared to initially concede that the Fourteenth Amendment applied by stating, "[f]or the purposes of the court's analysis at summary judgment, the court will apply the Fourteenth Amendment standard…" but then applied the Eighth Amendment to Hakes, awarding her a level of deference that is not owed. R. 160, p. 27, 28. The Estate challenges the inability for the district court to choose a lane and employ a standard that comports with the Fourteenth Amendment.

Hakes argues that the Eighth Amendment should apply and incorrectly suggests that a court has <u>discretion</u> to decide whether to apply the Eighth or Fourteenth Amendment to the facts of this case. Hakes Br., at p. 26, 30 ("In the context of a claim for inadequate medical care under the Eighth <u>or</u> Fourteenth Amendment….")(emphasis added). Even assuming Hakes' argument relates back to precedent where the standard for professional liability under the Eighth and Fourteenth Amendments were conflated, she must confront the status of the law today. Hakes and the district court are guilty of mingling the two standards, requiring this Court to make a correction.

Specifically, the district court erroneously relied on the Eighth Amendments' framework despite the Fourteenth Amendment's application to Hakes:

> …the professional judgment standard requires <u>essentially the same analysis as the Eighth Amendment standard</u>: (1) "plaintiff's medical needs must have been objectively serious"; and (2) the defendant's decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment"

> demonstrated by evidence "that the professional knew of the serious medical need" and "disregarded it." *Id*. at 989 …. Moreover, a psychologist's judgment regarding an inmate's mental health needs is entitled to deference. *Scott v. Moss*, No. 24-1479, 2025 WL 48412, *2 (7th Cir. Jan. 8, 2025).

R. 160, at p. 28 (emphasis added).

In support of the above statement, the district court cited cases that used the Eighth Amendment's framework because "the precise scope of the [Fourteenth Amendment's] protections [was] not well settled…." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 987 (7th Cir. 1998). This is not true. The Supreme Court of the United States has held **that there is a difference**, between the Eighth and Fourteenth Amendment standards, rendering *Collignon* inapplicable. *See Pittman by & through Hamilton v. Madison Cnty., Illinois*, 108 F.4th 561, 568-572 (7th Cir. 2024), *reh'g denied*, No. 23-2301, 2024 WL 3889635 (7th Cir. Aug. 21, 2024), and *cert. denied*, 220 L. Ed. 2d 443 (Jan. 27, 2025); *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). There is now a distinction between the two standards as applied in a medical context and the district court failed to address it. *Pittman*, 108 F.4th 561 at 658 ("As we extended *Kingsley* to the failure-to-protect context, we determined that a pretrial detainee does not have to show a defendant's subjective awareness of the risk of harm. See *Kemp v. Fulton County*, 27 F.4th 491, 497 (7th Cir. 2022); *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022); *Echols v. Johnson*, No. 22-3230, 105 F.4th 973, 974-75 (7th Cir. June 27, 2024).").

Hakes, rather than engage with arguments made by the Estate on appeal, regurgitates her arguments made at summary judgment. The only proposition Hakes

proposes with regard to the applicable standard is a blanket statement that the Eighth Amendment must apply because she believes that Mouradian was "neither a pretrial detainee nor a sentenced prisoner," despite conceding that this Court has held that a presentenced detainee is entitled to the broader Fourteenth Amendment protections. Hakes Br., at p. 41-42.[2] In support of her assertion, Hakes cites to a variety of unrelated cases that fall flat. For instance, *Wilber v. Hepp* involved a criminal trial where a defendant pursued postconviction relief asserting that there was insufficient evidence for his conviction and that his counsel was ineffective. 16 F.4th 1232 (7th Cir. 2021). That appeal was deciphering whether the district court's decision to shackle the defendant in front of the jury was inherently prejudicial. *Id.*, at 1253-55. *Wilber* has nothing to do with the classification of a pretrial detainee, nor does in suggest how this Court should handle Mouradian's particular rights. Plus, Hakes does nothing to analogize *Wilber* or any of the other parentheticals to the facts of this case. Hakes Br., at p. 46. They should be disregarded.

The Estate argues that that the Eighth Amendment cannot apply to Mouradian because he is classified as a pretrial detainee who was awaiting sentencing. *See Lewis,* 581 F.3d at 474.

### b. The Professional Standard Is Inconsistent with a Fourteenth Amendment Analysis Post-*Pittman*.

Whether the professional judgment standard applies to claims brought under the Fourteenth Amendment is a question of first impression for this Circuit.

---

[2] County Defendants agree with the Estate that the Fourteenth Amendment is the proper analysis and rely on the Fourteenth Amendment in their brief in response.

Regardless, the Estate's position is that the professional judgment standard is inapplicable to this case because it improperly injects a subjective analysis into an objective Fourteenth Amendment.

Because the Fourteenth Amendment standard no longer contains a subjective prong, due to the holding in *Pittman,* the district court's analysis hinged on a specific fact this Court has already rejected. Unlike here, under an Eighth Amendment claim, a plaintiff must show a subjective element: that a defendant was "deliberately indifferent," i.e., subjectively aware of a strong likelihood of harm. *See, e.g., Eagan v. Dempsey,* 987 F.3d 667, 693-65 (7th Cir. 2021). This Court concluded that a plaintiff **does not** have to show subjective awareness under the Fourteenth Amendment but instead must show that the defendants did not take reasonably available measures to abate the risk of serious harm to the plaintiff, even though a reasonable person under the circumstances would have understood the risk involved. *Id.* The district court's holding was inconsistent with its application of the law and with respect to the analysis it must abide by.

As highlighted in its opening brief, precedent before *Pittman* illustrates that subjective awareness of a risk was a critical element to consider. *See, e.g., Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016) ("A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state…"); *Petties v. Carter*, 836 F.3d 722, 729-30 (7th Cir. 2016) (stating that the professional judgment standard is based on the subjective opinions of the doctor); *Goodloe v. Sood*, 947 F.3d 1026, 1030-1031 (7th Cir. 2020) (explaining that the

10

professional judgment standard relates to the subjective prong of the deliberate indifference analysis); *Greeno v. Daley,* 414 F.3d 645, 654-55 (7th Cir. 2005) (when a medical professional knows his treatment is likely to aggregate the prisoner's condition that is evidence the professional knew of and disregarded the risk, i.e., it shows deliberate indifference); *Gonzalez v. Feinerman*, 663 F.3d 311, 314-15 (7th Cir. 2011) (medical professional's knowledge that current treatment is not working that is evidence the professional knew of and disregarded the risk).

But, that historical lens has shifted with the recent rulings that remove the subjective intent from the Fourteenth Amendment's analysis. The district court's analysis was flawed because there is no subjective element under the Fourteenth Amendment, and its reliance on Hakes' subjective understanding of Mouradian's treatment is grounds for reversible error.

Hakes asserts that the professional judgment standard must apply, and that *Johnson* supports her position because it has utilized post-*Pittman* analysis. But the present case and *Johnson* are dissimilar. In *Johnson* an individual voluntarily committed himself based on his mental health and committed self-injurious wounds while at the treatment facility. *Johnson v. Rimmer*, 936 F.3d 695, 698-703 (7th Cir. 2019). The plaintiff in *Johnson* was visually observed daily in 15-minute increments, met with nursing staff, doctors, discussed his moods, medications, and treatments, and had the resources to examine his hallucinations and self-harm ideation. *Johnson*, 936 F.3d 695, 701-702 (7th Cir. 2019). The day Johnson was removed from one-on-one observation, he had been a patient for over almost one month, had received daily

11

treatment which included safety checks, and was showing signs of improvement. *Id.*, at 702. In contrast, Mouradian was a pretrial detainee and awaiting sentencing; Mouradian was incarcerated, not a self-committed individual seeking exclusive treatment at the time of his suicide. Mouradian was not on suicide watch, did not have daily access to mental health resources, and reportedly struggled with depressive and suicidal thoughts up to the day of his suicide. The fact that Mouradian did receive *some* treatment does not align him to the self-committing individual from *Johnson* who received a plethora of care by multiple doctors and nurses and was not facing consequences of criminal action.

Hakes' point in using *Johnson,* however, was more to suggest that the legal landscape is instructive because the Court applied the same analysis post-*Pittman*. From a legal standpoint, *Johnson's* appeal did focus on an objective analysis. The holding identifies the reasons under which the doctor there took a patient off of on-on-one observation based on whether a reasonable doctor would have made a similar decision when taking the totality of the patient's treatment into consideration: i.e., an objective analysis. Here, the proper inquiry is whether a reasonable psychologist treating Mouradian would have maintained an inconsistent treatment, after identifying deficiencies and not placing Mouradian on suicide watch. The Estate contends a reasonable psychologist would have responded differently. Even more so, a reasonably instructed jury could be positioned to agree.

But this conflict strikes at the very heart of the Estate's contention: the subjective portion of the professional judgment standard – as a whole – does not

comport with the holding in *Pittman* and has shifted the constitutional backdrop that these cases are analyzed from. Current caselaw is inconsistent: if the subjective prong of the Fourteenth Amendment has been removed from the holding in *Pittman*, and the professional judgment standard explicitly considers subjective intent, the professional judgment standard and the Fourteenth Amendment are at odds. Therefore, the district applied the incorrect legal standard, and this Court should instruct as to the current state of the law by reversing.

    **c. Assuming The Professional Judgment Standard Applies as is, Hakes Is Not Deserving of Deference Because She Ignored Her Own Medical Opinion.**

If the Court finds that the professional judgment standard applies to Hakes and is not in need of correcting, the district court's decision still warrants reversal. The district court incorrectly construed the Estate's claim by assuming the Estate's contention was solely rooted in Hakes' failure to put Mouradian on suicide watch. The Estate's claim is that Hakes acted objectively unreasonable by failing to take *any* preventative measures, despite knowing that the current plan for Mouradian was not working. If Hakes knew and identified reasons why Mouradian's plan was failing, she was required to make appropriate changes; the failure to do so was objectively unreasonable by any standard.

This Court will not defer to a medical professional's judgment if he or she is disregarding instructions from a specialist **or has changed his or her own opinion**. *See, e.g., Ortiz v. Webster*, 655 F.3d 731, 735-36 (7th Cir. 2011); *Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008). A prison physician's conduct amounts to deliberate

13

indifference when the medical professional knows that her treatment is likely to aggravate the prisoner's condition, *Greeno,* 414 F.3d at 654-55, or she knows that the treatment is not working. *Gonzalez*, 663 F.3d at 314-15. "Put most bluntly, faced with an inmate experiencing ongoing suffering from a serious medical condition, **a prison physician cannot "doggedly persis[t] in a course of treatment known to be ineffective"** without violating the Eighth Amendment." *Goodloe*, 947 F.3d at 1031, citing *Greeno*, 414 F.3d at 655 (emphasis added).

The record is clear that Hakes' treatment of Mouradian was not effective, and Hakes herself identified areas of concern but implemented no strategic plan to change it. Hakes also utilizes facts in a strategic way to suggest that Mouradian was somehow getting better in her care. Stating that "Mouradian appeared to be better than [he] had ever been" or that Mouradian was showing improvement, is displaced when considering the tell-tale signs of depression. Hakes, a touted professional in her field, knows that suicidality and the risk of plans being executed do not have to align with an individual's then state of mind. Hakes' failure to take any preventative measures, especially when she had the ability to have Mouradian recommitted for his breach of the settlement agreement, directly contradicts her opinions that Mouradian would commit suicide under the current treatment plan (that did not change) (R. 151, ¶ 92); that Mouradian had a setback and needs to extend the settlement agreement (R. 151, ¶ 136); that Mouradian may need to go back on the Chapter 51 commitment (R. 151, ¶ 124); that Mouradian would commit suicide if more was not done. *See Ortiz*, 655 F.3d at 735 (deference is not owed to a doctor who ignored his own opinion). Hakes

could have told Northwest Connections that Mouradian was neither taking his medications (R. 151, ¶ 145) and was not maintaining his safety (R. 151, ¶¶ 125), and he could have been reevaluated for a Chapter 51 commitment at any point, yet she refused to do so. R. 151, ¶ 139. Hakes cannot cherry pick the facts that work in favor and suggest that her treatment plan was consistent with what she was observing, but claim that Mouradian had chronic depression, major setbacks, and that he would more likely than not commit suicide.

Furthermore, the district court's analysis similarly cherry-picked details in favor of Hakes and failed to properly analyze the totality of circumstances surrounding whether Hakes disregarded her own opinions or persisted in a course of treatment that she knew was not working. It is undisputed that Mouradian reported symptoms to Hakes ("severe depression," endorsed "passive suicidal ideation and plan, but is void of intent," and his thoughts "evidenced hopelessness and helplessness") in August 2019, September 2019, October 2019, November 2019, December 2019, February 2020, March 2020, April 2020, and May 2020. R. 137, ¶ 59; R. 151, ¶¶ 21-22, 24, 26-27, 31, 33, 39, 41, 43, 45, 50-51, 53, 56, 80, 83, 92, 110, 125, 130, 136, 140, 147. Hakes opined that any changes in Mouradian's presentation following his plea hearing, including the appearance of improvement in interactions and symptoms, is a red flag. R. 151, ¶ 80. Mouradian's February 2020 plea hearing was re-scheduled because Mouradian reportedly was looking around his cell for something to hang himself with. R. 138, ¶ 82. Subsequently, Mouradian told Hakes he would kill himself. R. 138, ¶ 87-89. And then Mouradian was sent out from the

15

Jail on a Chapter 51 commitment. It is undisputed that Hakes opined Mouradian had no "intention of going to prison," she "would not be surprised if he ha[d] a plan to suicide before any transfer to" prison, he would not get better until his depression is addressed from a medication perspective, and that therapy plus medication would not improve Mouradian's symptoms and mood. R. 151, ¶¶ 92, 97. Hakes ignored her documented opinions. R. 137, ¶ 219, 151, ¶ 114, 151, ¶¶ 125, 124, 136 (documenting setbacks with Mouradian's April and July 2020 sentencing hearings.)

The sheer fact that Hakes and the Estate fail to agree to the above facts, *see* Hakes Br., at Sec. VI-VII, only highlights that summary judgment was inappropriate. Hakes on the one hand believes that the Estate's "version of the facts" is improper, but the Estate contends that the facts are obvious when construed in its favor. For these reasons, even if applying the professional judgment standard, Hakes deviated from her opinion of Mouradian's mental health status and never reflected on her failing treatment plan. A well-instructed jury could reasonably find against Hakes. Therefore, this Court should reverse.

### d. The Estate's Appeal is Rooted in Factual Representations.

Finally, Hakes lodges accusations against the Estate for "misrepresenting the records," "omit[ting] key facts," and relying on "speculation." Hakes' Br., at 58-64 (Sec. VI-VIII).

First, Hakes asserts that Mouradian's "attempted" suicide and his determination of suicide are so distinct that they cannot be viewed as medically problematic. Hakes' Br., at 60. Mouradian was a consistent suicide risk based on the

16

statements he was making, and there is no question that Mouradian's suicidal ideation, including his various suicide plans and attempts, are well established from the record. R. 138, ¶ 82-86 (February 21 incident); 92 (Hakes email stating that Mouradian would plan to commit suicide before being sent to prison).

Furthermore, with regard to whether Hakes was required to contact the social worker regarding the 90-day Settlement Agreement, Hakes conveniently avoids the record citation she claims the Estate purposely dodged. *Compare* R. 138, ¶ 96 ("At 8:19 AM – Kennedy states that they are going to do a 90 day Settlement Agreement that requires Mouradian to take all medication as prescribed and continue to meet with Hakes on a weekly basis. If during that 90 day period, he does not follow the terms of the agreement, **they would reevaluate to determine whether or not he needs to be sent back to the hospital for stabilization**. (Hakes Emails, at 47)" *with* Hakes Br. at 60 (discussing Hakes' communication with Stephanie Kennedy)(emphasis added). While Hakes is correct that she does not have the credentials to prescribe or manage Mouradian's medication, she was entirely responsible for monitoring his success, changing his treatment plan when it was running astray from the recommendations of others, and had a duty to report those concerns to the correct individuals.

Continuing on, Hakes draws attention to the Estate's concern that Mouradian was not med-complaint after returning to the Jail. Hakes Br., at 61. Hakes' testimony under oath supports the fact that she did not tell anyone that Mouradian was not med-compliant. (R. 138, citing Hakes Dep. at 207:1-7). The factual assertions made by the Estate at summary judgment were supported by the record, and show as follows:

**April 10, 2020**

110.   Anthony experiencing agitation, shakiness, and is antsy, he believes his medication is making him worse with regard to hopelessness and he cannot relax, he said he is getting worse, he was angry and frustrated, rated his mood a 2 out of 10 and experienced increase in hopelessness thoughts, denied suicidal ideation (SOAP Notes, at 66).

111.   Hakes reports to Bowe and Jacobson that Anthony is fairly agitated and wants to stop the fluphenazine, Anthony endorsed thoughts of hopelessness (Hakes Emails, at 60).

112.   Anthony discontinues his medication without Jacobson's approval. (SOAP Notes at 70 ("he discontinued his fluphenazine on or around 4/10/2024"); (SOAP Notes at 68 (Anthony does not see Jacobson until 4/15/2024).

R. 138, ¶¶ 110-112.

Hakes hopes to make minute details seem outcome determinative when they truly are not. The district court, if taking the facts in the light most favorable to the Estate, should not have abandoned the series of events leading up to Mouradian's death.

Finally, with respect to Dr. Braaksma, Hakes suggest that the Estate is hiding from its expert's testimony and that his testimony proves that Hakes cannot be held liable for her inactions. Hakes Br., at 62-63. Yet, the Estate made clear that Dr. Braaksma's testimony was that Hakes breached the standard of care by not placing Mouradian on suicide watch, R. 106:47:16-48:12; that the standard of care may shift based on the circumstances and whether that risk that a person is likely to commit suicide, *Id.*, at 47:1-12; that Dr. Braaksma stated that Mouradian's statements regarding suicidality were consistently with his behaviors and actions, *Id.*, at 21-27; and that Mouradian's suicide was more than foreseeable. *Id.*, at 27:19-25. Dr. Braaksma's testimony supports a finding that a reasonable psychologist in Hakes' shoes would have treated Mouradian differently.

Herein lies another example of Hakes cherry-picking which facts support her position but, more importantly, highlights to the Court that there are significant disputes issues of fact and law present that the district court failed to engage in. The opinion regarding summary judgment is devoid of analysis regarding much of the arguments made on appeal and should compel this Court to review and reverse.

## II. SUMMARY JUDGMENT MUST BE REVERSED WITH RESPECT TO THE COUNTY DEFENDANTS.

### a. The District Court's Analysis Was Inadequate as it Relates to the Correctional Officers.

County Defendants contend that they cannot be found deliberately indifferent because they relied on Hakes' opinion as a medical professional. County Br., at 19-20. However, any reliance or deference to Hakes' professional judgment does not

extend to the County Defendants ordinary jail staff duties or responsibilities. *See Eagan*, 987 F.3d at 694 (stating the deference applies to "professional judgment of the facility's medical officials on questions of prisoners' medical care." (internal citations omitted) (emphasis added)). Here, however, the challenge is to the observational failures committed by Jail staff the night of Mouradian's suicide.

As stated *supra*, the Estate argues that the Fourteenth Amendment must remove subjective analysis. This Court concluded that a plaintiff **does not** have to show subjective awareness; rather, he must show that the defendants did not take reasonably available measures to abate the risk of serious harm to the plaintiff, even though a reasonable person under the circumstances would have understood the risk involved. *Id*. The core argument for the Estate is not that the County Defendants could not or did not request information from Hakes, Jacobson, or any other Jail medical personnel, and utilize their opinions when observing Mouradian. The concern is the *lack of observation* on Mouradian *despite knowing* that he presented a serious suicide risk.

County Defendants spend considerable space in their brief arguing that their job was to abide by Hakes' decision making and fail to take account of their duties to observe and protect in the moment that Mouradian effectuated his suicidal plan. County Br., at p. 19-21. Yet, County Defendants never asserted that their duties to visually observe Mouradian would have been burdensome or compromised if they had paid more attention to Mouradian than any of their other duties. *See, e.g., Ortiz*, 656 F.3d at 531 ("The duty to respond reasonably to an arrestee's medical needs is

affected by any police policies that may endanger the well-being of those in custody."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). An officer can be placed on notice of an arrestee's serious medical condition, "either by word or through observation of ... physical symptoms." *Est. of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017); *Braun v. Village of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022)(same). Such knowledge can be learned via personal observation or on what an officer learned from others. *Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *5 (N.D. Ill. July 31, 2018). The Estate had produced sufficient evidence to raise a genuine issue of material fact as to whether the County Defendant officers were on notice that Mouradian presented a serious medical issue and that their failure to observe his conduct on the night of his suicide. The officers had both personal knowledge from Hakes, Captain Rich, and Captain Bowe, among others, regarding Mouradian's suicidality, and had received a plethora of emails and other updates alerting staff of his ongoing mental state.

Courts have recognized that other observed conditions (such as the loss of consciousness, the failure to regain consciousness, difficulty staying awake, slumping over while seated, and the failure to breathe) are indicative of a serious medical need that requires immediate attention. *See, e.g., Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 464 (6th Cir. 2021); *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 Fed.Appx. 831, 837–38 (6th Cir. 2011); *Lankamer v. Lalley*, No. 24 C 506, 2024 WL 4119152, at *5 (N.D. Ill. Sept. 9, 2024); *Snukis v. Taylor*, No. 3:21-CV-00135-TWP-MFB, 2022 WL 2305697, at *7 (S.D. Ind. June 27, 2022); *Neely v. Garza*, No. 15 C

407, 2017 WL 959014, at *8 (N.D. Ill. Mar. 13, 2017). Whether, and when, a defendant officer has notice of an arrestee's serious medical needs is a question of fact. *Est. of Williams v. Cline*, 902 F.3d 643, 650 (7th Cir 2018); *Paine v. Cason*, 678 F.3d 500, 506 (7th Cir. 2012). Shifting the focus on Hakes' treatment plan or whether to place Mouradian on suicide watch does not remove the duty for correctional offices to recognize an immediate medical need and respond to it accordingly. Ultimately, County Defendants cannot escape liability by stating that they simply deferred to Hakes' medical opinion when their duties were to recognize situations requiring immediate response and stay alert during their observation of Mouradian. Because the law clearly establishes that non-medical jail staff may not ignore a detainee in obvious medical distress, *Smith v. Whitsel*, 134 F.4th 962, 965 (7th Cir. 2025), citing *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015), this Court should reverse and remand.

### b. Qualified Immunity is Inappropriate Here.

The district court did not analyze whether County Defendants were entitled to qualified immunity. They now ask this Court to consider it, but the Estate maintains that applying qualified immunity would be improper and cumbersome. *See Johnson v. Jones*, 515 U.S. 304, 319, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995) (explaining that, where the district court does not "state those facts" which led to the denial of qualified immunity, courts of appeals may review that legal determination by "undertak[ing] a cumbersome review of the record" and evaluating the facts "in the light most favorable to the nonmoving party").

Qualified immunity is an affirmative defense that must be pleaded by a defendant official. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S. Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). A defendant is protected from suit unless (1) the plaintiff has established a violation of a constitutional right and (2) that right was "clearly established" at the time of the defendant's allege misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 816, 172 L.Ed.2d 565 (2009). The "very action in question" need not have previously been held unlawful, but, in the light of pre-existing law, the unlawfulness of the action must be apparent. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A prior case that is "precisely on all fours on the facts and law involved here" is also not required. *Landstrom v. Illinois Dep't of Children & Family Servs.,* 892 F.2d 670, 676 (7th Cir. 1990)*; see, e.g., Carroll v. Carman,* 135 S. Ct. 348, 350, 190 L.Ed.2d 311 (2014) (in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate") (quoting *Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011)).

A basic review of precedent demonstrates that qualified immunity cannot apply here. The law clearly establishes that non-medical jail staff may not ignore a detainee in obvious medical distress. *See Dobbey,* 806 F.3d at 941. And even if the detainee was under the care of medical professionals, an officer could not reasonably defer to them if there was reason to believe the detainee was not receiving treatment or the treatment was clearly inadequate. Furthermore, a detainee's right to be free from deliberate indifference to the risk of suicide was clearly established in as early

23

as 1992, if not sooner. In *Hall v. Ryan*, this Court held that jail officials violate a pretrial detainee's constitutional rights when they act with deliberate indifference to a known risk of suicide based on an arrest that occurred in 1986. *Hall v. Ryan*, 957 F.2d 402, 404 (7th Cir. 1992). The Court emphasized that where officials are aware of a substantial risk that a detainee may harm themselves, their failure to take reasonable measures to prevent suicide constitutes a violation of the detainee's Fourteenth Amendment rights. *Id*. at 405-406. Appling the same rationale here, the County Defendants cannot escape liability through qualified immunity because the record demonstrates that Mouradian presented a serious risk of self-harm, and that they failed to enact proper measures to surveille and monitor him on the night of his suicide. Finding otherwise suggests that a man hanging from his cell for nearly 20 minutes does not constitute an obvious medical need, supporting a nonsensical result.

The same outcome has been held in a variety of other similarly situated instances. *See Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003)("The rule that officials, including police officers, will be "liable under section 1983 for a pre-trial detainee's suicide if they were deliberately indifferent to a substantial suicide risk," *Hall v. Ryan,* 957 F.2d 402, 406 (7th Cir.1992), was clearly established prior to 1998."); *see also Est. of Clark v. Walker*, 865 F.3d 544, 552 (7th Cir. 2017)(finding that the right to protect a detainee from suicide "has long been clearly established in [the Seventh] circuit."); *Sanville v. McCaughtry,* 266 F.3d 724, 740–41 (7th Cir. 2001) ("There can be little debate that it was clearly established, long before 1998, that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if

24

they were deliberately indifferent to a substantial suicide risk.") There is no question that the County Defendants had notice that failing to act objectively reasonable toward that risk was clearly established before May 2020. Qualified immunity must be denied.

### c. *Monell* Liability Extends to Jackson County.

The Estate maintains that Jackson County and Sheriff Waldera are liable under *Monell*[3] for two reasons: (1) the suicide policy in effect in May 2020 was deficient and (2) that the Jail knew the radios were unreliable based on various "dead zones" where the radios would fail to pick up a signal within the Jail. Both deficiencies implicate *Monell* liability for failing to employ a policy to protect an individual's safety while confined at the Jail, and for permitting deficient communication tools to officers instructed to protect the Jail's inmates.

A municipality can be a liable if a custom or policy was a cause of the plaintiff's injury. *Jones v. Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). Municipalities generally are not liable under § 1983 unless the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). Importantly, even "a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence of the municipality's failure to act.'" *Woodward v. Corr. Med.*

---

[3] *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed. 2d. 611 (1978).

*Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 406, 117 S. Ct. 1382 (1997)).

The County argues that the district court's analysis was proper in dismissing the Estate's *Monell* claims and likewise argues that the claims fail regardless. The Estate disagrees.

### i.    *Jail Suicide Policy*

First, County Defendants' brief attempts to confuse the issue by stating that the Estate is "misrepresenting" the suicide policy. Ironically, the Estate's proof that the suicide policy was not only deficient, but unconstitutionally so, is evidenced through its own testimony and recordkeeping. The Jail suicide policy was replaced one month before Mouradian's suicide. R. 138, ¶¶ 66-67. Notwithstanding zero live training on the new policy, the officers were required to "acknowledge" the existence of the new policy, presumably acquiescing that they reviewed, understood, and would comply with the requirements moving forward. An acknowledgement in this sense was on a virtual platform. R. 138, ¶ 71. Yet, an alarming number of Jackson County officers failed to acknowledge the change in suicide policy, including Appellee Linda Keller. R. 138, ¶ 72.

Even more concerning is that the County Defendants were unclear on both the prior and newly enacted suicide policy and could not articulate the proper requirements for placing an inmate on suicide watch. County Defendants all believed under the newly enacted Policy 723 that suicide watch required the approval of a qualified mental health professional and a sergeant. Captain Rich testified that Jail

officers "defer to mental health professionals to make decisions for individuals that they're meeting with on a regular basis. And then, also, we would go off of if there were any indicators from officers that there was an issue or that somebody would need to go on a watch." R. 138, ¶ 9. The reason that Jail staff would assume they defer to mental health professionals to make decisions for inmates was mostly because the Jail only assesses inmates at the intake stage to decipher if someone is exhibiting concerning behaviors; but this is not included in any formal training. R. 138, ¶ 9. There also is no record that Lucas Johnson, the guard in the control room monitoring Mouradian's cell the night of his suicide, was trained on *any* suicide prevention policies until June 2020, noticeably after Mouradian's suicide. Hakes, on the other hand, believed that she was to simply recommend which individuals presented a risk to the Captain. A serious lack in understanding is obvious, and when dealing with suicidal detainees, the consequences are devastating.

This lack of guidance and training in the policy is shown by the handling of Mouradian's signs and symptoms. For instance, before Policy 723 was in effect, staff-initiated suicide watches without Hakes, but once Policy 723 was in effect, supervising staff waited until Hakes recommended inmates like Mouradian be on a suicide watch. For instance, the first time Mouradian was reported to be looking around his cell for a place to tie something to, correctional staff immediately initiated a modified suicide watch. The second time Mouradian was reported to be looking around his cell for a place to tie a towel to, correctional staff did not initiate a modified suicide watch. *See Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir. 1988)

27

(liability may be founded upon proof of a policy of deficiencies in staffing or procedures such that the inmate is effectively denied access to adequate medical care).

In *City of Canton v. Harris,* 109 S.Ct. 1197 (1989), the Supreme Court recognized that under certain circumstances the inadequacy of police training may serve as the basis for § 1983 liability. *Id.* at 1204. Liability attaches, however, only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.; see also Dorman v. District of Columbia,* 888 F.2d 159 (D.C.Cir.1989) (standard applied to failure to train claim in jail suicide case); *Hinkfuss v. Shawano County,* 772 F.Supp. 1104 (E.D. Wis. 1991) (same). The *Harris* Court also adopted a demanding standard of causation: for liability to attach, "the identified deficiency in a city's training program must be closely related to the ultimate injury." 109 S.Ct. at 1206. Stated differently, and applicable here, this Court must ask whether the suicide policy and training in question was adequate and, if it was not, whether such inadequate training "can justifiably be said to represent Jackson County policy. *Id.* at 1205. The Estate argues that is absolutely represents Jackson County policy and the failure to train and understand it properly led to a constitutional deprivation. Additionally, the *Harris* Court explained that

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees *the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.*

*Id.*

The failure to properly train the officers on the new policy is unconstitutional because, under that new policy, if trained properly, Mouradian more like than not would have been placed on a form of suicide watch or the correctional staff would have recognized the signs imperative to prevent further harm from occurring in the first place. *See Bradford v. City of Chi.*, 2017 WL 2080391, at *4–5 (N.D. Ill. 2017) (Durkin, J.) (noting a plaintiff in a jail suicide case need not allege more than one instance of suicide and denying motion to dismiss where the City of Chicago failed to monitor at-risk detainees). The failed training and implementation of its suicide policy warrants reversal of the district court because a reasonably instructed jury could determine that the change in suicide policy and the inconsistency among the County Defendants in acknowledging such changes led to a constitutional injury.

### ii. *Dead Zone Radios*

Second, County Defendants contend that the systematic problem with the radios was not a well-known issue. County Br., at 50. The Estate likewise disagrees because testimony of the County Defendants prove that this issue was pervasive and known.

Two individuals were deposed and identified that the radios were faulty. The first is Captain Rich, who was Jackson County's corporate deponent. She testified that the Jail knew about the radios having signal problems before Mouradian's suicide:

Q:    What do you mean, there are issues with signals?
A:    Sometimes if, depending on where you are in the jail – obviously, in a building with steel and concrete, you don't always get a

29

transmission. And that was one of the reasons that when patrol got new radios, I pushed to get their olds ones.

Q:    Because you knew that there was an issue?
      [Objection to form]
Q:    You're shaking your head. Is that a "yes"?
A:    Yes.
Q:    And so it was known that there was, essentially, for lack of a better word, dead spots with regards to communication in the jail?
      [Objection to form]
A:    At times, yes.

R. 99, at 87:5-20.

The second deponent was Linda Keller, who testified that the radio dead zones were common knowledge and were problematic with respect to the control room duties. When asked about her first noticing Mouradian hanging in his cell, Keller testified as follows:

Q:    Did you try using your radio at that point?
A:    Yes. I yelled. I don't know if I yelled first or if I used my radio first. I yelled his name twice and I radioed twice for help.
Q:    And the radio did work or did not work?
A:    Apparently it did work, but I did not know it worked.
Q:    Explain that, please.
A:    So when I radioed for help, I never heard an acknowledgment from Officer Johnson. So I radioed again, still didn't hear an acknowledgement. Then I rand won the corridor to the direct hallway to control and just yelled, and he said he heard me and he has like an ambulance and officers coming. So he obviously heard me, but I could not hear his acknowledgment on my radio.

.....

Q:    And the issues with the radios, is that issue still there today?
      [Objection]
A:    That I'm not 100 percent sure of, if that issue is still an issue.

30

> Q:     Okay. But at least as of May 2020, it was known there was an
> issue with the radios in terms of communicating with the control
> room from certain parts of the jail?
>
> A:     Yes. I believe it was known.

R. 101, at 88:21-90:3.

The dead zones were a known and persistent issue at the Jackson County Jail, and one that was recognized by policy making officials. The lack of proper communication for correctional officers who are sworn to protect and observe those in their custody is sufficient for a constitutional harm. This Court should reverse because a reasonable jury could agree.

## **CONCLUSION**

Plaintiff-Appellant respectfully requests that this Court REVERSE the district court's grant of summary judgment in favor of the Defendants-Appellees Jackson County, Scott Bowe, Linda Keller, Lucas Johnson, and Ashley Hakes for the reasons stated on appeal and REMAND for a trial on the merits of the Estate's Fourteenth Amendment claim against the County Defendants and Hakes, *Monell* claim against the County, and state law claims.

Dated this 27th day of October 2025.

Respectfully submitted,

**CADE LAW GROUP LLC**

By: */s/Annalisa Pusick*
Nathaniel Cade, Jr.
Annalisa Pusick
P.O. Box 170887

31

Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(A)(7), FRAP RULE 32(G), AND FRAP RULE 32(C)</u>

The undersigned counsel of record for Plaintiff-Appellant furnishes the following in compliance with F.R.A.P Rule 32(a)(7) and Cir. R. 32(c):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. Rule 32(a)(7)(B)(ii) and Circuit Rule 32(c) for a reply brief produced with a proportionally spaced font. The length of this brief is less than 7,000 words (the length is 6,947 words).

Dated this 27th day of October 2025.

**CADE LAW GROUP LLC**

By: <u>*/s/Annalisa Pusick*</u>

Nathaniel Cade, Jr.
Annalisa Pusick
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
nate@cade-law.com
annalisa@cade-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of October 2025, I electronically filed the foregoing Reply Brief of Plaintiff-Appellant in Support of Appeal with the Clerk of Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

Dated this 27th day of October 2025.

**CADE LAW GROUP LLC**

<u>By: */s/ Annalisa Pusick*</u>
Nathaniel Cade, Jr.
Annalisa Pusick
P.O. Box 170887
Milwaukee, WI 53217
Phone: (414) 255-3802
Fax: (414) 255-3804
<u>nate@cade-law.com</u>
<u>annalisa@cade-law.com</u>

☑

## CERTIFICATE OF SERVICE
**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___October 27, 2025___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Annalisa Pusick___

☐

## CERTIFICATE OF SERVICE
**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/_____